**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

 ------------------------------------------------------------------------------- X

Towaki Komatsu,                                                    **COMPLAINT**

                                                                   **JURY DEMAND**

                            Plaintiff,

              -vs-

The City of New York, Rachel Atcheson, Marco Carrion, Pinny Ringel,
Shauna Stribula, NYPD Officer Cruz (shield #: 751), NYPD Detective
Galante, NYPD Officer Jerry Ioveno (shield #: 5560), NYPD Detective
Nicholas Mason (shield #: 6995), NYPD Inspector Howard Redmond,
NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John
Doe3 10/26/17, Bill de Blasio, Lawrence Byrne, Jr., Letitia James, Brad
Lander, James O'Neill, Jessica Ramos, Anthony Shorris, Cyrus Vance,
Jr.,

- All of the defendants listed above who are people are being sued in
  their individual and official capacities,

                            Defendants.

 ------------------------------------------------------------------------------- X

# TABLE OF CONTENTS

I.    Preliminary Remarks ....................................................................... 4

II.    Jurisdiction ..................................................................................... 15

III.    Parties ............................................................................................. 15

IV.    Background Facts ........................................................................... 27

     A.   Treatment of Thomas Lopez-Pierre at a town hall meeting that the Mayor conducted in December of 2018 established a precedent in which the Mayor's staff and NYPD illegally barred critics of the New York City government officials from town hall meetings that the Mayor conducted ....................................................... 27

     B.   My illegal exclusion by the defendants since 4/27/17 from public forums that the Mayor conducted mostly with other government officials that were comprised of public town hall meetings, public resource fair meetings, and public hearings as well as a publicity stunt ............................................ 31

     C.   E-mails from Jessica Ramos confirmed that I was being illegally barred prospectively from town hall meetings that the Mayor conducted as an abuse of process and First Amendment retaliation that was tied to my HRA lawsuit as the Mayor's office was illegally being apprised of updates in that sealed lawsuit as early as 4/10/17 that was just 1 day before the Mayor's 4/11/17 public resource fair in Staten Island ........................... 38

     D.   Criticism of the Mayor and other rowdiness were tolerated during the Mayor's 10/4/17 town hall ......................................... 40

V.    Retrospective Facts ....................................................................... 51

     A.   Defendant Ioveno's intervention on my behalf on 11/30/17 that enabled me to attend the Mayor's 11/30/17 town hall .................................... 52

     B.   How David Rem lawfully expressed himself during the Mayor's 2/19/20 town hall, was applauded for that by audience, and was retaliated against for that by Defendant Redmond and the Mayor .............................. 58

     C.   My conversations with David Cole of the ACLU and Arthur Eisenberg of the New York Civil Liberties Union on 10/30/17 about attending public forums that the Mayor conducted ............................. 67

VI.    Legal Standards ............................................................................. 68

VII.   Main Statement of Facts.................................................................................79

    A.  A discussion of e-mail messages sent on 6/28/17 by Defendants Redmond and
        Ramos that are a smoking gun in regards to a conspiracy among them and other
        senior members of the Mayor's staff to illegally prevent me from attending town
        hall meetings that the Mayor conducted within the room in which they were and
        would continue to be conducted.................................................................80

    B.  Whistleblowing objectives I had for attending the Mayor's 10/26/17 town hall.................90

    C.  Facts about the Mayor's 10/26/17 town hall.................................................123

VIII.  Causes of Action..........................................................................................159

IX.   Jury Demand................................................................................................169

X.    Prayer for Relief...........................................................................................169

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.    The following applies throughout this complaint in the interests of brevity:

    a.    Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | ACLU | American Civil Liberties Union |
| 2 | Bronx DA | Bronx District Attorney's office |
| 3 | CCRB | New York City Civilian Complaint Review Board |
| 4 | City Council | New York City Council |
| 5 | City Hall email excerpts | Excerpts from a 374-page PDF file that I was provided on 2/15/19 by the New York City Mayor's office in response to a Freedom of Information Law demand that I submitted to it. Those excerpts correspond to e-mail messages that appear on pages 211 212, and 361 thru 374 in that file. Information shown on those pages was provided to me with redactions. Copies of e-mail messages about me that were sent 4/10/17, 6/28/17, and 6/29/17 appear on those pages. Those e-mail messages partly concern litigation that I commenced against the New York City Human Resources Administration ("HRA") in which I was then involved that are closely related to my claims in this action. Senior members of the New York City Mayor's administration and the head of the Mayor's NYPD security detail (Defendant Redmond) sent those e-mail messages to HRA Commissioner Steven Banks and amongst themselves. Those excerpts are available in a PDF file that is available on the Internet at https://drive.google.com/file/d/16wSpJ7kk-aOtx7Bkg8MeqUpyWd5Io2hR/view?usp=sharing |
| 6 | Defendant City | Defendant City of New York |
| 7 | DHS | New York City Department of Homeless Services |
| 8 | DOE | New York City Department of Education |
| 9 | DOI | New York City Department of Investigations |
| 10 | DOJ | U.S. Department of Justice |

| 11 | DSS | New York City Department of Social Services |
|----|-----|---------------------------------------------|
| 12 | FOIL | Freedom of Information Law |
| 13 | FRCP | Federal Rule of Civil Procedure |
| 14 | HPD | New York City Department of Housing, Preservation and Development |
| 15 | HRA | New York City Human Resources Administration |
| 16 | IAB | The NYPD's Internal Affairs Bureau |
| 17 | K1 | The related federal lawsuit that I commenced against the City of New York, Defendant Nieves, and others in April of 2018 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that my claims in this case relate back to and amplify. The judges in that case refused to grant me sufficient time to file a further amended complaint in that case that would have otherwise enabled me to assert my claims in that case instead of in this case. In fact, Judge Lorna Schofield explicitly directed me to instead commence a new civil action for additional claims that I sought to assert in that case. |
| 18 | K2 | The related federal lawsuit that I commenced against the City of New York, Mr. Banks, and others on 8/14/20 that corresponds to the case of _Komatsu v. City of New York_, No. 18-cv-6510(LLS)(S.D.N.Y.) that is pending appeal and that my claims in this case relate back to and amplify. |
| 19 | K3 | The related federal lawsuit that I commenced against the City of New York, Defendant Redmond, and others on 8/29/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-7046 (ER)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 20 | K4 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 9/13/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-7502(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 21 | K5 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 9/25/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-8004(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 22 | K6 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason and others on 10/5/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-8251(ER)(S.D.N.Y.) that my claims in this case relate back to and amplify. |

| 23 | K7 | The related federal lawsuit that I commenced against the City of New York, Defendant Mason, and others on 10/11/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-8540 (S.D.N.Y.) that my claims in this case relate both back and forward to and amplify. |
|----|----|----|
| 24 | The Mayor | New York City Mayor Bill de Blasio |
| 25 | Mayor's 3/15/17 town hall | The town hall meeting that the Mayor conducted on 3/15/17 in the Chelsea district in Manhattan as New York City Councilman Corey Johnson was its moderator |
| 26 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Jimmy Van Bramer, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |
| 27 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 5/23/17 inside of the Bronx Supreme Court. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 28 | Mayor's 9/8/17 public hearing | The public hearing that the Mayor conducted on 9/8/17 at 2 pm in the Blue Room in City Hall that partly concerned proposed legislation about reforming the NYPD as I was illegally prevented from attending that hearing. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor conducted. |

| 29 | Mayor's 9/14/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Chaim Deutsch, and other government officials as a mostly traditional public forum on 9/14/17 at 2525 Haring Street in Brooklyn. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
|---|---|---|
| 30 | Mayor's 9/26/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilman Dan Garodnick, and other government officials as a mostly traditional public forum on 9/26/17 at 245 East 56th Street in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 31 | Mayor's 9/27/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 9/27/17 at 3940 Broadway in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 32 | Mayor's 9/28/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilwoman Melissa Mark-Viverito, and other government officials as a mostly traditional public forum on 9/28/17 at 1833 Lexington Avenue in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |

| 33 | Mayor's 10/4/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Ritchie Torres, and other government officials as a mostly traditional public forum on 10/4/17 at 2452 Washington Avenue in the Bronx. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum: |
|---|---|---|
| | | **a)** While I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted, |
| | | **b)** Just 1 day after Defendant Mason and another member of the NYPD illegally prevented me from attending a public press conference in front of City Hall that concerned reforming the NYPD. |
| | | **c)** Just 1 day after both Manhattan District Attorney Cyrus Vance, Jr. and Lawrence Byrne, Jr. informed me during a meeting that was conducted at the New York City Bar Association that was partly recorded on audio that they would willfully violate their Fourteenth Amendment affirmative legal duty as law-enforcement officials to intervene on my behalf to uphold my constitutional rights by refusing to do their jobs as I apprised them of crimes that members of the NYPD were committing against me at public forums that the Mayor was conducting and they told me then that they would not do anything about that. |
| | | **d)** Just 2 days after I testified to New York City Councilman Eric Ulrich and others during the public hearing that the City Council's Committee on Veterans conducted in City Hall partly about being illegally barred from public forums that the Mayor conducted. |

| 34 | Mayor's 10/12/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilwoman Rosie Mendez, and other government officials as a mostly traditional public forum on 10/12/17 in a school located at 442 E Houston Street in Manhattan. That school is controlled by the New York City Department of Education. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum by Defendant Stribula and others: **a)** While I continued to have active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted, **b)** While I was engaged in protected activity on 10/12/17 partly by distributing literature containing whistleblowing information against the Mayor's administration and NYPD security detail that I prepared to members of the public as I waited in line with them to attend that town hall before I was illegally coerced by Defendant Stribula to leave that line as she then threatened me by telling me that she would arrange for Defendant Redmond to coerce me to leave that line if I didn't immediately exit it. **c)** While Defendant Stribula flat out lied to my face by claiming that I had turned down offers of legal assistance that she claimed I had received as a result of referrals that I received to legal services organizations. Contrary to her deceit, I never received any offers that to be provided legal assistance. **d)** Just 8 days after Defendant Mason and others illegally prevented me from attending the Mayor's 10/4/17 town hall. |
| --- | --- | --- |
| 35 | Mayor's 10/12/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 10/12/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=seUP48e0KUY |

| 36 | Mayor's 10/18/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilwoman Stephen Levin, and other government officials as a mostly traditional public forum on 10/18/17 at 180 Remsen Street in Brooklyn. That public forum was subject to New York State's Open Meetings Law |
|---|---|---|
| 37 | Mayor's 10/18/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 10/12/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=QJ9MnU8so4E. |
| 38 | Mayor's 10/25/17 resource fair | The public resource meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a traditional public forum on 10/25/17 at Brooklyn College that is located at 2705 Campus Road in Brooklyn. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum by Defendant Redmond and others while I continued to have active litigation against HRA. |
| 39 | Mayor's 10/26/17 town hall | The public resource meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a traditional public forum on 10/26/17 in a public school controlled by the DOE that is located at 350 Fifth Avenue in Brooklyn. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I still had ongoing litigation against HRA. |
| 40 | Mayor's 10/26/17 town hall video | The video recording that the Mayor's office arranged to be recorded of the Mayor's 10/12/17 town hall. That video is available on the Internet at https://www.youtube.com/watch?v=RCqp7aOToOY. |
| 41 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 42 | Mr. Banks | HRA Commissioner Steven Banks |
| 43 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct., New York Cty.) and is being appealed. I asserted claims in that case that my claims in this case relate back to and amplify. Prior to 6/8/17, I asserted claims in that case that concerned illegal acts and omissions that were committed against me by defendants in this action that caused me to have been illegally barred from attending both the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 public resource fair meeting. |

| 44 | NTT Data, Inc. | NTT |
|----|----------------|-----|
| 45 | NYAG | New York State Attorney General's Office |
| 46 | NYCHA | New York City Housing Authority |
| 47 | NYCLU | New York Civil Liberties Union |
| 48 | OCA | New York State Office of Court Administration |
| 49 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 50 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 51 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.      Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's 10/26/17 town hall concerns those that I made to lawfully attend it from within the room in which the Mayor, Mr. Banks, and/or other government officials jointly conducted it as it was conducted, shortly before it began, and shortly after it ended.

3.      References to HRA, DHS, and DSS will be used interchangeably in this pleading for simplicity.

4.      The first page of what appears in the annexed **Exhibit A** is a public notice that the City of New York issued on the Internet for the Mayor's 10/26/17 town hall. That notice contains the following details:

a.      The fact that the Mayor's 10/26/17 town hall would be conducted in Brooklyn on 10/26/17 at 350 Fifth Avenue and begin at 7:30 pm.

b.      The fact that that town hall meeting would be conducted inside of the William Alexander Middle School that was located at that address.

c.      The fact that admission to that event would begin at 6:30 pm and end at 8 pm.

d.      Information about how those who sought to attend that public forum could register in advance to do so.

e.      The identities of some of the government officials and government agencies with which the Mayor conducted that public forum as a mostly traditional public forum.

f.      The identities of various groups that helped to sponsor that public forum.

5.      The second page of what appears in the annexed **Exhibit A** shows an online registration form as I completed it to register in advance with the Mayor's office to attend the Mayor's 10/26/17 town hall. I made it perfectly in the bottom of that registration form that discrimination was the top concern that I sought to discuss while attending that public forum that was subject to my First Amendment and Fourteenth Amendment rights as well as New York State's Open Meetings Law and significant restrictions about how that town hall meeting could lawfully be conducted that are discussed in _Bloomberg v. the New York City Department of Education_, No. 17-cv-3136 (PGG) (S.D.N.Y. Sept. 24, 2019).

6.      The third page of what appears in the annexed **Exhibit A** shows the confirmation report as it appeared after I submitted that online registration form to attend the Mayor's 10/26/17 town hall. That confirmation report clearly states the following:

> Thank you for your RSVPing for our upcoming mayoral town hall. This message will serve as confirmation of your registration.
>
> Doors will open at 6pm and all seats are first come, first serve. Please arrive early to ensure seat availability.

7.      The illegal acts and omissions that were committed against me on 10/26/17 at the site of the Mayor's 10/26/17 town hall that my claims in this complaint concern were committed in relation to my efforts to have exercised my legal right to have done the following:

a.      Lawfully attended that public forum in accordance with my constitutional rights.

b.      Exercised the full extent of my rights while attending it partly by engaging in protected whistleblowing about a broad array of matters of public concern and private matters.

8.      This is a civil rights action to vindicate my rights in response to illegal acts and omissions

that were committed against me on 10/26/17 at the site of public town hall meeting that the

Mayor conducted with other government officials in relation to my efforts to have lawfully

attended it while Defendant Redmond was **a)** the head of the Mayor's NYPD security detail and

**b)** the primary defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB) (S.D.N.Y. Jun.

13, 2018). Since 4/27/17, I was aware of his status as the defendant in _Sherrard v. City of New_

_York_ by having conducted research about him then in the wake of illegal acts and omissions that

he and others committed against me on 4/27/17 that caused me to be illegally barred from

attending the Mayor's 4/27/17 town hall in flagrant violation of my constitutional rights and

other applicable laws. Those who committed such illegal acts and omissions against me on

10/26/17 mostly did so as part of a conspiracy in retaliation against me that was mainly for

protected whistleblowing and litigation activities that I continued to be engaged in against Mr.

Redmond, themselves, other members of the NYPD, members of the Mayor's staff, HRA,

HRA's business partners, Mr. Banks, New York State court officers, and others. Such protected

whistleblowing and litigation activities that this concerns were largely related to my HRA

lawsuit and earlier illegal acts and omissions that were committed against me in flagrant

violation of the Hatch Act (5 U.S.C. §1502(a)(1)) and other laws for the mutual benefit of the

Mayor, members of the City Council, and those who committed such illegal acts and omissions

leading up to the 2017 New York City government election in the interest of extending their job

security and maintaining their access to opportunities to further advance their careers. Such

illegal acts and omissions wee committed against me on the following dates by the defendants in

this action and others in relation to efforts that I previously undertook to exercise my

constitutional rights to lawfully attend and participate in 17 earlier public forums that **a)** would

have otherwise been conducted partly by me on 4/12/17 with respect to a scheduled oral

arguments hearing in my HRA lawsuit that Jeffrey Moszyc of HRA illegally stole from me by engaging in illegal ex-parte communications to request an adjournment and **b)** were partly conducted by the Mayor, Mr. Banks, and others that included public town hall meetings, public resource meetings, public hearings, a publicity stunt that the Mayor conducted on 7/25/17 in a public area of a subway station, and a public press conference on 10/3/17 that about reforming the NYPD:

> 4/12/17, 4/27/17, 5/23/17, 6/8/17, 7/12/17, 7/25/17, 8/30/17, 9/8/17, 9/14/17, 9/26/17, 9/27/17, 9/28/17, 10/3/17, 10/4/17, 10/12/17, 10/18/17, 10/25/17

9.      While committing such illegal acts and omissions against me on 10/26/17 that my claims in this complaint concern, that was done to extend a campaign of harassment, retaliation, and unequal and discriminatory acts against me at public forums dating back to 4/27/17 that the Mayor and other government officials conducted with members of the public in a collaborative manner as the Mayor and such other government officials were running for re-election and using those public forums to try to improve their re-election prospects partly by trying to attract publicity.

10.     The illegal acts and omissions that were committed against me on 10/26/17 as well as on earlier dates that go as far back as to 4/27/17 at public forums that the Mayor conducted with other government officials and continued long after 10/26/17 at additional public forums that they conducted were acts of voter suppression, voter fraud, whistleblower retaliation, a malicious and naked abuse of process, illegal selective-enforcement, standardless discretion, viewpoint discrimination in violation of the Hatch Act, my constitutional rights, federal and New York State criminal statutes, New York State's Open Meetings Law, and other applicable laws that were against me directly and others indirectly largely by illegally depriving the public of relevant and significant information that it could use to make informed voting decisions during the 2017

New York City government elections that I sought to lawfully and widely broadcast by attending

public forums that the Mayor conducted within the rooms in which they were conducted while

they were recorded on video that could amplify and extend the reach of the critical views against

the Mayor's administration, the NYPD, the Mayor's administration's business partners, and

whistleblower news censors in journalism that I sought to lawfully express.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C.

§§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First,

Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.      My claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and

2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and the

illegal acts and omissions that were committed against me that this complaint concerns occurred

in Manhattan and Brooklyn.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a

timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my

claims under New York law.

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State

of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against

all of its enemies indefinitely and without exceptions. I have honored that oath and continue to do so.

2.      At all times relevant herein Defendant Bill de Blasio and Defendant James O'Neill were employees of the City of New York.

3.      At all times relevant herein, **a)** Defendant de de Blasio has been the Mayor of the City of New York, **b)** Defendant James O'Neill was the commissioner of the NYPD, and **c)** Defendant Lawrence Byrne, Jr. was the Deputy Commissioner for Legal Matters for the NYPD. As the commissioner of the NYPD, Defendant O'Neill was among others who were responsible for how the NYPD operated, how the NYPD's personnel were trained, how they were supervised, and how they were disciplined. In his capacity as the Deputy Commissioner for Legal Matters for the NYPD, Defendant Byrne, Jr. was similarly responsible for having the members of the NYPD operate within the bounds of applicable laws while they were on-duty as members of the NYPD. Defendant de Blasio was also partly responsible for how the NYPD operated and was supervised at all times relevant herein partly by having the power to replace Defendant O'Neill as the NYPD's commissioner and set the budget for the NYPD.  In regards to this point, Mr. de Blasio was recorded on video on 11/30/17 during the public town hall meeting that he conducted in Queens as he stated the following:

        "If you have a problem with policing, I am ultimately responsible."

4.      Mr. De Blasio is shown and heard as he made that remark in that video at the elapsed time of 1 hour, 49 minutes, and 19 seconds. That video recording is available on the Internet at https://www.youtube.com/watch?v=CRV0IKbg5tQ.

5.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York

is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to the maintenance of a police force and the employment of police officers.

6.      The following defendants in this action were at all times relevant herein officers, employees, and agents of the NYPD and the City of New York:

> NYPD Officer Cruz (shield #: 751), NYPD Detective Galante, NYPD Officer Jerry Ioveno (shield #: 5560), NYPD Detective Nicholas Mason (shield #: 6995), NYPD Inspector Howard Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, Lawrence Byrne, Jr., James O'Neill

7.      Defendants O'Neill and Byrne, Jr. have retired from the NYPD.

8.      NYPD John Doe1 10/26/17 is a member of the Mayor's NYPD security detail. The next table contains images of how NYPD John Doe1 10/26/17 appeared in video recordings that I recorded on the dates and times listed in that table at the sites of public town hall meetings and public resource fair meetings that the Mayor conducted in Manhattan and Brooklyn as he illegally prevented me with others from attending those public forums.

| # | Filename | Date & Time Recorded | Elapsed Time | Image |
|---|----------|----------------------|--------------|-------|
| 1 | IMG_2736.MOV | 10/18/17 at 5:01 pm | 34 seconds |  |
| 2 | IMG_2857.MOV | 10/25/17 at 12:48 pm | 9 seconds |  |

| 3 | IMG_2881.MOV | 10/26/17 at 7:04 pm | 6 seconds |  |
|---|---|---|---|---|

9.     Additional information about NYPD John Doe1 10/26/1 in regards to the video recordings that I just listed appears in the following table with a link to copies of those video recordings on the Internet:

| Filename | Comments | Link |
|---|---|---|
| IMG_2736. MOV | He is heard in this video as he illegally refusing to intervene on my behalf to enable me to attend the Mayor's 10/18/17 town hall in violation of 42 USC §1986 by refusing to have a NYPD Commanding Officer come to where he and I then were to remedy the fact that he, Defendant Ringel, and others were illegally preventing me from doing so. | https://drive.google.com/file/d/1l9Jbry4NU62uo3kRJXA6jTqoeYfBP3PS/view?usp=sharing |
| IMG_2857. MOV | He is shown in this video as he was helping Defendant Redmond and others in illegally preventing me from being to walk past him to reach the building that hosted the Mayor's 10/25/17 public resource fair meeting. | https://drive.google.com/file/d/1Twochabl-z_otheC-yjwdOyFsta6ka8/view?usp=sharing |

| IMG_2881.MOV | He is shown in this video as he illegally didn't attempt to intervene on my behalf to enable me to attend the Mayor's 10/26/17 town hall as Defendant Ringel, other members of the NYPD near him, and others were illegally preventing me from doing so. This video was recorded in front of the entrance to the school that hosted the Mayor's 10/26/17 town hall that was used to provide access to it to the members of the public who attended that town hall. | https://drive.google.com/file/d/1nHZbp4dlZcYWvCpjMeyG5WOxBkkRWPiL/view?usp=sharing |

10.     The following additional facts apply to the defendants in this action who I identify with John Doe in their names:

      a.     They were people whose real names I don't know.

      b.     They worked for the NYPD at all times relevant herein.

      c.     They appear in video recordings that I recorded on 9/14/17 and/or 10/26/17.

      d.     Most of those defendants appear in the video recordings listed in the next table at the elapsed time shown.

| # | Defendant | Filename | Date & Time Recorded | Elapsed Time |
|---|-----------|----------|----------------------|--------------|
| 1 | NYPD John Doe2 10/26/17 | IMG_1858.MOV | 9/14/17 at | 23 seconds |
| 2 | NYPD John Doe2 10/26/17 | IMG_2884.mov | 10/26/17 at 7:37 pm | 0 seconds |
| 3 | NYPD John Doe3 10/26/17 | IMG_2882.MOV | 10/26/17 at 7:10 pm | 16 seconds |

11.     The faces of the defendants in this action who I identify with John Doe in their names are shown in the following table at the elapsed times in the video recordings to which I just referred and otherwise referred earlier in this complaint:

| # | Defendant | Image | Comments |
|---|-----------|-------|----------|
| 1 | NYPD John Doe2 10/26/17 |   | The first image shown to the left is from the elapsed time of 23 seconds in the video recording that has the filename of "IMG_1858.MOV". He was then illegally condoning the fact that Defendant Mason and others nearby were illegally preventing me from being able to attend the Mayor's 9/14/17 town hall meeting from within the room in which it would be conducted.<br><br>The second image shown to the left is from the very beginning of the video recording that has the filename of "IMG_2884.mov". He was then illegally condoning the fact that Defendant Ringel, Stribula, members of the NYPD nearby, and others were illegally preventing me from being able to attend the Mayor's 10/26/17 town hall meeting. This video was recorded in front of the entrance to the school that hosted the Mayor's 10/26/17 town hall that was used to provide access to it to the members of the public who attended that town hall. |
| 2 | NYPD John Doe3 10/26/17 |  | The image shown to the left is from the elapsed time of 16 seconds in the video recording that has the filename of "IMG_2882.MOV". He was then illegally condoning the fact that Defendant Ringel, Stribula, members of the NYPD nearby that included Defendants Redmond and Galante, and others were illegally preventing me from being able to attend the Mayor's 10/26/17 town hall meeting. This video was recorded in front of the entrance to the school that hosted the Mayor's 10/26/17 town hall that was used to provide access to it to the members of the public who attended that town hall. |

12.     The table shown next contains brief information about as well as links to copies of video

recordings that I recorded with my cell phone on 9/14/17 and 10/26/17 to which I just referred

above.

| # | Filename | Link to video |
|---|----------|---------------|
| 1 | IMG_1858.MOV | https://drive.google.com/file/d/15hEg_yGUEHSDwjktHqVxmEguW dWLsNHF/view?usp=sharing |
| 2 | IMG_2884.mov | https://drive.google.com/file/d/1OvRqHbRb3dkgoC7xRmvxpJV1z7 BzJI7M/view?usp=sharing |
| 3 | IMG_2882.MOV | https://drive.google.com/file/d/1XwM4gAZNUn3GYO_fOJ5ErcYkv 81mPjmV/view?usp=sharing |

13.     Upon information and belief, Defendants Redmond, Mason, and Ioveno, and NYPD John Doe1 10/26/17 were at all times relevant herein members of the NYPD security detail for the Mayor.

14.     At all times relevant herein, Mr. Redmond helped to direct and supervise how the Mayor's NYPD security detail operated.

15.     At all times relevant herein, Defendant Vance, Jr. has been the Manhattan District Attorney and has been responsible for enforcing applicable laws that include New York State's Penal Code in New York City by commencing prosecutions.

16.     At all times relevant herein, Defendant Brad Lander has been a member of the City Council, and employee of the City of New York. He was also the moderator of the Mayor's 10/26/17 town hall.

17.     At all times relevant herein, Defendant Anthony Shorris was an employee of the City of New York and worked for the Mayor's office as the First Deputy Mayor of New York City.

18.     At all times relevant herein, Defendant Letitia James was an employee of the City of New York who worked for it as New York City's Public Advocate.

19.     At all times relevant herein, Defendants, Atcheson, Carrion, Ringel, and Stribula were employees of the City of New York who worked for the Mayor's CAU as Mr. Carrion was the commissioner of the Mayor's CAU.

20.     The next table contains links to the LinkedIn profiles on the Internet for Defendants

Atcheson, Carrion, Ioveno, Ringel, and Stribula that contain summary information about their

careers and educational backgrounds:

| # | Name | Link to LinkedIn Profile |
|---|------|--------------------------|
| 1 | Rachel Atcheson | https://www.linkedin.com/in/rachel-atcheson-517b47a0/ |
| 2 | Marco Carrion | https://www.linkedin.com/in/marco-a-carrion/ |
| 3 | Jerry Ioveno | https://www.linkedin.com/in/jerry-ioveno-512794b/ |
| 4 | Pinny Ringel | https://www.linkedin.com/in/pinny-ringel-24b9045/ |
| 5 | Shauna Stribula | https://www.linkedin.com/in/shauna-stribula-294912a7/ |

21.     At all times relevant herein, Defendants Jessica Ramos was an employee of the City of

New York who worked for the Mayor's office.

22.     The defendants in this action who are people violated oaths that they were required to

take through the illegal acts and omissions that they committed against me on 10/26/17 in

relation to my efforts to lawfully attend the Mayor's 10/26/17 town hall. The specific oaths that

the defendants violated then in regards to me were those that they were required to take upon **a)**

joining the NYPD and/or **b)** otherwise working for the City of New York. Those oaths required

them to swear or affirm that they would perform their duties as members of the NYPD and/or

other personnel of the City of New York in accordance with the U.S. Constitution and New York

State Constitution to the best of their abilities. In regards to this point, the Mayor's press office

made a transcript available on the Internet of a swearing-in ceremony for new members of the

NYPD that the Mayor presided over on 10/8/15. That transcript is available on the Internet at

https://www1.nyc.gov/office-of-the-mayor/news/702-15/transcript-mayor-de-blasio-delivers-

remarks-nypd-swearing-in-ceremony.

23.     The next screenshot shows an excerpt from that transcript that reflects how those new

members of the NYPD pledged to uphold the U.S. and New York Constitution and to faithfully

discharge their duties as members of the NYPD to the best of their abilities after the defendant in

this action who are members of the NYPD most likely did the same before they committed

illegal acts and omissions against me that this action concerns. Hindsight therefore confirms that

they lied in the oaths that they took upon joining the NYPD to become part of a criminal mob as

liars and con artists instead of joining the ranks of actual law-enforcement.

**Mayor:** I do hereby pledge – I'm sorry, I should say repeat after me – I do hereby pledge and declare –

**Recruits:** I do hereby pledge and declare –

**Mayor:** – to uphold the Constitution of the United States –

**Recruits:** – to uphold the Constitution of the United States –

**Mayor:** – and the Constitution of the State of New York –

**Recruits:** – and the Constitution of the State of New York –

**Mayor:** – and faithfully discharge my duties –

**Recruits:** – and faithfully discharge my duties –

**Mayor:** – as a New York City Police Officer –

**Recruits:** – as a New York City Police Officer –

**Mayor:** – to the best of my ability –

**Recruits:** – to the best of my ability –

**Mayor:** – so help me God.

**Recruits:** – so help me God.

24.     In a similar vein, other personnel of the City of New York are required upon working for

the City of New York by New York State Civil Service Law §62 to take and file an oath or

affirmation in which they pledge and declare that they will support the U.S. and New York State

Constitution and faithfully discharge the duties of their jobs with the City of New York to the

best of their abilities. The terms of New York State Civil Service Law §62 are shown on the New

York State Senate's web site at https://www.nysenate.gov/legislation/laws/CVS/62. The

following are two relevant excerpts from that law:

a.     "Every person employed by the state or any of its civil divisions, except an employee in the labor class, before he shall be entitled to enter upon the discharge of any of his duties, shall take and file an oath or affirmation in the form and language prescribed by the constitution for executive, legislative and judicial officers, which may be administered by any officer authorized to take the acknowledgment of the execution of a deed of real property, or by an officer in whose office the oath is required to be filed. In lieu of such oath administered by an officer, an employee may comply with the requirements of this section by subscribing and filing the following statement: **"I do hereby pledge and declare that I will support the constitution of the United States, and the constitution of the state of New York, and that I will faithfully discharge the duties of the position of ............, according to the best of my ability.** " Such oath or statement shall be required only upon original appointment or upon a new appointment following an interruption of continuous service, and shall not be required upon promotion, demotion, transfer, or other change of title during the continued service of the employee, or upon the reinstatement pursuant to law or rules of an employee whose services have been terminated and whose last executed oath or statement is on file."

(boldface formatting added for emphasis)

b.     "The refusal or wilful failure of such employee to take and file such oath or subscribe and file such statement shall terminate his employment until such oath shall be taken and filed or statement subscribed and filed as herein provided."

25.     On a closely related note, the following shows the terms of New York City Charter Section 435(a) that address the legal duties that all members of the NYPD have and underscores the fact that the defendants in this action who were members of the NYPD on 10/26/17 committed illegal acts and omissions against me in relation to my claims in this case by flagrantly violating and disregarding their legal duties as members of the NYPD:

"**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public** streets, **sidewalks**, parks and places; **protect the rights of persons** and property, **guard the public health**, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all

places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes **to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**.

(boldface formatting added for emphasis)

26.    By committing the illegal acts and omissions against me that my claims in this action concern, the defendants who did so and were then personnel of the City of New York violated New York City Charter §1116 that requires them to be promptly fired and prohibited from working for the City of New York again.

27.    The individual defendants are being sued herein in their individual and official capacities.

28.    At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD, Mayor, Mr. Banks, HRA, and one another at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

29.    The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of plaintiff's rights.

30.    At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

<u>**BACKGROUND FACTS**</u>

1.      I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

2.      In the interests of brevity and pursuant to FRCP Rule 10(c), I incorporate by reference as though fully set forth herein both **a)** the "Background Facts" section and **b)** the "Legal Standards and Additional Background Facts" section that appear in the following:

   a.      The First Amended Complaint that I filed in K4 on 10/5/20. That submission corresponds to docket number 4 in that case.

   b.      The complaint that I filed in K5 on 9/25/20. That submission corresponds to docket number 2 in that case.

   c.      The complaint that I filed in K6. That submission corresponds to docket number 2 in that case.

3.      For the same reasons, I also incorporate by reference as though fully set forth herein the "Background Facts" section within the First Amended Complaint that I submitted in K7 on 10/18/20 that corresponds to docket number 3 in that case. That section begins on page 54 in that submission.

4.      Long before I was first prevented from attending a public forum that the Mayor conducted, a news organization named DNAInfo published a news article on the Internet on 12/18/16 at https://www.dnainfo.com/new-york/20161217/upper-west-side/mayor-de-blasio-town-hall-upper-west-side/ that was written by Carolina Pichardo and is entitled, "De Blasio's Town Hall Initially Bars Media Due to 'Miscommunication'" in which that article reported that members of the press were initially prevented from attending a town hall meeting that the Mayor conducted on 12/15/16 while Mr. Levine was the moderator for that town hall meeting that was a

public forum. That article also reported that someone named Thomas Lopez-Pierre was barred

from that public forum and wasn't eventually permitted to attend that town hall. Mr. Lopez-

Pierre was then a political rival of New York City Councilman Mark Levine who was seeking to

be Mr. Levine's replacement on the City Council. This means that the illegal acts and omissions

that the defendants in this action committed against me in relation to town hall meetings, a

resource fair meeting, and a public hearing that the Mayor conducted were a resumption of

illegal acts and omissions that were part of a municipal custom and practice by members of the

Mayor's office and members of the NYPD to illegally bar people from public forums that the

Mayor conducted in violation of the U.S. Constitution and other applicable laws. The following

is a relevant excerpt from that news article that sufficiently confirms that Mr. Levine and/or

people who acted on his behalf violated the Hatch Act by barring Thomas Lopez-Pierre from that

town hall meeting:

> The local tenant activist Thomas Lopez-Pierre — who is running against Levine for City
> Council — said he was also barred, after registering for the event and receiving a call for
> confirmation from the Mayor's office on Monday.
>
> Levine said Lopez-Pierre has a "violent history" and "has behaved in threatening ways at
> numerous such events."
>
> Levine said there was "some vetting for security concerns," but that a mixture of about two
> dozen community organizations, including nonprofits and NYCHA tenant groups, brought
> their own constituents. There was open registration as well, in which those interested could
> register by calling or emailing a designated number.
>
> Lopez-Pierre said he also spoke to Paola Ruiz, the Manhattan Borough Director for the
> mayor's community affairs unit, on Dec. 6 to directly register for the event.

5.      The next screenshot is from a Twitter posting that Mr. Lopez-Pierre posted on the

Internet at https://twitter.com/VoteLopezPierre/status/809560855151071232 on 12/15/16 at 7:48

pm by using a Twitter account that is registered to him and has the username of

"@VoteLopezPierre". His remarks in that posting sufficiently confirm that Mr. Levine violated the Hatch Act (5 U.S.C. §1502(a)(1)) by causing Mr. Lopez-Pierre to be barred from that town hall meeting and that town hall meeting was illegally conducted inside of a public school in violation of *Bloomberg v. The New York City Department of Education*, No. 17-cv-3136 (PGG) (S.D.N.Y. Sept. 24, 2019).



6.    The next screenshot is from a Twitter posting that a journalist named Brigid Bergin posted on the Internet at https://twitter.com/brigidbergin/status/809555592125759488 on

12/15/16 at 7:27 pm by using a Twitter account that is registered to her and has the username of "@brigidbergin". Her remarks in that posting confirm that she observed Mr. Lopez-Pierre on 12/15/16 as he was being illegally barred from attending the public town hall meeting that the Mayor conducted with New York City Councilman Mark Levine at a time when Mr. Lopez-Pierre sought to be Mr. Levine's replacement on the City Council.



Brigid Bergin
@brigidbergin

Mayor @BilldeBlasio praises @MarkLevineNYC. Thomas Lopez-Pierre who is challening Levine next year was not being allowed in when I arrived

7:27 PM · Dec 15, 2016 · TweetDeck

7.      On a related note, on 12/16/16, a news organization named Pix11 published a news article that was written by a Mario Diaz that is entitled "Demonstrators Brave the Cold to Protest De Blasio's Homeless Policy Outside Town Hall Meeting" and available on the Internet at https://pix11.com/2016/12/16/demonstrators-brave-the-cold-to-protest-de-blasios-homeless-policy-outside-town-hall-meeting/. That article reported the following:

a.      Mr. Lopez-Pierre was prevented from attending the town hall meeting that the Mayor conducted on 12/15/16 with Mr. Levine.

b.      Mr. Lopez-Pierre told a journalist outside of that public town hall meeting on 12/15/16 that though he received confirmation that he would be able to attend that town hall, he was prevented from doing so once officials of Defendant City learned that he was a political candidate who was running against New York City Councilman Mark Levine in an election to become a member of the City Council.

c.      Journalists observed Mr. Lopez-Pierre joking with members of the NYPD outside of that town hall meeting as they left it as temperatures outside were then well below freezing.

d.      d. A press secretary named Rosemary Boeglin for the Mayor thereafter claimed that Mr. Lopez-Pierre skipped a line for entering the school that hosted that town hall meeting in order to cause a scene and that he asked to be arrested then. However, that clearly was a fraudulent pretext that was designed to illegally cover-up the fact that Mr. Lopez-Pierre was illegally barred from that public forum in violation of applicable laws.

8.      Long before Defendant Stribula was among those who illegally prevented me from attending the Mayor's 10/26/17 town hall, I took a photograph of her and Defendant Ringel at 7:46 pm on 4/27/17 near the entrance to the school that hosted the Mayor's 4/27/17 town hall as I was being illegally prevented from attending that public forum by Defendants Redmond, Ringel, Miller, and others as Ms. Stribula was aware of that and didn't intervene on my behalf to enable me to attend that town hall. The next screenshot is from that 4/27/17 photograph and shows Ms. Stribula on the far-left as Mr. Ringel appears near its center.



9.      Hindsight suggests that Ms. Stribula's failure to intervene on my behalf on 4/27/17 to enable me to attend the Mayor's 4/27/17 town hall was a clear sign that she was then a co-conspirator with Defendants Redmond, Ringel, Miller, and others in a criminal scheme to violate my constitutional right to attend that town hall while those conspirators were violating the Hatch Act (5 U.S.C. §1502(a)(1)) in the process partly by engaging in voter suppression, whistleblower retaliation, and viewpoint discrimination against me and the public by extension while the Mayor used that town hall partly as a campaign event to attract publicity and goodwill to bolster his re-election prospects. Prior to that 4/27/17 town hall, Ms. Stribula sent an e-mail message on 4/27/17 at 2:46 pm to various people to communicate work assignments that she was issuing to people who included Defendant Miller for that town hall. Those work assignments partly pertained to tasks that would be performed in granting members of the public access to that town hall. A copy of that e-mail message appears in the annexed **Exhibit B**. I received a copy of that e-mail message on 2/18/20 from Hannah Faddis of the New York City Law Department. The redactions that appear in that e-mail message reflect how Ms. Faddis provided it to me. Also, Defendant City illegally engaged in spoliation of critically significant video recording evidence that it was legally required to have preserved that was recorded on 4/27/17 between 5:30 pm and 6:30 pm by a video security camera that was installed on 4/27/17 by the entrance to the school that hosted the Mayor's 4/27/17 town hall. That video security camera is controlled by the DOE and the video recording that Defendant City illegally didn't preserve was recorded between 5:40 pm and 6:30 pm on 4/27/17 by that specific video security camera.

10.     Additionally, long before Defendant Stribula illegally prevented me from attending the Mayor's 10/26/17 town hall, an eyewitness of mine sent an e-mail message on 6/24/17 at 4:26 pm to a whistleblower news censor in journalism named Graham Rayman and I in which that

witness discussed illegal acts that Ms. Stribula committed against that witness on 6/8/17 during

the public town hall meeting in Rego Park in Queens. That witness asked me to keep that

witness' identity confidential and I agreed to do so. As a result, I will refer to that witness as

"Person X" in this complaint. Person X worked for the New York State Attorney General's

office on 6/8/17 and 6/24/17. It's ironic that this means that Defendant Stribula illegally violated

the constitutional rights of someone on 6/8/17 by refusing to allow that person to access the room

in which the Mayor conducted his 6/8/17 town hall while seating was available in that room as

that town hall was being conducted. In short, the following excerpt from that e-mail message that

Person X sent on 6/24/17 at 4:26 pm about Ms. Stribula, the Mayor's 6/8/17 town hall, and I

confirms that Ms. Stribula illegally subjected me to stigma-plus defamation on 6/8/17 in remarks

that she made to Person X by baselessly referring to me as a "harasser" as I watched Ms. Stribula

and Person X talk in a stairwell in the building that hosted the Mayor's 6/8/17 town hall:

> **Subject:** Re: Information about police misconduct on 6/8 at Mayor's public town hall
> meeting in Rego Park
> **Date:** June 24, 2017 at 4:26:20 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Rayman, Graham" <grayman@nydailynews.com>
>
> I would just like to add that I was allowed to write my question on a card, after which the
> guard told me they would allow me in to ask the question after they reviewed it and people
> emptied the room. As the room emptied, they did not let me in saying that the room was full
> even though we saw empty seats in the TV screens. When I asked a Mayor's staff member
> why they wouldn't let me in, she explained it was because I was associated with Towaki and
> he was a "harasser", but did not explain anything else to me. I think maybe she was
> referencing Towaki's litigation history with different city agencies, but I am not sure since I
> just met him that day. I also think maybe they did not let me in because they did not like my
> question which was about police accountability, but I'm not sure about that since I know
> someone else in the room was allowed to ask a question about broken windows policing.
> Also, please keep my name anonymous. Thanks.

11.     Person X mistakenly expressed in the preceding e-mail message that I had litigation

against different agencies of Defendant City. Although I used my HRA lawsuit prior to 6/8/17 to

pursue entirely valid claims against personnel who worked for Defendant City and were assigned

to different agencies of Defendant City, the sole opposing party in my HRA lawsuit on 6/8/17

continued to be HRA. When I met Person X for the first and only time on 6/8/17 while attending

the Mayor's 6/8/17 town hall from within an overflow room in the basement of the building in

which the Mayor conducted that town hall in a room elsewhere within that building, I then had

ongoing and entirely valid litigation against HRA through my HRA lawsuit and had just

presented oral arguments in that case on 6/7/17 because Jeffrey Mosczyc of HRA illegally

colluded and conspired with New York State Judge Nancy Bannon in between 4/5/17 and

4/11/17 to illegally adjourn the scheduled 4/12/17 oral arguments hearing in that case through an

illegal ex-parte adjournment application that he faxed on 4/5/17 to Judge Bannon's chambers to

illegally prevent me from being able to oppose his illegal adjournment application before Judge

Bannon illegally granted it on 4/11/17 in flagrant violation of my due process rights while she

then was running for re-election as a judge. In hindsight, it appears that Ms. Stribula told Person

X on 6/8/17 that I was a harasser simply because I commenced litigation against HRA in which I

also asserted entirely valid claims on 5/19/17 through an order to show cause application that

concerned illegal acts and omissions that were committed against me on 4/27/17 that caused me

to be illegally prevented from attending the Mayor's 4/27/17 town hall and illegally assaulted by

NYPD Officer Rafael Beato on that date on a public sidewalk next to the school that hosted the

Mayor's 4/27/17 town hall by being shoved 3 times without cause as I lawfully sought to apprise

the Mayor from a sufficient distance away as he left the building that hosted that town hall partly

about the fact that I was illegally barred from that town hall and assaulted by Mr. Beato.

12.     Before she was among others who illegally prevented me from attending the Mayor's

10/26/17 town hall, Defendant Atcheson was recorded on video on 4/27/17 that confirms that she

was present then in the immediate vicinity of where I was near the entrance to the school that

hosted the Mayor's 4/27/17 town hall as Defendants Redmond, Ringel, and Miller were illegally

preventing me from entering that school to attend that town hall from within an overflow room

that was setup for that town hall after I was issued an admission ticket for that purpose. Ms.

Atcheson then was among others who illegally prevented me from attending the public resource

fair meeting that the Mayor conducted on 5/23/17 inside of the Veteran's Memorial Hall

chamber inside of the Bronx Supreme Court while I was conducting myself in an entirely lawful

manner in that courthouse on that date. That was after I registered in advance to attend that

5/23/17 resource fair. I thereafter received video recordings from OCA that were recorded in that

courthouse on 5/23/17 that show Ms. Atcheson as she used a variety of body language toward

me in conjunction with remarks to illegally direct me to move away from the entrance to the

Veteran's Memorial Hall chamber in that courthouse that was then being used to grant other

members of the public access to that public forum. Coincidentally, that 5/23/17 resource fair was

conducted during the U.S. Navy's annual Fleet Week event in New York City while I continued

to be a U.S. Navy veteran and as that 5/23/17 resource fair was conducted in **Veteran's**

Memorial Hall. The next screenshot is from one of the video recordings that I received from

OCA that was recorded on 5/23/17 by a video security camera it controls that is installed inside

of the Bronx Supreme Court. Defendant Atcheson and I appear on the left in that screenshot that

corresponds to the time of 9:30.24.444 am on 5/23/17. Ms. Atcheson was then using her left

hand to illegally direct me to move away from the entrance to the Veteran's Memorial Hall

chamber in that courthouse in spite of the fact that she and I were then in a public corridor in that

courthouse over which she certainly had absolutely no control whatsoever. Andrew Berkowitz of

the Mayor's NYPD security detail also appears in that screenshot as he then had his left hand

near his mouth while apparently engaging in a radio communication by using a device that was

installed near his left wrist. A female member of the NYPD is also shown in that screenshot as

she doing something with a cell phone instead of performing her legal duty to uphold my

constitutional rights by intervening on my behalf to enable me to attend that 5/23/17 resource

fair.



13.     New York State Court Officers Anthony Manzi (badge #: 182), Matthew Brunner (badge

#: 478), and Ramon Dominguez (badge #: 508) all were eyewitnesses to the illegal acts and

omissions that were committed against me on 5/23/17 inside of the Bronx Supreme Court that

caused me to be illegally prevented from attending the Mayor's 5/23/17 resource fair meeting in

it. They then jointly prepared an official report on 5/24/17 that is known as an "Unusual

Occurrence Report" that was submitted to their supervisors. I received a copy of that report from

OCA on 8/28/20 in response to a FOIL demand that I submitted to it.  The first page in that

report contains the following relevant statement about me and the fact that I was illegally

prevented at 9:50 am on 5/23/17 from attending the Mayor's 5/23/17 resource fair by them and

Defendants Atcheson, Gerola, Nieves, and Mr. Berkowitz as all of them then worked as co-

conspirators for that purpose:

> "AT ABOVE T/P/O, THE ABOVE UNKNOWN SUBJECT WAS DENIED ENTRY
> INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY CITY HALL
> STAFF AND MAYOR DEBLASIO'S NYPD DETAIL. SUBJECT WAS ASKED TO
> VACATE THE AREA HE WAS STANDING IN"

14.    No facts in that report exist that indicate that valid grounds existed to bar me from the

Mayor's 5/23/17 resource fair nor move from where I lawfully stood in a hallway in that

courthouse as I waited to be granted access to that public resource fair. Also, prior to being

among those who illegally caused me to be prevented from attending the Mayor's 10/26/17 town

hall by refusing to issue me an admission ticket to do so, Ms. Atcheson also illegally refused to

issue me such admission tickets on 9/14/17 and 9/26/17, and 10/18/17 to enable me to attend the

town hall meetings that the Mayor conducted near the buildings that hosted those public forums

on the dates when they were conducted in spite of the fact that I registered in advance to attend

those town hall meetings and I conducted myself in an entirely lawful manner at the sites of

those town hall meetings on the dates when they were conducted in contrast to her. The

circumstance clearly foreshadowed further such illegal acts by her against at the sites of town

hall meetings that the Mayor conducted on the dates when they would be conducted. That

circumstance was also an indication of an apparent addiction that Defendant Atcheson had to

remaining a faithless servant on account of the fact that she was willfully violating her oath of

office for her job with Defendant City by virtue of how she was illegally treating me at the sites

of public forums that the Mayor conducted. In short, Ms. Atcheson proved to be an incorrigible addict with others who were all addicted to violating my constitutional rights at public forums that the Mayor conducted to steal the 2017 New York City government elections by voter suppression, voter fraud, and whistleblower retaliation largely to protect their careers. An equitable remedy that I hope such addicts promptly receive to cure that addition would entail having them receive the lasting gift that the coronavirus can offer them largely because that would likely greatly improve my chances at the same time of being able to lawfully attend public forums in the future without any unreasonable interference and reduce crime.

15.    E-mail records confirm that senior members of the Mayor's staff received updates about my HRA lawsuit on 4/10/17 in spite and in flagrant violation of the fact that my HRA lawsuit had been sealed at my request since January of 2017 and was still sealed on 4/10/17. The next screenshot is from the e-mail message that appears on page 1 within the PDF file that I'm referring to as "City Hall email excerpts" in this complaint. That e-mail message was sent on 4/10/17 at 5:24 pm by someone named Raquel Lucas in her capacity as a senior assistant for Mr. Banks. That e-mail message was sent to Mr. Banks as well as Defendant Carrion and other senior members of the Mayor's office about me, my litigation against HRA, and my scheduled attendance on 4/11/17 at the Mayor's 4/11/17 public resource fair meeting before I discovered at 9:56 am on 4/11/17 that Mr. Mosczyc and Judge Bannon had illegally conspired and colluded to steal my First Amendment and Fourteenth Amendment right to have testified as scheduled on 4/12/17 in my HRA lawsuit and submit opposition in my HRA lawsuit to oppose the 4/5/17 adjournment application by Mr. Mosczyc before that adjournment could be legally granted just one day after I engaged in parallel litigation against HRA that was assigned to OTDA in its capacity as a New York State administrative appellate forum for claims asserted against HRA.

| From: | Lucas, Raquel |
|---|---|
| To: | Lauter, Rachel; Carrion, Marco A.; Arslanian, Kayla; Rothenberg, Jaclyn |
| Cc: | Banks, Steven (HRA); Yeaw, Jennifer |
| Subject: | Staten Island Resource Fair 4/11 Re: Towaki Komatsu |
| Date: | Monday, April 10, 2017 5:24:02 PM |
| Attachments: | image001.png |

Good Afternoon,

[text redacted]

See below for his case history:

16.     What follows shows an e-mail message that I received on 9/27/17 at 9:49 am that was

sent to me by someone named Judith Lê while she then worked for the CCRB as an investigator.

She sent me that e-mail message in response to an e-mail message that I sent to her on that date

at 9:27 am in which I apprised her that Defendants Gerola, Mason, and Atcheson acted in concert

on 9/26/17 to illegally prevent me from attending the public town hall meeting that the Mayor

conducted then in Manhattan with Mr. Banks and other government officials.  In her e-mail

message to me on 9/27/17 at 9:49 am, Ms. Lê claimed that the Mayor's staff and Mayor's CAU

were then in charge of admittance to town hall meetings that the Mayor conducted.

> **From:** "Le, Judith (CCRB)" <JLe@ccrb.nyc.gov>
> **Subject:** RE: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves at Mayor's 8/30 town hall in Brooklyn
> **Date:** September 27, 2017 at 9:49:27 AM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> Hi Mr. Komatsu,

As we previously discussed, unfortunately, admittance in and out of the Town Hall events falls outside the jurisdiction. Again, if you'd like, I can forward the complaint to Internal Affairs, or recommend that you speak to the Mayor's staff/Community Affairs office, as they are in charge of admittance to the Town Halls.

Best,

Judith Lê

Investigator, Squad 8
Civilian Complaint Review Board
100 Church Street, 10th Floor
New York, NY 10007
(212) 912-2081

17.     On 9/28/17, the Mayor conducted a town hall in Harlem during which members of the audience did a fantastic job of criticizing the Mayor about various matters. They did so after New York City Councilman Bill Perkins urged the audience for that town hall to speak freely about whatever was on their mind during that town has as they addressed the Mayor and other government personnel during it. While urging them to do so, he told the audience that he didn't want its members to feel restrained and to be shy in doing so. He instead then explicitly urged that audience's members to shout out whatever was on their minds as they addressed the Mayor and other government personnel who attended that that town hall. The Mayor's office arranged for that town hall meeting to be recorded on video that is available on the Internet at https://www.youtube.com/watch?v=4s9fYZNLK8o. Mr. Perkins is shown in the next screenshot at the elapsed time of 5 minutes and 37 seconds as he urged the audience members for that town hall to conduct themselves during it in the manner that I just discussed. Mr. Perkins' remarks then were a clear indication that it was certainly permissible pursuant to the First Amendment and Fourteenth Amendment for members of the public to shout their remarks to all government personnel who attended town hall meetings that the Mayor conducted following 9/28/17 because

due process and equal protection was applicable to being able to be as vocal during such

subsequent public forums.



18.     While following the instructions that Mr. Perkins gave during that town hall meeting, a

Black woman rose to the occasion and marched to the center of the room in which the Mayor

conducted that town hall as it was being conducted to lawfully express her irritation about

something to the audience. All of that and more was recorded in the video recording that I just

discussed. The next screenshot is from the elapsed time of 1 hour, 26 minutes, and 2 seconds in

the video recording that I just discussed. It shows the fantastic Black woman on the right to

whom I just referred as she stood and hilariously stole the stage from the Mayor during his

9/28/17 town hall as she raised a finger on her left hand, wore an circular earring on her right ear

and a blue denim jacket as she had her mouth open and had her right hand near her right hip.



19.     The Mayor appears on the right in the preceding screenshot as he wore a white shirt and

stood. Defendant Redmond appears in the upper-left corner in that screenshot. The fantastic

Black woman that I just discussed was very boisterous during that town hall and was permitted

to continue to attend that town hall for more than 30 minutes after she stole the stage from the

Mayor in the manner that I just described and was recorded on video. The next screenshot is

from the elapsed time of 1 hour, 59 minutes, and 10 seconds in that video and shows her again as

she talked to the Mayor while she held a microphone in her right hand and was lawfully

expressing a grievance to him about inadequate public notice that was issued for the Mayor's

9/28/17 town hall.



this program that program and not one bloody flyer was up in East Harlem it's

20.    The next screenshot is from the elapsed time of 1 hour, 59 minutes, and 50 seconds in

that same video as I played it back with the closed-captioning feature enabled. That screenshot

shows that same fantastic Black woman on the far left as she continued to talk to the Mayor

while using a microphone. As she did so, she brilliantly told the Mayor, "you're in with the

criminals". I totally agree with her remark about him and genuinely appreciate her outspokenness

then for having reminded him quite clearly, publicly, and loudly about his status as a criminal

while she stood next to Defendant Redmond. Mr. Redmond promptly thereafter coerced her to

leave that town hall meeting in retaliation for her remarks to the Mayor. Although the Mayor and Defendant Redmond certainly didn't like her remarks to the Mayor then, an excerpt from _Cohen v. California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that appears in this complaint's Legal Standards section confirms that what I just stated about that fantastic Black woman's speech may have been another person's "lyric" at the same time that others objected to it.



21.     The next screenshot is from the elapsed time of 1 hour, 50 minutes, and 37 seconds in that video and shows another fantastic woman as she stood up and assertively addressed the Mayor while lawfully criticizing him about his policies that concern rezoning and affordable housing matters as other members of that audience certainly supported her. At that time, she was a teacher and was schooling the Mayor about his lack of honesty, transparency, accountability, and leadership. I would have loved to have witnessed her addressing the Mayor firsthand as she

did so by having been permitted to exercise my constituonal right to have attended that town

hall from within the room in which it was conducted and seen her face that is not shown in that

video recording. If I had been able to attend that town hall within that room, I would have tried

to lawfully thank her for her criticism of the Mayor and recorded a video of her as she then

delivered her remarks to the Mayor. I had a First Amendment and Fourteenth Amendment right

to have recorded her conversation with the Mayor on video in a way that showed her face and the

defendants in this action.



22.     The next screenshot is from the elapsed time of 1 minute, 51 minutes, and 58 seconds in

that same video as it shows an unknown bald male as he looked in the direction of the video

camera that recorded that video and stood near the woman who had just schooled the Mayor

about his rezoning policies. That bald man whio is shown wearing a pink shirt and dark colored

sportscoat was recorded on video as he was present on 4/27/17 at the site of the Mayor's 4/27/17

town hall near its entrance as I was being illegally prevented from attending it by members of the

NYPD as well as Defendant Miller and Pinny Ringel of the Mayor's CAU. That bald man who wore the pink shirt during the Mayor's 9/28/17 town hall illegally didn't make any effort on 4/27/17 to allow me to attend the Mayor's 4/27/17 town hall as he was aware that I was being prevented from attending it. The totality of the circumstances on 9/28/17 strongly suggests that he was then in the middle of harassing that woman in response to her remarks to the Mayor then in spite of the fact that her remarks to the Mayor then had been protected speech about matters of public concern.



23.     The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 18 seconds in that same video as it shows an unknown Black woman harassing the teacher who schooled the Mayor about his rezoning policies. The bald man who was then wearing a pink shirt and dark colored sportscoat that I just discussed also appears in that screenshot as he also appeared to then be harassing that teacher.



24.    The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 20 seconds in that same video as it shows an unknown female staff member of the Mayor's office on the right as she stood near the fantastic teacher that I have been discussing while she continued to address the Mayor.



25.    The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 6 seconds in that video as it showed Melissa Mark-Viverito, who was then both the Speaker of the City Council and the moderator for that town hall. She was then telling the audience that people have a First Amendment right to **a)** express their views and disagree with others and that **b)** people had a First Amendment right to express their views in that room then.



26.      She made those remarks while I was being illegally prevented from attending that town

hall and before she told me on 9/28/17 as she left that event in front of the building that hosted it

and near a street that didn't know what the NYPD's problems with me were as I apprised her of

the fact that I was illegally prevented from attending that town hall in flagrant violation of my

First Amendment rights as I then expected her to promptly and effectively intervene on my

behalf to immediately remedy that. Instead, she illegally did nothing about that in spite of the

fact that she then had the power to introduce legislation that could have addressed and resolved

that.

27.      I wasn't recorded on video attending the Mayor's 9/28/17 town hall primarily because

Defendants Mason, Ringel, NYPD John Doe1 10/26/17, and others illegally prevented me from

attending that town hall after I arrived to the site of that public forum to do so in accordance with

my constitutional rights.  People who attended that town hall were illegally ejected from it while

that was also recorded on video. That occurred mainly because the Mayor has proven to be

incapable of tolerating valid criticism in contrast to his talents and apparent addiction for

violating civil rights at public forums that is an criminal addition that he appears to share with

several of the other defendants in this action. What I just discussed confirms that I had a

Fourteenth Amendment due process and equal right to attend the Mayor's 10/26/17 town hall

meeting and be as vocal and critical of the Mayor, his administration, and the NYPD as those

who attended the Mayor's 9/28/17 town hall in Harlem were.

28.     On a related note, the next screenshot is a composite that shows **a)** a screenshot on the

left that is from the elapsed time of 21 seconds within a video recording that I recorded on

9/28/17 at 5:58 pm as I lawfully waited in front of a woman named Marie Miranda to be granted

access to the Mayor's 9/28/17 town hall in front of the building in which it would be conducted

on that date with **b)** a screenshot on the right that shows Ms. Miranda as she spoke to the Mayor

during that town hall while attending it from within the room in which it was conducted.



29.     The screenshot on the right in the preceding screenshot is from the elapsed time of 1

hour, 26 minutes, and 36 seconds within the video recording that the Mayor's office arranged to be recorded of the Mayor's 9/28/17 town hall. This screenshot further and overwhelmingly confirms that I had a Fourteenth Amendment due process and equal protection right to have attended that town hall during which Ms. Miranda talked with the Mayor about one of the very same types of housing issues that was among the types of matters that I sought to discuss with government officials while attending the Mayor's 10/26/17 town hall. As she talked with the Mayor during that 9/28/17 town hall, Ms. Miranda told the Mayor that she needed assistance from his administration to contend with a landlord her landlord who wasn't properly maintaining conditions in her apartment building. In response, Vito Mustaciuolo told Ms. Miranda that HPD was suing her landlord. Mr. Mustaciuolo was then a senior member of HPD and I have talked with him face-to-face a few times. Ms. Miranda also told the Mayor then that she and other tenants in her building were suing that same landlord, but she needed conditions in her apartment building to be properly addressed in the interim. The sum and substance of what she discussed with the Mayor was very closely-related to problems that I have had with Urban and HRA in relation to conditions in the building in which I reside about which I sought to have the Mayor commit to immediately remedying while attending the Mayor's 10/26/17 town hall.

## **RETROSPECTIVE FACTS**

1.      This section is comprised of relevant facts about matters that occurred after most of the events occurred that gave rise to my claims in this action. These facts support my claims in this action by hindsight and what they reveal about a propensity and proclivity by the defendants to violate my rights at public forums that the Mayor conducted.

**Facts about my interactions with the defendants on 11/30/17 at the site of the Mayor's town hall on that date**:

2.      To mercilessly and legally kill any possible doubt that anyone may have about whether it's objectively reasonable to infer from the totality of the circumstances that **a)** Defendant Stribula was personally involved with others that included Defendant Ringel in causing me to be illegally prevented from attending the Mayor's 10/26/17 town hall through their acts and omissions, I will next discuss a critically significant video recording that I recorded of Defendants Stribula and Ringel well as NYPD Officer Baez (shield #: 5984) and Harold Miller of the Mayor's CAU on 11/30/17 at 5:30 pm in front of the building that hosted the town hall meeting that the Mayor conducted in Queens as I conducted myself in an entirely lawful manner in stark contrast to Ms. Stribula, Mr. Ringel, Mr. Baez, and Mr. Miller as I stood in front of eyewitnesses that were comprised of other members of the public who were also waiting to attend that town hall.

3.      The next screenshot is from the elapsed time of 3 seconds in a video recording that I recorded on 11/30/17 at 5:30 pm that has the filename of "IMG_3280.MOV" as I stood in front of the building that hosted the public town hall meeting that the Mayor conducted in Queens on that date.



4.     As I recorded that video, I stood in front of other members of the public who also were

lawfully conducting themselves and were also waiting to be granted access to that building to

lawfully attend that town hall. As I recorded that video, I recorded Ms. Stribula, Mr. Ringel, Mr.

Miller, Dustin Ridener of the Mayor's office, and Mr. Baez in it as well as members of the public

who certainly then were eyewitnesses. A copy of that video is available on the Internet at

https://drive.google.com/file/d/1p43pfi4DWQYVZi8b1GkHkcunEoN2Lhm4/view?usp=sharing.

This screenshot shows Defendant Stribula as she was about to tell me again that she was not

allowing me to attend the Mayor's 11/30/17 town hall.

5.     The next screenshot from that same video is from the elapsed time of 5 seconds and

reflects what appears in it as Mr. Miller appears on the right. At that point in that video, Ms.

Stribula was about to tell me that I couldn't attend that town hall simply because she said that she

wouldn't allow me to do so without any additional clarification about that. I had just asked her to

provide me a valid legal basis for why she was attempting to prevent me from attending that

town hall meeting that was certainly a public forum and subject to my constitutional rights and

New York State's Open Meetings Law. How she treated me on 11/30/17 by trying to prevent me

from attending that town hall is comparable to how **a)** she and other defendants treated me on

10/26/17 in regard to my efforts to have lawfully attended the Mayor's 10/26/17 town hall; **b)**

she and defendants Ringel, Atcheson, and others illegally barred me from the Mayor's 10/18/17

town hall; and **c)** Defendants Redmond, NYPD John Doe1 10/26/17, and others illegally barred

me from the Mayor's 10/25/17 resource fair as I was subjected to illegal standardless discretion

by them on 10/18/17, 10/25/17, and 11/30/17 in that regard.



6.      Defendant Stribula never provided me any due process nor an objectively valid legal justification on 11/30/17 about her decision to try to illegally exclude me from being able to lawfully attend the Mayor's 11/30/17 town hall meeting and Mr. Baez, Mr. Miller, Mr. Ringel, and Mr. Ridener certainly made no attempt to enable me to exercise my constitutional right to lawfully attend that town hall. One of the members of the public who was also waiting in line near me as I recorded that video is heard in that video as he agreed to a request that I then made to him to also record what was occurring in his presence with respect to the fact that I was then being illegally prevented from attending that town hall.

7.      The next screenshot from that same video that I recorded is from the elapsed time of 42 seconds and shows Defendant Ringel right after he nodded his head to express agreement with a remark that I made as I was narrating information about what I was then experiencing in regards to being illegally prevented from attending that town hall without being provided an objectively valid legal justification for that. Right before he nodded his head to express that agreement, I stated that I wasn't being provided such a legal justification and showed a printout from a news article that was written by Margo Schlanger, is entitled "The Supreme Court Gives a Subtle Boost to Free Speech", and was published on the Internet at

https://newrepublic.com/article/117925/woodv- moss-subtle-victory-free-speech on 5/28/14 by a news organization named New Republic. That news article focused on the U.S. Supreme Court's decision in _Wood v. Moss_, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014).



8.      The next screenshot is from that same video from the elapsed time of 36 seconds and shows the news article that I just discussed.



9.      The only reason why I was able to eventually able to attend the Mayor's 11/30/17 town hall was because Defendant Ioveno intervened on my behalf to enable me to do so after I apprised both him and New York City Councilman Rory Lancman in front of the building that hosted that town hall about the fact that I was being illegally prevented from attending that town

hall. Mr. Lancman was the moderator for that town hall meeting and flagrantly violated his legal

duty pursuant to 42 USC §1986, the constitutional oath he took to work for the City of New

York, New York City Charter §1116, and NYPL §195.00 to have attempted to intervene on my

behalf to enable me to attend that town hall. Mr. Ioveno then intervened on my behalf by briefly

talking with Defendant Carrion and Mr. Ridener on a sidewalk before he returned to where I was

and told me that I would be able to attend that town hall. I had a Fourteenth Amendment due

process and equal protection right on 10/26/17 to have had Mr. Ioveno and other members of the

NYPD to have similarly intervened on my behalf then and overruled those who were illegally

preventing me from attending the Mayor's 10/26/17 town hall to enable me to attend that public

forum.

**Facts about how David Rem lawfully expressed himself during the Mayor's 2/19/20 town**

**hall, was applauded for that by audience, and was retaliated against for that by Defendant**

**Redmond and the Mayor**:

10.     I will next briefly jump forward to a discussion of remarks that were made on 2/19/20 by

another trailblazer named David Rem, who followed the lead of the fantastic Black woman who

attended the Mayor's 9/28/17 town hall and stole the stage from him that I talked about earlier.

Mr. Rem picked up where she left off as Mr. Rem truthfully and refreshingly told the Mayor in

no uncertain terms that he was the "worst Mayor ever" during the town hall meeting that the

Mayor conducted on 2/19/20 in Forest Hills in Queens. The Mayor's office arranged for that

2/19/20 town hall to be recorded on video that is available on the Internet at

https://www.youtube.com/watch?v=5le6DCaxiG8. Along with the discussion that I presented

about the fantastic Black woman who attended the Mayor's 9/28/17 town hall, this discussion

about Mr. Rem is being presented to clearly establish the fact that the Defendants in this action

illegally subjected me to a double-standard with respect to my ability to attend public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted as they illegally discriminated against me and used a fraudulent pretext in doing so as they illegally subjected me to an abuse of process, standardless discretion, and flagrant violation of my First Amendment rights and Fourteenth Amendment rights that pertain to **a)** selective-enforcement that corresponds to the class-of-one theory and is predicated upon an illegitimate animus and invidious discriminatory intent, **b)** due process, and **c)** equal protection. This is proven by the fact that those defendants treated the fantastic Black woman who attended the Mayor's 9/28/17 town hall and that I discussed earlier and Mr. Rem on 2/19/20 much differently than they treated me by allowing them to attend and remain in the town hall meetings that the Mayor conducted on those dates even after they criticized the Mayor and other members of his administration while attending them.

11.    The next screenshot is from that video and shows Mr. Rem at the elapsed time of 1 hour, 37 minutes, and 55 seconds in that video as he **a)** exercised his First Amendment rights by lawfully reminding Bill de Blasio that he was the "worst Mayor ever" and **b)** received cheers from the audience in response for being so honest about that view concerning Mr. de Blasio that I certainly share. Mr. Rem is shown in this screenshot on the right as he stood and wore a hooded sweatshirt that had a red hood, red sleeves, and gray backside. When the Mayor entered the room that hosted that town hall on 2/19/20, he was met with a chorus of boos from its audience. Those who did so besides perhaps Mr. Rem were not forced to leave that town hall. That fact underscored the fact that it is entirely lawful behavior to criticize the Mayor and other government personnel who attend public forums that the Mayor conducts as they're conducted and as such personnel attend them.



12.     The next screenshot is from that same video and shows the Mayor making a hand signal to Defendant Redmond at the elapsed time of 1 hour, 38 minutes, and 23 seconds to criminally retaliate against Mr. Rem in response to Mr. Rem's valid criticism of the Mayor and Richard Carranza during that public forum. Mr. Carranza is the Chancellor of the DOE and was characterized as a racist by Mr. Rem during that town hall. By directing Mr. Redmond then through the use of that hand signal, the Mayor clearly demonstrated that he was acting in concert with Mr. Redmond to have Mr. Rem coerced to leave that town hall in violation of the First Amendment and Fourteenth Amendment with respect to both Mr. Rem as a speaker and those who sought to continue to receive Mr. Rem's speech as he attended that town hall.



13.     The totality of what is shown and heard in that video sufficiently establishes that Mr. de Blasio retaliated against Mr. Rem during that town hall in violation of **a)** Mr. Rem's First Amendment rights, **b)** other laws that include 18 U.S.C. §245(b)(5), NYPL §240.20, and New York State's Open Meetings Law, and **c)** the First Amendment right that other people who shared Mr. Rem's views and didn't share his views had to continue to hear what Mr. Rem had to say during that public forum while both they and Mr. Rem remained in that room as that town hall continued to be conducted.

14.     That 2/19/20 town hall meeting was co-sponsored by a variety of groups instead of having been organized and conducted strictly by the Mayor's office. In her capacity as the moderator of that 2/19/20 hall instead of someone else, Ms. Koslowitz's duties were identical to those that New York City Councilman Corey Johnson performed on 3/15/17 during the town hall meeting that the Mayor conducted. Specifically, just like how Mr. Johnson did on 3/15/17 during the town hall meeting that he then conducted with the Mayor, it was strictly Ms. Koslowitz' job during the Mayor's 2/19/20 town hall to control the length of time that people could speak to the

Mayor after she gave them a chance to do so as that town hall was conducted. The point here is that only Ms. Koslowitz was authorized to interfere with Mr. Rem's lawful freedom of expression that he directed against the Mayor during that 2/19/20 town hall because she was the moderator of that public forum instead of someone else.

15.     This fact is significant largely because though Ms. Koslowitz clearly proved that she does not support the First Amendment as she criticized Mr. Rem in response to him having lawfully exercised his First Amendment rights during that 2/19/20 town hall by criticizing the Mayor and Mr. Carranza, the video recording of that town hall that was recorded as a result of arrangements that the Mayor's office made does not indicate that she communicated anything to end Mr. Rem's remarks to the Mayor during that public forum.

16.     The next screenshot is from that same video and shows Defendant Redmond, Defendant Ringel, Mr. Rem, and the Mayor in it at the elapsed time of 1 hour, 38 minutes, and 25 seconds as Mr. Redmond appears to be clearly scowling to express anger about how Mr. Rem was fabulously criticizing the Mayor in front of an appreciate audience.



17.     Shortly thereafter, Defendant Redmond illegally coerced Mr. Rem to leave that public

forum in violation of his constitutional right to remain in it and continue to receive the cheers

and applause from its audience that he received for his leadership and honesty by having told

him that he was the worst Mayor ever. The next screenshot is from the elapsed time of 1 hour, 38

minutes, and 27 seconds in that video and shows Defendant Redmond as he was about to assault

Mr. Rem with right hand by illegally grabbing Mr. Rem's left arm in flagrant violation of Mr.

Rem's Fourth Amendment rights.



18.     Although it may appear from the next screenshot that is from the elapsed time of 1 hour,

38 minutes, and 29 seconds in that video that Mr. Rem punched the Mayor in his face that would

make me and other New Yorkers quite happy, it is far more likely that what is shown in that

screenshot indicates that Mr. Rem yanked his left arm away from Defendant Redmond's illegal

grasp of it in response to Mr. Redmond having illegally grabbed it.



19.    The next screenshot is from the elapsed time of 1 hour, 37 minutes, and 58 seconds in that video and shows Mr. Rem as he pointed at the Mayor while he finished his outstanding criticism of the Mayor then and received well-deserved applause from an unknown man who appears in the upper-right corner and stood up from his seat to pay respect to Mr. Rem for his leadership and outspokenness by taking off the gloves and showing the Mayor up in such a refreshing way during that public forum.



20.     The next screenshot is also from the elapsed time of 1 hour, 37 minutes, and 58 seconds in that video and shows Mr. Rem as he received well-deserved applause from a woman on the far-left as well as the man on the right who continued to applaud Mr. Rem.



21.     The following is a relevant excerpt from *Robar v. Village of Potsdam Board of Trustees*,

No. 8: 20-cv-0972 (LEK/DJS) (N.D.N.Y. Sept. 21, 2020) that addressed a legal standard that

pertained to an application for a preliminary injunction to uphold First Amendment rights that

was granted through that decision:

> ""Violations of the First Amendment are presumed irreparable." Tunick v. Safir, 209 F.3d
> 67, 70 (2d Cir. 2000). The Supreme Court has declared that "the loss of First Amendment
> freedoms, for even minimal periods of time, constitutes irreparable injury." Elrod v. Burns,
> 427 U.S. 347, 373 (1976); see also Bery, 97 F.3d at 693 ("Violations of First Amendment
> rights are commonly considered irreparable injuries for the purposes of a preliminary
> injunction."); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (noting that "[w]hen an
> alleged deprivation of a constitutional right is involved, most courts hold that no further
> showing of irreparable injury is necessary," and collecting cases)."

22.     In *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011), the U.S.

Supreme Court issued the following findings about the First Amendment that are very relevant to

my claims in this action and the relief that I seek to be granted:

> "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow,
> and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by
> punishing the speaker. As a Nation we have chosen a different course—to protect even
> hurtful speech on public issues to ensure that we do not stifle public debate."

23.     Similarly, the judge who issued the decision in *Center for Bio-Ethical Reform, Inc. v.*

*Black*, 234 F. Supp. 3d 423 (W.D.N.Y. 2017) cited *Snyder v. Phelp* in the following pertinent

excerpt from it that is also very relevant to my claims in this action and the relief that I seek to be

granted:

> ""[A]bove all else, the First Amendment means that government has no power to restrict
> expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of
> Chicago. v. Mosley,* 408 U.S. 92, 95-96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). State actors
> are "not permitted to privilege the feelings or viewpoints of one group over the viewpoints of
> another group." *See Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 134, 112
> S.Ct. 2395, 120 L.Ed.2d 101 (1992). "[U]nder our Constitution the public expression of ideas
> may not be prohibited merely because the ideas are themselves offensive to some of their
> hearers, or simply because bystanders object...." *Bachellar v. Maryland,* 397 U.S. 564, 567,
> 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970). Indeed, "[a]s a Nation, we have chosen ... to protect
> even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v.*

*Phelps,* 562 U.S. 443, 460-61, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). It is well settled that 435*435 "the right to engage in peaceful and orderly political demonstrations is, under appropriate conditions, a fundamental aspect of the `liberty' protected by the Fourteenth Amendment." *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 161, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (Harlan, J., concurring)."

24.     On 10/30/17, I attended a meeting that was about the U.S. Constitution that Arthur

Eisenberg of the NYCLU and David Cole of the ACLU conducted at the Fordham Law School

that is located at 150 West 62nd Street in Manhattan. Those who organized that meeting

arranged for it to be recorded on video that is available on the Internet at

https://livestream.com/accounts/14230140/events/7870400/videos/165193623. During that

meeting's question and answer session with its audience, I told Mr. Eisenberg and Mr. Cole that

I was both a U.S. Navy veteran and a whistleblower. I also told them that the Mayor's NYPD

security detail had been illegally preventing me from attending public forums that the Mayor had

been conducting. I told them that as I asked them how I could get legal representation from their

organizations to address that problem. Mr. Eisenberg was then the NYCLU's legal director and

Mr. Cole was then the ACLU's national legal director. In response, Mr. Eisenberg clearly told

me that I had a legal right to attend the Mayor's public forums as long as I was not disrupting

those public forums. The conversation that I had with both of them during that meeting during

which I made the remarks to them that I just discussed and Mr. Eisenberg gave me the answer

that I just discussed begins at the elapsed time of 55 minutes and 25 seconds in the video

recording of that meeting. I'm shown later in that video at the elapsed time of 1 hour, 6 minutes,

and 12 seconds as I talked with Mr. Eisenberg as I wore a white sweater and was carrying a

backpack. The next screenshot shows both Mr. Cole on the left and Mr. Eisenberg on the right

immediately after Mr. Eisenberg told me that I had a right to attend the Mayor's public forums

while I was not disrupting those meetings.



## <u>LEGAL STANDARDS</u>

1.      I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

2.      In the interests of brevity and pursuant to FRCP Rule 10(c), I incorporate by reference as though fully set forth herein the "Legal Standards" section that appears in the following:

      a.      The First Amended Complaint that I filed in K4 on 10/5/20. That submission corresponds to docket number 4 in that case.

      b.      The complaint that I filed in K5 on 9/25/20. That submission corresponds to docket number 2 in that case.

      c.      The complaint that I filed in K6. That submission corresponds to docket number 2 in that case.

      d.      The First Amended Complaint hat I filed in K7 on 10/18/20. That submission

corresponds to docket number 3 in that case and the "Legal Standards" section within it starts on page 97.

3.    By illegally preventing me from attending the Mayor's 10/26/17 town hall, those who did so and illegally didn't intervene on my behalf to stop and otherwise reverse that violated my First Amendment right to communicate directly to government officials that is articulated as follows in _Kittay v. Giuliani_, 112 F. Supp. 2d 342 (S.D.N.Y. 2000):

> "The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. _See_ _McDonald v. Smith,_ 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); _Mozzochi v. Borden,_ 959 F.2d 1174, 1180 (2d Cir.1992)"

4.    According to _Bloomberg v. The New York City Department of Education_, No. 17-cv-3136 (PGG) (S.D.N.Y. Sept. 24, 2019), the Mayor, members of the City Council, and other government officials were explicitly prohibited by from conducting town hall meetings and other similar meetings inside of schools controlled by the DOE after school, unless the following prerequisites were satisfied:

> a.    "Candidate forums are permitted provided all candidates are invited to participate."

> b.    "Permit applications for candidate forums must include a written representation that all candidates have been invited to participate."

5.    The preceding prerequisites clearly confirm that they were designed to foster discussion and debate by political rivals in government elections in accordance with the intent of New York State's Open Meetings Law. This point is reinforced by the fact that the preceding excerpts apply to the additional excerpt from _Bloomberg v. The New York City Department of Education_ that confirms it:

> "No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official,

candidate, candidates, slate of candidates or political organization/committee may be held in a school building after school/business hours, except as indicated in paragraphs II.C and II.D below."

6.     The prohibition that I just discussed is discussed in greater detail in a memorandum that was issued by the DOE on 6/22/09 and is shown in a PDF file that is available on the Internet at https://cdn-blob-prd.azureedge.net/prd-pws/docs/default-source/default-documentlibrary/d-130-6-22-2009-final-remediated-wcag2-0.pdf.

7.     That PDF file corresponds to regulation number D-130 that was established by a DOE Chancellor that remained in effect on and after 10/26/17. The prohibition that I discussed above appears on page 6 within that regulation. Information on that page indicates that prohibition stems from New York State Education Law section 414 and policies by the DOE.

8.     There is no reason to believe that the Mayor, members of the Mayor's administration, and members of the City Council complied with the prerequisites for being able to lawfully conduct a public town hall meeting within the school that hosted the Mayor's 10/26/17 town hall by having invited people to attend that town hall who were rivals of the Mayor in the 2017 New York City government elections. Concerning this point, Politico New York published a news article on 2/29/16 on the Internet at https://www.politico.com/states/new-york/albany/story/2016/02/avella-outraged-by-lateinvite-to-de-blasio-town-hall-031750 that is entitled "Avella Outraged by Late Invite to De Blasio Town Hall" that was written by Laura Nahmias. That article reported about a claim that was made by New York State Senator Tony Avella that the Mayor's administration failed to invite him to attend a town hall meeting that the Mayor would conduct until it was too late for Mr. Avella to be able to attend it. That article further reported that Mr. Avella was a critic of the Mayor and his administration and believed that the Mayor's staff deliberately waited to invite him to attend the Mayor's town hall meeting that the Mayor held on 2/29/16 in Queens

until it would be too late for Mr. Avella to attend it.

9.      The following findings that were issued in _Walsh v. Enge_, 154 F. Supp. 3d 1113 (D. Or.

2015) concern prospective exclusions from public forums and are therefore extremely relevant to

my claims in this action that concern my having been illegally and prospectively barred without

due process from attending the Mayor's 10/26/17 town hall:

> This case requires the Court to decide whether the First Amendment allows a Mayor or
> his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially
> indefinitely, from attending future City Council meetings to which the public is otherwise
> invited to attend and present their opinions simply because the person has been disruptive
> at previous meetings. The First Amendment protects, among other things, "freedom of
> speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I.
> The First Amendment is incorporated into the Fourteenth Amendment and thus applies to
> the states and local governmental bodies. _Gitlow v. New York,_ 268 U.S. 652, 666, 45
> S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has
> ever held that the First Amendment permits prospective exclusion orders from otherwise
> public city council meetings. A presiding officer may remove a disruptive individual
> from any particular meeting, and a sufficiently disruptive person may even be prosecuted
> for such conduct if public law permits. But no matter how many meetings of a city
> council a person disrupts, he or she does not forfeit or lose the future ability to exercise
> constitutional rights and may not be prospectively barred from attending future meetings.
> Our democratic republic is not so fragile, and our First Amendment is not so weak.

10.     The following findings from _Frain v. Baron_, 307 F. Supp. 27 (E.D.N.Y. 1969) is also

relevant to my claims in this action for reasons that are sufficiently self-explanatory:

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a
> ground for limiting peaceful exercise of First Amendment rights. _Edwards v. South_
> _Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)_."

11.     The U.S. Supreme Court issued the following critically significant findings in _Cohen v._

_California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971):

> a.      "It may be that **one has a more substantial claim to a recognizable privacy
>         interest when walking through a courthouse corridor** than, for example,
>         strolling through Central Park"
>
> b.      "Finally, in arguments before this Court much has been made of the claim that
>         Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting
>         viewers, and that the State might therefore legitimately act as it did in order to

protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, *e.g.*, *Organization for a Better Austin v. Keefe*, 402 U. S. 415 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e.g.*, *Rowan v. Post Office Dept.*, 397 U. S. 728 (1970), we have at the same time consistently stressed that "we are often `captives' outside the sanctuary of the home and subject to objectionable speech." *Id.*, at 738. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections."

c.      "it is nevertheless often true that one man's vulgarity is another's lyric."

d.      ""[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U. S. 665, 673674 (1944).

Finally, and in the same vein, we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk of opening the door to such grave results."

e.      "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. See *Whitney v. California*, 274 U. S. 357, 375377 (1927) (Brandeis, J., concurring)."

12.     The admission tickets that were issued by the Mayor's staff for town hall meetings that the Mayor conducted were functionally equivalent to press credentials that grant members of the press access to meetings that government officials conduct. What follows is a relevant excerpt from *Karem v. Trump*, No. 19-cv-5255 (D.C. Cir. June 5, 2020) that addressed what is required

of due process in the context of a denial of access to government officials through the revocation

of a press credential. In short, that lawsuit led to Brian Karem having a press credential revoked

from him by the Whitehouse reinstated.

> "A fundamental principle in our legal system," the Supreme Court observed in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id*. at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." *Id*. at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).
>
> That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S. at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.
>
> Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

13.     The following is a relevant excerpt from *Kass v. City of New York*, 864 F.3d 200 (2d Cir.

2017) that addresses the matter of illegal dispersal orders that law-enforcement personnel issue.

"New York courts have held that "a refusal to obey such an order [to move] can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order." *People v. Todaro,* 26 N.Y.2d 325, 328-29, 310 N.Y.S.2d 303, 258 N.E.2d 711 (1970) (quoting *People v. Galpern,* 259 N.Y. 279, 284-85, 181 N.E. 572 (1932)); *Crenshaw v. City of Mount Vernon,* 372 Fed.Appx. 202, 206 (2d Cir. 2010) (summary order) (same)."

14.    The following findings from *Henry v. Wyeth Pharmaceuticals, Inc.,* 616 F.3d 134 (2d Cir. 2010) address scenarios in which supervisors like **a)** Defendants de Blasio, Carrion, Redmond, and Stribula act like mob bosses while using subordinates and others that include **b)** Defendants Ringel, Atcheson, Galante, Ramos, and Mason like henchmen, agents, and proxies to carry out their dirty work to commit criminal acts against others and otherwise violate the rights of others:

We believe the court erred in this instruction. In *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000), we stated, "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." We then rejected the argument that in order to satisfy the causation requirement, a plaintiff must show that the particular individuals who carried out an adverse action knew of the protected activity. *Id.* at 117. Instead, we indicated that a jury may

find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.

*Id. See also Gorman-Bakos v. Cornell Coop Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (noting that a plaintiff can establish causation by showing protected activity was closely followed in time by adverse employment action); *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir.2006). *Gordon* directly addressed the situation in which a corporate agent *carries out* an adverse employment action on the *orders,* explicit or implicit, of a superior with knowledge that the plaintiff has engaged in a protected activity. However, in order to show causation in the sense required by *McDonnell Douglas* — that is, a causal connection between the protected activity and the adverse employment action — it is not necessary that the supervisor who has knowledge of the plaintiff's protected activities have *ordered* the agent to impose the adverse action. A causal connection is sufficiently demonstrated if the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to *encouragement* by a superior (who has knowledge) to disfavor the plaintiff.

15.     _Gordon v. New York City Bd. of Educ._, 232 F.3d 111 (2d Cir. 2000) is cited in _Henry v._

_Wyeth Pharmaceuticals, Inc._ and includes the following related findings:

> The lack of knowledge on the part of particular _individual agents_ is admissible as some
> evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence
> of proximity or disparate treatment. _See Alston,_ 14 F.Supp.2d at 312-13. A jury, however,
> can find retaliation even if the agent denies direct knowledge of a plaintiff's protected
> activities, for example, so long as the jury finds that the circumstances evidence
> knowledge of the protected activities or the jury concludes that an agent is acting
> explicitly or implicit upon the orders of a superior who has the requisite knowledge. _See
> id._ at 311. This is so, moreover, regardless of whether the issue of causation arises in the
> context of plaintiff's satisfaction of her _prima facie_ case or as part of her ultimate burden
> of proving that retaliation "played a motivating role in, or contributed to, the employer's
> decision." _Renz v. Grey Advertising, Inc.,_ 135 F.3d 217, 222 (2d Cir.1997)

> Accordingly then, to the extent that the district court charged the jury that the
> very _agents_ of the Board who engaged in retaliatory actions against Gordon had to know
> of her protected activity, it erred.

16.     The following findings from _Housing Works, Inc. v. Turner_, 00 Civ. 1122 (LAK)(JCF)

(S.D.N.Y. Sept. 15, 2004) address an ongoing pattern of retaliation and how retaliatory intent

may be proven that includes by a pattern of unequal treatment without any rational basis:

> The plaintiff can demonstrate a causal connection between its protected activities and the
> defendants' adverse actions either "indirectly by means of circumstantial evidence, . . . or
> directly by evidence of retaliatory animus." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir.
> 2003) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)); Kantha v. Blue, 262
> F. Supp. 2d 90, 103 (S.D.N.Y. 2003). Summary judgment is inappropriate when
> "questions concerning the employer's motive predominate the inquiry." Morris, 196 F.3d
> at 110. "Nonetheless, we have held that a plaintiff may not rely on conclusory assertions
> of retaliatory motive to satisfy the causal link . . . Instead, he must produce `some
> tangible proof to demonstrate that [his] version of what occurred was not
> imaginary.'" Cobb, 363 F.3d at 108 (quoting Morris, 196 F.3d at 111)).

> A plaintiff's circumstantial evidence of retaliation could include the timing of the
> defendant's actions, such as when the alleged retaliation closely follows the plaintiff's
> speech. Morris, 196 F.3d at 110; McCullough v. Wyandanch Union Free School District,
> 187 F.3d 272, 280 (2d Cir. 1999). The plaintiff can also proffer evidence of unequal
> treatment, or an ongoing campaign of retaliation. Hampton Bays Connections, Inc. v.
> Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001); Economic Opportunity Commission
> of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y.
> 2000) (citing Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994)).

The defendants' arguments with respect to causation will be discussed in relation to each of the adverse actions alleged.

17.    The following is a relevant excerpt from *Musso v. Hourigan*, 836 F.2d 736 (2d Cir. 1988).

> "As a general rule, a government official is not liable for failing to prevent another from violating a person's constitutional rights, unless the official is charged with an affirmative duty to act. *See, e.g., Rizzo v. Goode,* 423 U.S. 362, 376-77 (1976); *Doe v. New York City Dep't of Social Servs.,* 649 F.2d 134, 141 (2d Cir.1981)."

18.    42 USC §1986 includes the following relevant provisions that are applicable partly about New York City government personnel who had opportunities to intervene on my behalf to attend the Mayor's 10/26/17 town hall:

> "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action"

19.    New York City Charter §1116 includes the following provisions that are applicable partly about New York City government personnel who had opportunities to intervene on my behalf to attend the Mayor's 10/26/17 town hall and did not do so:

a.    Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in addition to the penalties imposed by law and on conviction shall

forfeit such office or employment, and be excluded forever after from receiving or

holding any office or employment under the city government.

b.      Any officer or employee of the city or of any city agency who shall knowingly

make a false or deceptive report or statement in the course of duty shall be guilty of a

misdemeanor and, upon conviction, forfeit such office or employment.

20.    NYPL §195.00 concerns official misconduct and includes the following terms that are

applicable partly about New York City government personnel who had opportunities to intervene

on my behalf to attend the Mayor's 10/26/17 town hall and did not do so:

> A public servant is guilty of official misconduct when, with intent to obtain a benefit or
> deprive another person of a benefit:
>
> 1. He commits an act relating to his office but constituting an unauthorized exercise of his
> official functions, knowing that such act is unauthorized; or
>
> 2. He knowingly refrains from performing a duty which is imposed upon him by law or is
> clearly inherent in the nature of his office.
>
> Official misconduct is a class A misdemeanor.

21.    The following is a relevant excerpt from _Puckett v. City of Glen Cove_, 631 F. Supp. 2d

226 (E.D.N.Y. 2009) that confirms that I had a First Amendment right to criticize government

personnel without being retaliated against for doing so:

> "Plaintiff must first allege that she engaged in protected activity to state a First
> Amendment claim of retaliation. **The First Amendment p**rotects the right of access to
> the courts, and **an individual's right to complain to public officials**. _Lewis v. Casey_,
> 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (right of access); _Monsky v._
> _Moraghan_, 127 F.3d 243, 246 (2d Cir.1997) (right of access); _Patriots Way, LLC v._
> _Marconi_, 2007 WL 988712 *4 (D.Conn.2007); _see Colondres v. Scoppetta_, 290
> F.Supp.2d 376, 381 (E.D.N.Y.2003) (right of access is "bound up" with the First
> Amendment right to petition the government); _Gagliardi_, 18 F.3d at 194-95 (right to
> complain to public officials protected by First Amendment). **These First Amendment**
> **rights include the right to be free from retaliation for their exercise**. _Colondres_, 290
> F.Supp.2d at 382; _see Patriots Way_, 2007 WL 988712"

22.    The following are pertinent findings that were issued in _Elrod v Burns_, 427 US 347 (1976):

a.  "The timeliness of political speech is particularly important. *See Carroll v. Princess Anne*, 393 U. S. 175, 182 (1968); Wood v. Georgia, 370 U. S. 375, 391-392 (1962)."

b.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

23.     The following is a pertinent excerpt from the Second Circuit's decision in *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980) that concerns government estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

24.     The following excerpt from *Glus v. Brooklyn Eastern Dist. Terminal*, (359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770 (1959) reinforces this point:

"To decide the case we need look no further than the maxim that no man may take advantage of his own wrong."

25.     The following findings from *People v. Howard*, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408 N.E.2d 908 (1980) sufficiently confirm that I had a clear legal right to be left alone and allowed to attend the Mayor's 10/26/17 town hall because I was conducting myself in an entirely lawful manner at the site of that town hall on 10/26/17:

a.  "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he **may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime**, seize or search the individual or his possessions, even though he ran away."

b.  "But while the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment to the United States Constitution and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause. As Mr. Justice **BRANDEIS put it long ago in *Olmstead v United States* (277 US 438, 478), defendant had "the right to be let alone**.""

(boldface formatting added for emphasis)

26.     Findings were issued in both *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App.

Div. 1981) and _Dotson v. Farrugia_, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012) that address

unofficial arrests of an individual's ability to move about freely by a show of authority without a

legal justification in violation of the Fourth Amendment. That is exactly what transpired on

10/26/17 at the site of the Mayor's 10/26/17 town hall as members of the NYPD and Mayor's

staff that included Defendant Ringel illegally prevented me from being able to lawfully walk into

the school that hosted the Mayor's 10/26/17 town hall in order to lawfully exercise my First

Amendment and Fourteenth Amendment right to attend that public forum within the gym in

which that town hall was conducted and lawfully continue to exercise those rights and others of

mine while doing so.

### MAIN STATEMENT OF FACTS

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully
set forth herein.

2.      The illegal acts and omissions that were committed against me on 10/26/17 at the site of

the Mayor's 10/26/17 town hall meeting that concern my claims in this action were a microcosm

of a much larger, pervasive, systemic, and longstanding campaign and pattern of illegal customs,

practices, and policies that included flagrant violations of my First Amendment and Fourteenth

Amendment rights that were jointly devised, coordinated, implemented, executed, and covered-

up by senior decision-making members of the NYPD and members of the Mayor's staff against

me in relation to my efforts to lawfully attend public town hall, public resource fair, and public

hearings in accordance with my constitutional rights that members of the public conducted in a

collaborative manner with the Mayor, Mr. Banks, and other City of New York and State of New

York personnel. Defendants de Blasio, O'Neill, Vance, Jr., Byrne, Jr., James, Shorris, and other

City of New York, State of New York, and federal government personnel that include members of the City Council that include Defendant Lander and Stephen Levin tacitly condoned those illegal acts and omissions against me.

3.      When I tried to attend the Mayor's 10/26/17 town hall I had ongoing litigation partly through my HRA lawsuit and K1 in which I was pursuing entirely valid claims against defendants in this action for having been previously barred from public forums that the Mayor and Mr. Banks conducted that included town hall and resource fair meetings. Defendants Redmond, Carrion, and other senior members of the Mayor's staff were aware of my HRA lawsuit as early as 6/29/17 according to e-mail records that I was provided by the Mayor's office. I'm referring to what appears in the City Hall email excerpts. Much of those emails that are shown in that PDF file were provided to me by the Mayor's office with redactions applied to them and I urge this Court to immediately compel the City of New York to immediately provide me non-redacted and unedited copies of the e-mail messages that are shown in that PDF file to better facilitate my ability to prove my claims in this action on the merits. As a reminder, the following is a link to that PDF file on the Internet:

https://drive.google.com/file/d/16wSpJ7kk-aOtx7Bkg8MeqUpyWd5Io2hR/view?usp=sharing

4.      The following is a screenshot from the e-mail message that Defendant Redmond sent about me on 6/28/17 at 2:18 pm that appears on page 8 in that PDF file:



**From:** Redmond, Howard DI.
**Sent:** Wednesday, June 28, 2017 2:18 PM
**To:** Phillips, Eric; Ramos, Jessica; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
**Subject:** Re: town halls

5.      That e-mail concerns illegal acts that he and other members of the NYPD and Mayor's

CAU that include Defendant Ringel, Harold Miller committed against me on 4/27/17 that caused

me to be illegally barred from the town hall meeting that the Mayor conducted on 4/27/17 in

Queens while I conducted myself in an entirely lawful manner. Additional e-mail messages

appear in that PDF file that were sent by Defendant Ramos in which she blatantly lied about me

and my HRA lawsuit as well as other matters about me to illegally cover-up the illegal acts and

omissions that were committed against me that had caused me to be barred from attending town

hall meetings and resource fair meetings that the Mayor conducted on 4/27/17, 5/23/17, and

6/8/17 while I had ongoing litigation against HRA that was unquestionably protected activity.

6.      The next screenshot is from the e-mail message that Defendant Ramos sent on 6/28/17 at

3:27 pm to a whistleblower news censor in journalism named Erin Durkin who works for a news

organization named Politico. Ms. Durkin worked for the New York Daily News on 6/28/17.

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to
enter the overflow room.

7.      The remarks that Ms. Ramos expressed in the preceding screenshot is a smoking gun and

confirms that she and others were illegally subjecting me to an illegal prior restraint of my First

Amendment and Fourteenth Amendment rights in regards to public forums that the Mayor was

then conducting that was applicable to town hall meetings and additional types of public forums

that he was conducting, such as public resource fair meetings.

8.      While trying to lawfully attend the town hall meetings, resource fair meetings, and public

hearings that the Mayor conducted with Mr. Banks and others on and after 4/27/17, I sought to

lawfully try to have Mr. Banks fired for cause, Urban's contracts with the City of New York to

be cancelled immediately for cause, and all of the personnel of HRA, DHS, and DSS to be

replaced largely to prevent further atrocities from occurring to those who resided in the building

in which I reside as a consequence of fraud and negligence by personnel of HRA, DHS, DSS,

Urban, and others. However, I was illegally prevented from being able to do so. As I sought to

do so, I took it upon myself to be an advocate for those who resided in the building in which I

reside that is a shelter for military veterans that is subsidized by taxpayers and comparable to

notoriously horrific NYCHA housing in that respect. Defendant City and NYCHA were sued by

the DOJ in the lawsuit that corresponds to _USA v. New York City Housing Authority_, No. 18-cv-

5213, (WHP) (S.D.N.Y. November 14, 2018) because of fraud and negligence that the Mayor's

administration perpetrated as a slumlord in regards to NYCHA housing after defendants in this

action and other members of the Mayor's staff and the NYPD stole the outcomes of the 2017

New York City government elections for the Mayor's benefit and their own. Such fraud and

negligence by NYCHA and the Mayor's administration was illegally covered-up prior to the

2017 New York City government elections to protect the re-election interests of the Mayor and

his administration. The written transcript that was prepared from the public hearing that U.S.

District Judge William Pauley conducted on 9/26/18 in _USA v. New York City Housing_

_Authority_, No. 18-cv-5213, (WHP) (S.D.N.Y. November 14, 2018) confirms that I testified to

him during that hearing. As I did so, I correctly and analytically pointed out to him that there

really isn't any meaningful difference between how HRA and NYCHA operate directly and

indirectly as slumlords of public housing. I recall that he gave short shrift to my testimony then.

My testimony in that hearing occurred after Defendant James engaged in grandstanding during

that hearing through her remarks before she rushed away from the duties that she then had as

New York City's Public Advocate to accord proper due process to the rest of the public who

were also there to testify. Defendant James instead rushed out of that courtroom immediately

after she finished grandstanding with the testimony that she delivered. Perhaps the deaths of

Robert Vargas and Gilda Giscombe that occurred thereafter in the building in which I reside due

to negligence by both Urban and HRA and were preventable will now spur Judge Pauley to visit

wherever they may be buried and humbly apologize to them and their families while buying the

arrogance and narrow-mindedness that he showed to me on 9/26/18. I will discuss the deaths of

both Mr. Vargas and Ms. Giscombe in greater detail shortly.

9.      Largely as a result of the fact that I was illegally prevented from attending many public

town hall meetings and public resource fair meetings that the Mayor conducted with Mr. Banks

and others on and after 4/27/17 prior to the 2017 New York City government elections that were

conducted in September of 2017 and November of 2017, Bill de Blasio was able to steal his re-

election win as New York City's Mayor to remain the a bastard mayor. That occurred as a result

of significant criminal assistance of the defendants in this action and others by engaging in voter

suppression, voter fraud, and whistleblower retaliation at the same time that atrocious, complicit,

and pervasive news censorship by the press facilitated that.

10.     If not for my having been illegally prevented from attending public town hall meetings

and public resource fair meetings that the Mayor conducted with Mr. Banks and others on and

after 4/27/17, it clearly stands to reason that I would be able to use Robert Vargas as a witness in

litigation that I have against Defendant City, Urban, HRA, Mr. Banks, and others. However, I

will never have the opportunity to do so nor to speak to Mr. Vargas again because Mr. Banks,

Ann Marie Scalia of HRA, and personnel of Urban significantly contributed to the circumstances

that caused his death to occur on or about 8/11/20 in the apartment in which he resided in the

building in which I reside roughly 8 days after I sent the following e-mail message about Mr.

Vargas and his needs to Mr. Banks and Ms. Scalia at 1:27 pm on 8/3/20:

**From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
**Subject:** Question about helping a disabled military veteran in my building
**Date:** August 3, 2020 at 1:27:32 PM EDT
**To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
**Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha" <calhounm@dss.nyc.gov>

Ms. Scalia,

I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the disabled military veteran who lives in apartment 1D in the building in which I reside who needs an air conditioner to be installed in his living room.

He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air conditioner to install that is located in the basement of that building, it will take 2 weeks from when he was told last week for bars to be cut outside of his living room window to install that air conditioner.

I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf during a City Council public hearing.

The person I'm talking about has had several strokes and can barely move.

It is unconscionable for HRA to allow him to have to sweat in his apartment only because Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by applicable health and safety laws in the middle of Summer.

I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to further establish that HRA is blatantly disregarding its legal duties with its business partners.

From,

Towaki Komatsu

11.     After I sent that e-mail message, I received an e-mail message from Ms. Scalia on

8/10/20 at 10:42 pm. The header section from that e-mail message and a relevant excerpt from it

about Mr. Vargas is shown next.

**From:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
**Subject:** RE: Update
**Date:** August 10, 2020 at 10:42:40 PM EDT

**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
**Cc:** "Aaronson, Nicola" <aaronsonn@dss.nyc.gov>, "Clary, Carin" <claryc@hra.nyc.gov>, "Wilkinson, Thatiana" <wilkinsont@hra.nyc.gov>, "Galindo, Daniel" <galindod@hra.nyc.gov>, "Jennifer, kelly" <Kellyjen@hra.nyc.gov>

Regarding the disabled veteran you referred to below we are look into this but we will not be able to communicate with you regarding this individual and his circumstances.

12.     The following is a link to an audio recording that has the filename of "Robert_Vargas on 8-2-20 at 9_11 pm_20200802 211142.m4a" that I recorded on 8/2/20 at 9:11 pm while I talked with Mr. Vargas in the kitchen area within his apartment as he was then telling me that he urgently needed to have an air conditioner to be installed in his apartment for his health after he had suffered numerous strokes:

https://drive.google.com/file/d/1kgqME-
aLSNUjKknYGY9lX03pfYBCQmM6/view?usp=sharing

13.     Mr. Vargas is clearly heard in that audio recording at the elapsed time of 35 seconds as he made a remark to me in which he rhetorically asked whether those who were depriving him of an air conditioner in his apartment wanted someone else to die in the building in which I reside after a nice woman whose name was Gilda Giscombe died in it in December of 2019 due to negligence by HRA, DHS, and Urban's personnel. I talked with Mr. Vargas on 8/2/20 while it had recently been both hot and humid in the building in which I reside that is poorly ventilated due to negligence by Urban, HRA, DHS, HPD, and OTDA. Mr. Vargas and I are heard in that audio recording at the elapsed time of 1 minute and 7 seconds as we talked about Gilda's death. Mr. Vargas told me that she collapsed in the lobby of the building in which I reside in December of 2019 before she asked a security worker who then worked in that building to help her to reach her apartment on the third floor in that building. Mr. Vargas told me that the security worker refused to assist her. Ms. Giscombe was found dead in her apartment a few days later.

14.     Prior to Mr. Vargas' death, I also recorded a video recording of a conversation that I had

with him on 12/19/19 at 2:25 pm as I stood in the lobby of the building in which I reside and

talked with him as he stood just inside of his apartment. Back then, things we talked about that

are heard in that video were the circumstances surrounding Gilda's death that suggested that

Urban is liable for negligence in regards to it, the fact that he was a disabled military veteran, the

fact that he wasn't having necessary repairs made in his apartment due to negligence by both

Urban and HRA, and the fact that I was viciously assaulted in that building by my former

roommate. That video recording is available on the Internet at

https://drive.google.com/file/d/1KRAiloeCKFB_aWofL7cMIV14C6R0Gx1s/view?usp=sharing.

15.     The following is a link to a video recording that has the filename of "FDNY forcing open

Robert Vargas' apartment door on 8-11-20 at 3_39 pm_IMG_3624.MOV" that I recorded on

8/11/20 at 3:39 pm while I stood in a public area on the first floor of the building in which I

reside as a recorded members of the New York City Fire Department ("FDNY") while they

broke open the front door to Mr. Vargas' apartment:

https://drive.google.com/file/d/1BGbVCcAlTCTy_WpODblxPbh7H-q1zYnk/view?usp=sharing

16.     The next screenshot is from the elapsed time of 2 seconds in that video and shows 3

members of the FDNY as one of them was using a tool to force open the front door to Mr.

Vargas' apartment in the building in which I reside. They had been asked to come to that

building then because Mr. Vargas was no longer responding to people who were checking up on

his welfare and the front door to his apartment was locked from the inside.



17.     The following is a link to a video recording that has the filename of "Urban staff member in front of apartment building on 8-11-20 at 4_04 pm with a FDNY ambulance in front and EMTs inside of the building by Roberts apartment_IMG_3636.MOV" that I recorded on 8/11/20 at 4:04 pm while I stood in front of the building in which I reside and recorded a FDNY ambulance that was there while paramedics assigned to it were inside of the building in which I reside and outside of Mr. Vargas' apartment as they were then there to respond to his death:

https://drive.google.com/file/d/1dAFNodgC63nglKYenr0Djgva_UpXJjY9/view?usp=sharing

18.     The next screenshot is from the elapsed time of 14 seconds in that video and shows

FDNY paramedics as they stood in an area of the lobby of the building in which I reside that is located just outside of Mr. Vargas' apartment.



19.     The following is a link to a video recording that has the filename of "NYC Medical Examiner's Office workers rolling Robert Vargas out of apartment building at 8_53 pm on 8-11-20_IMG_3661.MOV" that I recorded on 8/11/20 at 8:53 pm while I stood in front of the building in which I reside and recorded members of the New York City Chief Medical Examiner's Office as they used a stretcher to roll Mr. Vargas out of the building in which I reside while he was then in a black body-bag:

https://drive.google.com/file/d/1otdIE5Ggj2QMzLvY1c6sSU7XFg3MHet4/view?usp=sharing

20.     The next screenshot is from the elapsed time of 3 seconds in that video and shows the members from the New York City Chief Medical Examiner's Office and the black body-bag that Mr. Vargas was then inside of in front of the building in which I reside.



**Whistleblowing objectives I had for attending the Mayor's 10/26/17 town hall:**

21.    The following lists what some of my primary objectives were in broad terms that focused

on whistleblowing that I sought to lawfully engage in while attending the Mayor's 10/26/17 town

hall and while waiting to be granted access to the school that hosted it while I would wait on

10/2617 outside of the building in which it would be hosted and interact with members of the

public and journalists:

    a.    I sought to engage in extensive protected whistleblowing about matters of both

    public concern and private matters while attending that public forum as **a)** reporters,

    members of the public, and numerous government officials were present and nearby and

    **b)** that public forum was recorded on video that was broadcast on the Internet that could

greatly amplify the message that I was trying to widely broadcast through word-of-mouth advertising. However, hindsight sufficiently confirms that the defendants in this action and others were hell-bent on trying to illegally prevent me from being able to exercise my legal right to take advantage of public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted with Mr. Banks and others to use them and the resources that they made available to get the messages out that I was lawfully attempting to broadcast as I sought for those messages and viewpoints of mine to achieve the greatest possible reach largely through word-of-mouth advertising that could occur **a)** at the sites of those public forums as they were being conducted and **b)** as a result of those who watched the video recordings of those public forums and may have chosen to engage in such advertising.

b.      The subject matter of whistleblowing that I intended to lawfully engage in while attending the Mayor's 10/26/17 town hall largely concerned the sum and substance of my HRA lawsuit that was a complex hybrid proceeding, illegal acts and omissions that had been committed against me since 4/11/17 in regards to public forums that the Mayor and Mr. Banks conducted and also included the scheduled 4/12/17 oral arguments hearing in my HRA lawsuit that Jeffrey Mosczyc illegally caused me to be deprived of just 1 day prior to that scheduled hearing. On 4/11/17, HRA also illegally manipulated OTDA during a fair hearing that OTDA pointlessly conducted between HRA and I after OTDA illegally refused to fully enforce a fair hearing decision that one of its administrative law judges issued on 9/15/16 in my favor that I discussed with New York City Councilman Stephen Levin on 4/27/17 as I testified to him in a public hearing that the City Council's Committee on General Welfare conducted. HRA manipulated OTDA on 4/11/17 by

managing to have a new administrative law judge who was then assigned to the fair hearing that OTDA then conducted between HRA and I to disregard the fact that an attorney for HRA named Marin Gerber flagrantly violated res judicata and committed wire fraud during that hearing through her remarks as both OTDA and I separately recording audio recordings of that hearing that was conducted by telephone. That hearing was conducted by telephone only because OTDA had been illegally preventing me from having such hearings face-to-face in its offices located at 14 Boerum Place in Brooklyn following 7/5/16. On 7/5/16, an administrative law judge who was assigned to OTDA illegally and abruptly terminated a face-to-face fair hearing that OTDA conducted between HRA and I in OTDA's offices located at 14 Boerum Place in Brooklyn while OTDA recorded that hearing on audio.  She did so while I was in the middle of attempting to lawfully answer a question that I was asked during that hearing just 3 days after I was viciously assaulted in the living room of where I reside by my former roommate (Ronald Sullivan) that fraud and negligence by HRA, Urban, Services for the Underserved, Inc. ("SUS") enabled. That assault was both entirely foreseeable and preventable. It occurred after Mr. Sullivan attempted to assault me in that same living room on 5/12/16 and was physically restrained by one of Urban's personnel who then happened to be in that living room as Mr. Sullivan was making verbal threats against me before he suddenly rushed toward me to try to assault me. I then promptly reported that attempted assault on 5/12/16 mainly through cell phone text messages to someone named Molly McCracken of SUS to have her act as an intermediary between Urban and I to arrange for Mr. Sullivan to be immediately evicted from the building in which I reside because he had proven that he was a clear and unacceptable threat to my safety in that

building. I also made telephone calls on 5/19/16 to Lisa Lombardi and Ronald Abad while they were then among Urban's senior management to try to persuade them to immediately evict Mr. Sullivan for the same reasons. However, all of my requests for him to be evicted were denied. Instead, I received more than 15 punches from Mr. Sullivan's fists to an area near my left temple on my head in the living room of where I reside on 7/2/16 when Mr. Sullivan exploded as the time bomb that I correctly recognized him to be on 5/12/16. On or about 2/24/17, Bronx Criminal Court Judge Cori Weston issued a fraudulent determination in the case of _People v. Sullivan_, No. 2016BX042188 (Bronx Crim. Ct. Feb. 24, 2017) in which she claimed that Mr. Sullivan was not guilty for assaulting me on 7/2/16 in the living room of where I reside after she abused her discretion by suppressing a critically significant security log as evidence in the criminal case that the Bronx DA commenced against Mr. Sullivan for assaulting me on that date in my living room as the Bronx DA committed prosecutorial misconduct in that case in a number of significant ways that prejudiced my right to have Mr. Sullivan to be properly prosecuted for assaulting me. Bill de Blasio appointed Cori Weston as a judge and I have held him liable for doing so. I certainly intended to engage in protected whistleblowing against the Mayor during the Mayor's 10/26/17 town hall about the fact that he appointed Cori Weston to be a judge and the harm that caused me as a result of Judge Weston having fraudulently determined that Mr. Sullivan was not guilty for having assaulted me partly by fraudulently concealing material evidence. The Mayor also appointed David Kirschner to be a judge and that enabled Mr. Kirschner as a Bronx Criminal Court judge to free a gang-member named Jose Gonzalez, who then killed a FDNY paramedic as he stole an ambulance that was assigned to her. The New York Post published a news article

on 3/20/17 about how Mr. Gonzalez killed Ms. Arroyo and how Judge Kirschner enabled

that to occur. That news article is entitled "Judge Was Soft on Accused EMT Killer

Weeks Before Rampage", was written by Larry Celona, and is available on the Internet at

https://nypost.com/2017/03/20/judge-was-soft-on-accused-emt-killer-weeks-before-

rampage/. That news article was published less than one month after Judge Weston

fraudulently determined that Mr. Sullivan was not guilty of having viciously assaulted me

on 7/2/16. The findings in *Johnson v. NYC Health & Hosps*, 246 A.D.2d 88, 676

N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) confirm that security logs are admissible as

evidence in criminal cases. The security log that I sought to have accepted as evidence in

the criminal case against Mr. Sullivan for assaulting me was updated by security

personnel who worked for Urban in the building in which I reside. That log contained

critically significant information about how Mr. Sullivan was observed as exhibiting an

angry demeanor as he fled from the building in which I reside after he viciously assaulted

me in the living room of where I reside on 7/2/16. Additionally, Mr. Sullivan made

incriminating remarks to a witness named Larry Kayatt on 7/2/16 as Mr. Sullivan fled

from the building in which I reside after assaulting me in it. Mr. Kayatt thereafter told me

both prior to 11/2/16 and on 8/29/17 how Mr. Sullivan described to him on 7/2/16 as he

fled from that building about precisely how he assaulted me on 7/2/16 in the living room

of where I reside. Mr. Kayatt told me then that Mr. Sullivan told him that he (Mr.

Sullivan) "bitch-slapped" me and hit me with an open hand as he criminally assaulted me

on 7/2/16. Also, I legally recorded an audio recording of my conversation with Mr.

Kayatt at 4:01 pm on 8/29/17 as he shared that information about Mr. Sullivan with me. I

have played back that audio recording while testifying in public hearings that the City

Council conducted and using that recording in conjunction with the testimony that I

provided. Also, I sent an e-mail message to Hayden Briklin of the Bronx DA on 11/2/16

at 6:37 pm in which I provided her Mr. Kayatt's name to have her team use him as a

witness in the criminal case that her team commenced against Mr. Sullivan for having

assaulted me on 7/2/16. Mr. Briklin was involved in the criminal case against Jose

Gonzalez that led to Judge Kirschner ordering him to be released from custody before he

killed Ms. Arroyo. Also, the Bronx DA negligently didn't appeal the decision that Judge

Weston issued in the criminal case against Mr. Sullivan to exclude the security logs as

evidence to the greatest extent that its prosecutors. While he was the assistant district

attorney for the Bronx DA who prosecuted the criminal case at trial against Mr. Sullivan

for assaulting me, Scott McDonald, Jr. as well as a female supervisor of his instead

merely debated the matter of the admissibility of the security logs with Judge Weston in

her courtroom. They did so in spite of the fact that the Bronx DA could have formally

pursued an appeal to an appellate court about Judge Weston's arbitrary and capricious

decision to exclude those security logs from the evidence that she would consider in that

case. The Bronx DA also never used any witness in that criminal case against Mr.

Sullivan other than me in spite of what Mr. Kayatt and others knew about that assault and

how Mr. Sullivan was observed to have an angry demeanor as he fled from the building

in which he assaulted me. The Bronx DA also waited until October of 2017 to arrange for

me to be issued an order of protection against Mr. Sullivan for having assaulted me on

7/2/16. That caused me to have to continue to have Mr. Sullivan as my roommate in the

same apartment in which he viciously assaulted me at the same time that I was battling to

recover from the concussion and trauma that assault caused me. All of this information

were among the subjects of additional protected whistleblowing about which I intended to engage in whistleblowing against the Mayor, the Bronx DA, Judge Weston, the NYPD, HRA, and Urban during the public town hall meetings and public resource fair meetings that the Mayor conducted on and after 4/27/17. Returning to my discussion about OTDA, though it is responsible for providing proper oversight over how HRA operates as well and is also responsible with HRA for providing proper oversight over how Urban operates as the landlord of the building in which I reside, hindsight confirms that no such oversight has existed over HRA nor Urban. Similarly, no proper oversight over how OTDA operates has existed. After my 7/5/16 OTDA fair hearing was illegally terminated by the administrative law judge assigned to it in retaliation for entirely valid complaints that I lawfully reported to her during that hearing about the fact that she wasn't paying proper attention to the information that I was communicating during that hearing at the same time that I was battling a concussion that was developing in my head as well as justifiable rage against HRA for my having been assaulted on 7/2/16 partly because of fraud and negligence that it and Urban committed against me, Samuel Spitzberg of OTDA sent me a letter dated 7/21/16 in which he implicitly acknowledged the fact that my 7/5/16 OTDA fair hearing had been illegally terminated in violation of my rights pursuant to the First Amendment and Fourteenth Amendment.  On 7/5/16, prior to leaving the building in which my 7/5/16 OTDA fair hearing was conducted, I lawfully expressed outrage to OTDA personnel in a public waiting area in that building about the fact that my 7/5/16 OTDA fair hearing was illegally terminated in violation of my rights after I travelled all the way from the Bronx to Brooklyn to attend that hearing and was heavily suffering from the effects of having been viciously assaulted just 3 days earlier.

OTDA never accorded me any due process in regards to its decision to illegally ban me from returning to its offices in Brooklyn after 7/5/16. Instead, OTDA's personnel have repeatedly lied to me and negligently condoned fraud by HRA against me following 7/5/16 that concerned material matters. Such negligence contributed to the circumstances that enabled Mr. Vargas' death. Additionally, OTDA has illegally never conducted fair hearings for additional claims that I asserted against HRA that I brought to OTDA's attention on 2/9/17 in a 62-page fax that I transmitted to OTDA on 2/9/17 to have OTDA conduct fair hearings between HRA and I within 30 days in accordance with OTDA's own policies. In short, I also intended to try to engage in extensive protected whistleblowing against OTDA while attending the Mayor's 10/26/17 town hall. Concerning what I just discussed about OTDA, it's necessary to bear in mind that the site of the Mayor's 10/26/17 town hall isn't very far from OTDA's offices in Brooklyn that are located at 14 Boerum Place. It's also necessary to keep in mind that in his capacity as a member of the City Council, Defendant Lander was among others who were supposed to be providing proper oversight over how HRA operated that he egregiously wasn't before he served as the moderator for the Mayor's 10/26/17 town hall.

c.        The subject matter of whistleblowing that I intended to lawfully engage in while attending the Mayor's 10/26/17 town hall also concerned the sum and substance of the face-to-face conversations that I had with the Mayor and Mr. Banks prior to 10/26/17 that dated back to 3/1/16 with respect to Mr. Banks and 3/15/17 with respect to the Mayor as both the Mayor and Mr. Banks had proven to be con artists as far as I was concerned. I sought to lawfully and widely apprise voters and potential voters as well as political rivals of the Mayor and members of the City Council while attending public forums that

the Mayor conducted with others that New Yorkers sorely needed a complete overhaul of New York City's government personnel and that the primary way to get that done was by immediately firing the Mr. De Blasio, his entire administration, and the entire City Council as well as other New York City government personnel through the power of their votes.

d.      Additional whistleblowing of public concern about which I intended to engage in while attending the Mayor's 10/26/17 town hall was against whistleblower news censors in journalism.

e.      Clarification about matters that I intended to engage in whistleblowing about while attending such public forums that the Mayor conducted is readily apparent by the sum and substance of the testimony that I gave during public hearings that committees of the City Council conducted on the following dates that were recorded on video as a result of arrangements that the City Council made:

i.      4/27/17: General Welfare Committee. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=yT2sfbuWriiW. I addressed New York City Councilman Stephen Levin as I testified in that hearing. My testimony in that video begins at the elapsed time of 3 hours, 27 minutes, and one second and lasted until the elapsed time of 3 hours, 29 minutes, and 28 seconds.

ii.     6/14/17: Committee on Public Safety. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=YXl0VS6f0vsZ. I primarily addressed New York City Councilwoman Vanessa Gibson at the end of my testimony in that hearing as I then testified to her and others. My testimony in

that video begins at the elapsed time of 2 hours, 54 minutes, and 42 seconds
and lasted until the elapsed time of 3 hours, 58 minutes, and 28 seconds.

iii.    6/19/17: Committee on Oversight and Investigations. That video is available
on the Internet at
https://councilnyc.viebit.com/player.php?hash=mpfP5DcsXgf5. I testified
then to former New York City Councilman Vincent Gentile and former New
York City Councilwoman Elizabeth Crowley. My testimony in that video
begins at the elapsed time of 35 minutes and 19 seconds and lasted until the
elapsed time of 50 minutes, and 55 seconds.

iv.    6/27/17: General Welfare Committee. That video is available on the Internet
at https://councilnyc.viebit.com/player.php?hash=5dKD0m59T0oF. I testified
then to New York City Councilman Ben Kallos. My testimony in that video
begins at the elapsed time of 4 hours, 42 minutes, and 50 seconds and lasted
until the elapsed time of 4 hours, 51 minutes, and 37 seconds. I testified
during that hearing partly about the fact that I was being illegally prevented
from attending public forums that the Mayor had been conducting since
4/27/17 with other government officials.

v.    10/2/17: Committee on Veterans. That video is available on the Internet at
https://councilnyc.viebit.com/player.php?hash=iL2CQdQxyO6c. I testified
then to New York City Councilman Eric Ulrich. My testimony in that video
begins at the elapsed time of 2 hours, 8 minutes, and 3 seconds and lasted
until the elapsed time of 2 hours, 26 minutes, and 3 seconds. I also testified
during that hearing partly about the fact that I was being illegally prevented

from attending public forums that the Mayor had been conducting since 4/27/17 with other government officials.

vi.    10/16/17: Committee on Courts and Legal Services. That video is available on the Internet at https://councilnyc.viebit.com/player.php?hash=6D4LixzIe9Bs. I testified then to New York City Councilman Rory Lancman. My testimony in that video begins at the elapsed time of 2 hours, 43 minutes, and 4 seconds and lasted until the elapsed time of 2 hours, 26 minutes, and 3 seconds. I testified during that hearing partly about the fact that I was being illegally prevented from attending public forums that the Mayor had been conducting since 4/27/17 with other government officials. The next screenshot is from what appears at the elapsed time of 2 hours, 39 minutes, and 26 seconds in that 10/16/17 hearing as I testified about the fact that I was being illegally prevented from attending public town hall meetings and resource fair meetings that the Mayor had been conducting.



In response to that specific testimony about illegal acts and omissions against me at public forums, I reasonably expected Mr. Lancman to immediately directly or indirectly intervene on my behalf in some way that would ultimately cause that illegal practice to immediately stop. However, he unconscionably did nothing about that. The video recording of that 10/16/17 hearing also recorded Mr. Lancman on audio as I testified in it while Mr. Lancman was rude to me by answering a telephone call that he received instead of letting it go to voicemail and properly paying complete attention to my testimony. While I have testified in public hearings that the City Council has conducted in City Hall, I have observed Defendants Redmond, Mason, and other members of the Mayor's NYPD security detail as they conducted surveillance against me. Since the public hearings that the City Council

conducts are broadcast over the Internet on video in real-time as they are being conducted, all of the defendants in this action and others had the opportunity to watch my testimony in such public hearings before I attempted to attend the Mayor's 10/26/17 town hall.

f.      Additional clarification about matters that I intended to engage in whistleblowing about while attending such public forums that the Mayor conducted is readily apparent by the sum and substance of the conversations that I had with Marcia Kramer of CBS New York and Juliet Papa of 1010 WINS on 6/15/17 during a town hall meeting that CBS New York conducted in Corona in Queens that it recorded on video and is shown in a news report that is available on the Internet at

http://newyork.cbslocal.com/2017/06/15/queens-election-town-meeting/. Erin Durkin attended that town hall. During that town hall's video, I talked with Ms. Kramer and Ms. Juliet in Ms. Durkin's immediate presence during two separate periods and engaged in protected whistleblowing about a variety of matters while doing so. Such matters included whistleblowing that was about my having been illegally prevented from attending public town hall and resource fair meetings that the Mayor conducted on 4/27/17, 5/23/17, and 6/8/17. The periods in that video recording during which I talked with Ms. Kramer and Ms. Juliet were between the following elapsed times in that video:

  i.   **a)** 40 minutes and 22 seconds and **b)** 47 minutes and 17 seconds.

 ii.   **a)** 56 minutes and 33 seconds and **b)** 57 minutes and 45 seconds.

g.      Further clarification about matters that I intended to engage in whistleblowing about while attending such public forums that the Mayor conducted is readily apparent by the sum and substance of the conversations that I had with the following government

officials that were recorded on video and otherwise on audio:

    i.    3/15/17 and 7/18/17: With the Mayor during the town hall and resource fair

        meetings that he conducted on those dates. The next screenshot shows me as I

        began talking with the Mayor during the Mayor's 3/15/17 town hall that the

        Mayor's office arranged to be recorded on video that is available o the

        Internet at https://www.youtube.com/watch?v=i5LjWB2d2vc.  The screenshot

        corresponds to what appears in that video at the elapsed time of 2 hours, 1

        minute, and 18 seconds.



A whistleblower news censor in journalism named Michael Gartland attended

that meeting along with Defendants Stribula and Redmond. Paola Ruiz of the

Mayor's staff also attended that meeting. I talked with both Ms. Ruiz and Ms.

Stribula during that meeting and Ms. Stribula gave me her business card then.

While I talked with Ms. Ruiz during that meeting right after I finished talking

with the Mayor during it, I gave her a comment card that I was issued during that meeting. I wrote a list of issues and whistleblowing information on that card for which I sought assistance from the Mayor's office and never really received in response. I thereafter sent Ms. Stribula and Ms. Ruiz a detailed e-mail message on 3/16/17 at 10:54 pm that was partly against HRA and its business partners that include Urban and NTT. No one replied to that e-mail message. Instead, hindsight clearly suggests that I was illegally retaliated against by **a)** Ms. Stribula and other members of the Mayor's CAU that include Defendant Ringel and **b)** members of the Mayor's NYPD security detail that include Defendant Redmond in relation to my efforts to lawfully attend further public forums comprised of town hall meetings, resource fair meetings, and public hearings that the Mayor thereafter conducted with other government officials and the public in response to the protected whistleblowing that I engaged in through that 3/16/17 e-mail message. That e-mail message contained a large amount of entirely valid and protected whistleblowing information. I also sent that e-mail message then to others that included the following people as both courtesy-copy ("Cc") recipients and blind courtesy copy ("Bcc") recipients:

| # | Recipient Name | E-mail | Cc or Bcc? |
|---|---|---|---|
| 1 | ABC News | iwitness@abc.com, | Bcc |
| 2 | Madina Toure | mtoure@observer.com | Bcc |
| 3 | Yoav Gonen | ygonen@nypost.com | Bcc |
| 4 | Matthew Chayes | matthew.chayes@newsday.com | Bcc |
| 5 | Laura Nahmias | LNahmias@Politico.com | Bcc |
| 6 | Jeff C. Mays | jeffcmays@gmail.com | Bcc |
| 7 | Errol Louis | errol.louis@charter.com | Bcc |
| 8 | Paola Ruiz | pruiz@cityhall.nyc.gov | Cc |

| 9 | New York City Public Advocate's office | gethelp@pubadvocate.nyc.gov | Cc |
|---|---|---|---|
| 10 | Lourdes Rosado | lourdes.rosado@ag.ny.gov | Cc |
| 11 | Melissa Mark-Viverito | mmark-viverito@council.nyc.gov | Cc |

The next table contains additional information about some of those e-mail recipients.

| # | Recipient Name | Notes |
|---|---|---|
| 1 | Madina Toure | She then worked for a news organization named Observer and now works for Politico. She is a whistleblower news censor in journalism. |
| 2 | Yoav Gonen | He then worked for the New York Post and now works for a news organization named "The City". He is a whistleblower news censor in journalism. |
| 3 | Matthew Chayes | He works for Newsday and is a whistleblower news censor in journalism. |
| 4 | Laura Nahmias | She then worked for Politico and now works for New York Daily News. She is a whistleblower news censor in journalism. |
| 5 | Jeff C. Mays | He works for the New York Times and is a whistleblower news censor in journalism. |
| 6 | Errol Louis | He works for Spectrum News and is a whistleblower news censor in journalism. |
| 7 | Lourdes Rosado | She was then the head of the civil rights division of the New York State Attorney General's office. I previously met her on 3/13/17 and she gave me her business card then. |
| 8 | Melissa Mark-Viverito | She was then the Speaker of the City Council. I previously met her on 3/13/17 during the meeting in which I met both Ms. Rosado and Jeff C. Mays. |

The next screenshot shows me as I began talking with the Mayor during the

Mayor's 7/18/17 resource fair meeting that the Mayor's office arranged to be

recorded on video and illegally concealed from the public while the Mayor ran

for re-election as well as thereafter in spite of the fact that that video is a

public record. The Mayor's office temporarily provided me access to that

video recording in response to a FOIL demand that I submitted to it. A video

clip of that recording that I recorded is available on the Internet at

https://drive.google.com/open?id=1-

ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc.  The beginning of that video clip

corresponds to what appears in the video of the Mayor's 7/18/17 resource fair

at the elapsed time of 1 hour, 8 minutes, and 25 seconds. This screenshot is

from what appears in that video clip at the elapsed time of 1 minute and 31

seconds.  NYPD John Doe1 3/18/19 appears on the far-left in it as Mr. Banks,

the Mayor, and Jessica Ramos also appear in it. In addition to Mr. Gartland

and other whistleblower news censors in journalism who attended that

meeting, Gloria Pazmino attended it in her capacity as a whistleblower news

censor in journalism. All of them then sat within roughly 15 from where I then

talked with the Mayor. One of them was then clearly recording my

conversation with the Mayor on audio. Mr. Gartland then still worked for the

New York Post and now works for the New York Daily News. Ms. Pazmino

then worked for a news organization named Politico and now works for

Spectrum News.



ii.   6/26/17: With Defendant O'Neill at the New York City Bar Association that

arranged for the meeting in which I talked with him to be recorded on audio

that is available on the Internet at

http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/po

lice_commissioner_audio_2017-06-26.mp3. During that meeting, I had two

face-to-face conversations with Mr. O'Neill. My first conversation with him

during it extends from the elapsed time of **a)** 32 minutes and 38 seconds from

the beginning of that audio recording to **b)** 33 minutes and 36 seconds in that

recording. My second conversation with him then extends from the elapsed

time of **a)** 47 minutes and 4 seconds from the beginning of that recording to **b)**

49 minutes and 14 seconds. Numerous whistleblower news censors in

journalism attended that meeting. The next screenshot is from a video

recording that I recorded during that meeting that shows microphones that are

labeled with information that correspond to Pix11News, 1010Wins, NBC,

CBS New York, WCBS 880, ABC News, and NBC New York that confirms

that whistleblower news censors from those organizations attended that meeting.



iii.   10/3/17: With Defendant Vance, Jr. at the New York City Bar Association that arranged for the meeting in which I talked with him to be recorded on audio that is available on the Internet at http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3. My discussion with Mr. Vance, Jr. during that audio recording extends from the elapsed time of roughly 2 hours, 3 minutes, and 50 seconds to 2 hours, 5 minutes, and 11 seconds. Since

the microphones that were passed to the audience during that meeting were faulty, it is necessary to significantly amplify the volume of that audio recording to clearly hear much of what I then discussed with Mr. Vance, Jr. Defendant Byrne, Jr. is clearly heard in that audio recording as he stated "Viewpoint discrimination?" in a way that clearly suggested he wasn't' aware of what viewpoint discrimination entailed in spite of the fact that he was then the head of the NYPD's legal division. While talking with Defendants Vance, Jr. and Byrne, Jr. during that meeting, I specifically and clearly asked both of them to intervene on my behalf to end the NYPD's illegal practice of preventing me from attending public forums that the Mayor was conducting. In response, Mr. Vance, Jr. told me then that he wouldn't do so and didn't know if such acts against me violated any laws. When I immediately responded to that by telling him that my exclusion from such public forums constituted violations of federal criminal statutes, Mr. Vance, Jr. irrelevantly stated that he wasn't a federal prosecutor instead of agreeing to properly and promptly do his job partly by acting in compliance with 42 USC §1986, his Fourteenth Amendment affirmative legal duty as a law-enforcement official to intervene on my behalf to uphold my constitutional rights upon being apprised that they were being violated, and the constitutional oath that he took upon becoming an employee of the City of New York. When I talked with Mr. Byrne, Jr. during that meeting about the fact that members of the NYPD had been illegally preventing me from attending public forums that the Mayor had been conducting, he told me that I would have to keep reporting complaints

about that instead of similarly agreeing to uphold his legal duties as a law-enforcement official to properly and promptly intervene on my behalf to end the illegal acts and omissions that were being committed against me by members of the NYPD and members of the Mayor's staff that were causing me to be illegally barred from attending public forums that the Mayor was conducting with others. A whistleblower news censor for the New York Times named Joseph Goldstein attended that meeting at briefly talked with me at the end of that meeting around the same time that I talked with an average and arrogant civil rights attorney named Ron Kuby during that meeting as Mr. Kuby then told me that he would rather walk his dogs than provide me legal representation for the matters that my litigation against Defendant City concerns insofar as that concerns illegal acts and omissions that have been committed against me at public forums that the Mayor conducted with other government officials and members of the public.

iv.  10/13/17: With Defendant Shorris during a meeting that the New York Law School hosted while whistleblower news censors in journalism named Yoav Gonen, Ben Max, Matthew Chayes, and Jillian Jorgensen attended that meeting. Mr. Gonen then worked for the New York Post. He now works for a news organization named "The City". Ben Max runs a news organization named Gotham Gazette. Mr. Chayes works for Newsday. Ms. Jorgensen then worked for the New York Daily News and now works for Spectrum News. Mr. Shorris, Mr. Max, Mr. Chayes, Mr. Gonen, and Ms. Jorgensen appear from left to right in the next screenshot that is from a photograph that the New

York Law School arranged to be taken at the end of that meeting and is available on the New York Law School's web site.



The New York Law School recorded that meeting on video and that video is available on the Internet at

https://www.youtube.com/watch?v=ZEKi8skDT0c. The next screenshot is from the elapsed time of 37 minutes and 54 seconds in that video as I talked with Mr. Shorris during that meeting. This screenshot is from how I played back that video with its closed-captioning feature enabled.



NYPD security detail going to stop violating those rights particularly

This screenshot accurately reflects the fact that I then asked Mr. Shorris to tell me when the Mayor's NYPD security detail would stop violating my First Amendment right to attend public forums that the Mayor conducted as I cited the landmark and seminal court decision about viewpoint discrimination that the U.S. Supreme Court issued in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) as I then talked with Mr. Shorris. I also told Mr. Shorris during that conversation that **a)** I had just been illegally prevented from attending the Mayor's 10/12/17 town hall and **b)** Defendant Redmond was then both the defendant in a civil right lawsuit (I was then referring to *Sherrard v. City of New York*) and a member of the Mayor's NYPD security detail who illegally prevented me from attending public forums that the Mayor had been conducting. I also told Mr. Shorris during that conversation that I had previously attended a meeting on 12/16/16 that the New York Law School hosted in which Mr. Banks made false statements. I talked with Mr. Banks during that meeting and he lied to my face then about legal assistance

as a whistleblower news censor in journalism named Courtney Gross attended

that meeting. She works for Spectrum News. The New York Law School

arranged to have that 12/16/16 meeting to be recorded on video that is

available on the Internet at

https://www.youtube.com/watch?v=czkZh6cAVWY. My conversation with

Mr. Banks in that video begins at the elapsed time of 48 minutes and 40

seconds. The next screenshot is from the elapsed time of 48 minutes and 51

seconds as I addressed Mr. Banks and discreetly pointed out to him and that

meeting's audience that hindsight confirmed that he lied to my face on 3/1/16

at the Yale Club in Manhattan by having told me then that he would thereafter

try to get me some legal help that I never received and that he instead

fraudulently worked to be withheld from me. I played back that video with its

closed-captioning feature enabled. Mr. Banks also lied about additional

material matters of fact during that 12/16/16 that ultimately significantly

caused or contributed to the death of Robert Vargas on or about 8/11/17 in the

building in which I reside. Mr. Banks clearly stated during that 12/16/16

meeting that he and the Mayor were committed to controlling things that were

within their control. Mr. Vargas would likely still be both alive and a potential

witness of mine if Mr. Banks had been truthful about that remark by him on

12/16/16.



The next screenshot is from a photo of Courtney Gross that appears on the

New York Law School's web site that was taken of her during that 12/16/16

meeting with Mr. Banks.



22.     Further clarification about matters that I intended to engage in whistleblowing about while attending the Mayor's 10/26/17 town hall is readily apparent by the sum and substance of what I discussed during numerous 50-h hearings that I participated in prior to 10/26/17 with lawyers about entirely valid claims that I asserted against the City of New York and other defendants in this action that I was permitted to record on audio during most of those hearings. I had one such 50-h hearing on 10/19/17.

23.     Another matter that I intended to engage in whistleblowing about during the Mayor's 10/26/17 town hall concerned an application that I submitted on 10/18/17 to the New York State Supreme Court's Appellate Division's First Department to be granted immediate interim relief. Relief that I then sought to be immediately granted through that application was an issuance of an order by that court that would compel the City of New York to cause its personnel to stop illegally interfering with my constitutional rights to attend public forums that the Mayor conducted. Prior to denying that application on that date, I talked with Judge Richard T. Andrias of that court in the clerk's office of that courthouse on that date. He has since retired as a judge. He told me on 10/18/17 in that clerk's office that he wasn't sure if his court could possibly grant me the relief that I sought through that application and suggested that I might want to try commencing a federal lawsuit instead to be granted that relief. He also then directed personnel who were working in the rear right corner in that office to telephone the New York City Corporation Counsel to discuss my application. The next screenshot is from a draft e-mail message that I saved at 3:22 pm on 10/18/17 in which I recorded information about two people who are named Dan Ramos and Debbie Wolf who worked for that courthouse and witnessed my conversation with Judge Andrias in that clerk's office on 10/18/17.

Towaki Komatsu <Towaki_Komatsu@yahoo.com>   📁 Drafts - Yahoo!   October 18, 2017 at 3:22 PM

(No Subject)

Dan Ramos (supervising clerk)

Debbie Woll (court attorney for judge)

24.     I have no knowledge about whether such a telephone call was made by that courthouse's

personnel to the New York City Corporation Counsel in response to Judge Andrias' remarks in

that clerk's office about me and the illegal acts that had been committed against me prior to that

date that had been causing me to be barred from public forums that the Mayor had been

conducted and otherwise discriminated against in relation to my efforts to lawfully attend those

public forums in accordance with my constitutional rights. The primary reason why Judge

Andrias denied my application for interim relief about public forums that the Mayor had been

conducting was because no written notice was ever issued to me that informed me that I was

barred from them or that my attendance in regards to them would otherwise be restricted. A true

and accurate copy of the order that Judge Andrias issued on 10/18/17 in response to my

application to the New York State Supreme Court's Appellate Term's First Department for

interim relief appears within the annexed **Exhibit C**.

25.     I also intended to engage in whistleblowing during the Mayor's 10/26/17 town hall about

the fact that Jeffrey Mosczyc filed an affirmation on 10/19/17 in my ongoing HRA lawsuit after

he committed perjury in remarks that he expressed in that affirmation about material matters of

fact.

26.     I also intended to engage in whistleblowing during the Mayor's 10/26/17 town hall about

a meeting that I attended on 10/24/17 in which Jordan Dressler of HRA was part of a panel of

speakers that discussed tenants rights and legal assistance that is discussed next. That meeting

was conducted in Harlem at 527 West 125th Street. The panel of speakers at that meeting

included the following people:

    a.   Jordan Dressler of HRA. He is the head of its Office of Civil Justice that is
responsible or coordinating the provision of pro-bono and lost-cost legal
representation and legal assistance to New Yorkers for a variety of legal matters
through HRA's business partners that it funds for that purpose and refers people to in
order to have them undergo an intake meeting with such partners to determine
whether they will be provided such representation and/or assistance by them.

    b.   New York City Councilman Mark Levine.

    c.   Elsia Vasquez. She is the founder of a tenant advocacy organization named
P.A.'L.A.N.T.E. Harlem Inc.

    d.   Rodrigo Sánchez-Camus, who works for Northern Manhattan Improvement
Corporation ("NMIC") as its Legal Director.

27.    During that meeting, I recorded a video recording at 7:28 pm that is available on the

Internet at https://drive.google.com/open?id=1fIKkIA6KjevDPdUH2hPs20kIvw1IK3M of that

meeting's speakers.

28.    The next screenshot is from that video and shows Mr. Dressler, Mr. Levine, Mr. Sánchez-

Camus, and Ms. Vasquez from left to right.



29.     During that meeting, I talked with Mr. Sánchez-Camus about the fact that I received a notice via e-mail on 4/11/17 from someone named Adlin Adon from his organization while she was worked for it as a paralegal. I told him then that she expressed in that notice that NMIC wouldn't provide me legal assistance nor legal representation in the wake of my having met with her for a legal intake appointment to ascertain whether NMIC would provide me legal assistance or legal representation after I had been referred to it by HRA. I asked him then to better explain why I had been denied that assistance from his legal organization. He lied to me in response by claiming that his organization couldn't provide me legal representation nor legal assistance for the types of matters that I sought such legal representation or legal assistance. He did so in spite of the fact that one of the legal matters for which I sought such assistance from his organization was a housing matter pertaining to my housing in the Bronx. His organization provides legal representation and/or assistance for such matters in the Bronx.

30.     I also talked with Mr. Dressler during that meeting. While I talked with him then, he lied to me by telling me that HRA couldn't cause me to be provided pro-bono or low-cost legal assistance from HRA's business partners that it funds for the types of legal matters for which I sought to such assistance.  He told me that after the Mayor told me during the public town hall meeting that he conducted on 3/15/17 that was recorded on video that the City of New York could cause me to be provided pro-bono legal representation for wage-theft matters and HRA's Deputy General Counsel Ann Marie Scalia issued me a binding and fully-enforceable agreement dated 8/1/17 that lacked any disclaimer, caveat, and qualifying remark in an e-mail message that I received from her in which she explicitly stated that she and HRA would assist me in "any way possible". Ms. Scalia sent me that e-mail message in response to having been referred to me by Mr. Banks following face-to-face conversations that I had with him on 7/18/17 and 7/19/17

during the public town hall meeting and public resource fair meeting that he conducted with the Mayor on those dates while those were rare instances in which members of the Mayor's NYPD security detail, other members of the NYPD, and members of the Mayor's staff took a temporary break from committing criminal acts and omissions against me to briefly allow me to lawfully exercise my First Amendment right to attend those public forums.  Mr. Dressler was bound by the terms of the 8/1/17 binding and fully-enforceable agreement that Ms. Scalia issued to me to assist me in any way possible. New York City Charter §13-b and 18 NYCRR §352.23(a) jointly also obligated HRA to ensure that I had access to HRA's business partners that provide pro-bono legal representation and low-cost legal assistance represent or assist me with legal matters for which I sought such help largely to eliminate my need for further assistance from HRA. I also recall having talked with Ms. Vasquez during that meeting on 10/24/17 about widespread corruption in New York City's government. She agreed with me that such corruption existed and told me that no one was going to help me to contend with and overcome that. The information that I was told by those who I talked with during that meeting was all the more reason why I sought to attend the Mayor's 10/26/17 town hall meeting to engage in protected whistleblowing that would also be about the fact that HRA and its business partners weren't performing their legal and contractual duty to provide me pro-bono and/or low-cost legal assistance to meet my legal needs. Prior to attending that 10/24/17 meeting, Mr. Banks lied to my face on 4/11/17 in Staten Island about why I hadn't received such legal representation or legal assistance from HRA's business partners as NMIC was one of two organizations that he then lied to me about.

31.     I also intended to engage in whistleblowing during the Mayor's 10/26/17 town hall about the 50-h hearing that I participated in on 10/19/17 for entirely valid claims that I asserted against Defendant Redmond in response to him having been recorded on video as he illegally seized and

assaulted me on 7/25/17 in a subway station near City Hall below Broadway near Warren Street.

Mr. Redmond did so in retaliation for my having persisted in lawfully exercising my First

Amendment and Fourteenth Amendment rights in accordance with the MTA's rules in an area in

close proximity to the Mayor and a large group of whistleblower news censors in journalism that

included the following people while the Mayor conducted an illegal publicity stunt in a manner

and in an area in that subway station that flagrantly violated both the MTA's rules and the

constitutional rights that the public had in that subway station to not be obstructed in their ability

to freely assemble and otherwise move about in all public areas in that subway station:

| # | News Censor | Employer on 7/25/17 | Employer on 10/13/20 |
|---|---|---|---|
| 1 | Matthew Chayes | Newsday | Newsday |
| 2 | Erin Durkin | New York Daily News | Politico |
| 3 | Josh Einiger | ABC News | ABC News |
| 4 | Michael Gartland | New York Post | New York Daily News |
| 5 | Mara Gay | Wall Street Journal | New York Times |
| 6 | David Goodman | New York Times | New York Times |
| 7 | Courtney Gross | Spectrum News | Spectrum News |
| 8 | Noah Hurowitz | Unknown | Unknown |
| 9 | Jillian Jorgensen | New York Daily News | Spectrum News |
| 10 | Ben Max | Gotham Gazette | Gotham Gazette |
| 11 | Gloria Pazmino | Politico | Spectrum News |
| 12 | Marc Santia | NBC New York | Unknown |
| 13 | Shant Shahrigian | New York Daily News | New York Daily News |
| 14 | Madina Toure | Observer | Politico |
| 15 | Audrey Wachs | Unknown | Unknown |

32.     The publicity stunt that the Mayor then conducted in that subway station was illegal

partly because it was conducted right next to a staircase and in an area that illegally obstructed

and hindered the movements of the public as well as their right to assemble in the specific area in

which that publicity stunt was illegally conducted. Also, the Mayor illegally used a microphone

during that publicity stunt in violation of the MTA's rules. Members of the Mayor's NYPD also illegally caused a downtown subway train to be held in that subway station without any valid justification in spite of the fact that the Mayor has repeatedly stated that he does not control the MTA. Additionally, I sought to ask those who attended the Mayor's 10/26/17 town hall while attending it and while waiting to be granted access to it if they would be interested in reading the transcript that would be prepared from the 50-h hearing that I participated in against Defendant Redmond on 10/19/17. I sought to lawfully embarrass the Mayor, Mr. Redmond, and other members of the NYPD, and news censors in journalism while making those invitations during that town hall meeting and while waiting to be granted access to it. I sought to do so partly by sarcastically asking the Mayor, Mr. Redmond, and other members of the NYPD, and news censors in journalism if they would like to read that transcript and to precisely, honestly, and fully explain to everyone who attended that town hall meeting on the spot why they wouldn't want to do so. While asking such questions to them then, those questions and their responses would be recorded on video that was being broadcast over the Internet prior to the 2017 New York City general elections. Such questions and answers would allow the public to directly and indirectly fire the Mayor, his entire administration, everyone who was then a member of the City Council, and members of the NYPD directly and indirectly.

33.     Additional whistleblowing that I intended to engage in while attending the Mayor's 10/26/17 town hall concerned the lawsuit of _Sherrard v. City of New York_, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) that was commenced against Defendant Redmond before he committed perjury in relation to it about material matters during a deposition on 5/19/17 and as he testified at trial in it.

34.     Further whistleblowing that I intended to engage in while attending the Mayor's 10/16/17

town hall concerned the needs of other tenants who resided in the building in which I reside that is housing for military veterans that is subsidized by taxpayers and terribly mismanaged by Urban through a contract it has with HRA that has illegally shirked its legal duty to provide proper oversight of how Urban operates as the landlord of that building. Concerning this point, I intended to voluntarily serve as an advocate for the needs of such other tenants in that building while attending those public forums before Mr. Banks, Ann Marie Scalia of HRA, and Urban's personnel significantly caused or contributed to the death of one of those tenants that occurred on or about 8/11/17 by depriving him of an air conditioner in his apartment. His name is Robert Vargas. He was both a U.S. Marines and Army National Guard military veteran who had suffered from numerous strokes. I sent an e-mail message to Mr. Banks and Ms. Scalia on 8/3/20 in which I urged them to immediately cause an air conditioner to be installed in Mr. Vargas' apartment in the building in which I reside. Instead, members of the New York Fire Department broke open the front door to Mr. Vargas' apartment on 8/11/20 and discovered that Mr. Vargas had died in his apartment while there was no air conditioner installed in it. Prior to that date, I twice testified on Mr. Vargas' behalf during public hearings that the City Council conducted. Mr. Banks attended one of them as I testified about Mr. Vargas. Mr. Vargas' death occurred after I was viciously assaulted in the living room of my apartment on 7/2/16 that was largely due to HRA and Urban having illegally subjected me to a bait-and-switch fraud and forgery concerning a binding apartment lease agreement that I signed on 2/16/16 with Urban to be issued apartment 4C in the building in which I reside in its entirety instead of being a shared apartment. If not for that illegal bait-and-switch, I wouldn't have had my 7/2/16 assailant as my roommate because I wouldn't' have had any roommate in the apartment that I would otherwise have resided in within the building in which I reside. That 7/2/16 assault occurred after that assailant tried to assault me

on 5/12/16 in that same living room. I reported that attempted assault and actual assault to try to get my roommate immediately evicted from where I resided. However, that never happened because of criminal negligence by HRA and Urban's personnel that HRA has steadfastly illegally covered-up with Mr. Banks' knowledge and approval. This certainly was also a matter that I intended to engage in whistleblowing about during the Mayor's public forums to befit the public's interests in public safety as well as proper procurement and oversight practices.

**Facts about the Mayor's 10/26/17 town hall:**

35.     The next screenshot is from what appears in the Mayor's 10/26/17 town hall video at the elapsed time of 17 minutes and 43 seconds as I played back that video with the closed-captioning feature enabled. It confirms that the Mayor was then in the middle of telling the audience at that town hall that its members could meet with the other government officials who also attended that town hall at the end of that meeting within the room in which it was conducted to talk with them about whatever was on the minds of the members of the public who attended that town hall and that those government officials would stay there all night to talk with them, if necessary.



so all these good folks for any question
you don't get to ask or anything to

36.     By making such remarks then, the Mayor confirmed that town hall was a quorum that was comprised of senior government officials of his administration was present at that town hall and that they would be conducting public business during that meeting by being available for the audience members to talk with during that meeting. The Mayor's remarks then about that also confirmed that that meeting was mostly a traditional public forum because he explicitly stated that the members of the audience could meet with such senior government officials during that meeting to freely talk with them. That circumstance also largely caused him to be a sideshow and irrelevant during that meeting because the members of the audience weren't allowed to have a free-flowing discussion with him during that meeting in contrast to the free-flowing back and forth discussion that they could instead have with senior government officials of his administration at the end of that meeting that included Mr. Banks.

37.     On 10/26/17, I arrived sufficiently early and prior to 6:30 pm to the site of the Mayor's

10/26/17 town hall to be granted access to that town hall in accordance with my constitutional

rights and other applicable laws with respect to being able to attend that town hall from within

the room in which it would be conducted. Defendants in this action with whom I talked outside

of and in close proximity to the building that hosted that town hall shortly before it began in

regards to my efforts to lawfully attend that town hall included, but wasn't limited to the

following defendants in this action:

> Atcheson, Ringel, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17,
> NYPD John Doe2 10/26/17, James, and Lander

38.     As I discussed earlier, Defendant Atcheson illegally refused to issue me an admission

ticket that would enable me to attend the Mayor's 10/26/17 town hall as I lawfully waited in a

line prior to 6:55 pm on 10/26/17 with other members of the public next to the school that hosted

the Mayor's 10/26/17 town hall meeting to attend that public forum before I was illegally

coerced to leave that line. Ms. Atcheson's refusal to issue me that admission ticket on 10/26/17

violated my rights pursuant to the First Amendment, Fifth Amendment, Fourteenth Amendment,

and New York State's Open Meetings Law. Such a ticket was the functional equivalent of a

press credential that gives journalists access to areas where government officials are. In the

context of a public forum for which I have First Amendment rights of access, peaceful assembly,

expressive association, sharing and receiving information, petitioning for redress, I certainly had

a due process and equal protection right in having been issued an admission ticket by Ms.

Atcheson as well as a property interest in both that admission ticket and the corresponding

property interest in access to that town hall that the issuance of that ticket to me would confer

upon me.

39.     The next screenshot is from the elapsed time of 15 seconds in the video recording that I

recorded on 10/26/17 at 7:04 pm that has the filename of "IMG_2881.MOV" that I briefly discussed earlier in this complaint as I stood next to Defendant Ringel and a line of people that I had been lawfully waiting in earlier and illegally coerced to leave by him, Defendant Galante, and others that included other members of the NYPD as I sought to be granted access to the school that hosted the Mayor's 10/26/17 town hall in accordance with my rights pursuant to the First Amendment, Fourteenth Amendment, Fifth Amendment, and New York State's Open Meetings Law in order to lawfully attend the Mayor's 10/26/17 town hall from within the room in which it would be conducted as it would be conducted. Defendant Atcheson is shown on the far-left in this screenshot as she walked in the direction of where I then stood. Mr. Ringel's head is shown on the right. A member of the NYPD is a dark uniform is shown between Ms. Atchson and Mr. Ringel in this screenshot.



40.     The next screenshot is from the elapsed time of 18 seconds in the video recording that has the filename of "IMG_2881.MOV" that I discussed earlier in this complaint as I still stood next to Defendant Ringel and a line of people that I had been lawfully waiting in earlier to attend the Mayor's 10/26/17 town hall.



41.     A male member of the public is shown on the right in the preceding screenshot as he placed his belt in a plastic container shortly before he entered the school that hosted that meeting and underwent a security check that involved the use of a metal detector in the immediate presence of numerous members of the NYPD about which it's objectively reasonable to assume were armed with guns. This point is very significant largely because it naturally raises a key

question about why I was illegally prevented from attending that town hall meeting on account

of the fact that such security measures were in place then to check if people who sought to attend

that town hall possessed weapons with them at the time that they sought to gain entry to the

school that hosted that town hall meeting in order to attend it. While I stood in the area in which

I recorded that video, I told members of the public who were waiting in that line and being

granted access to that town hall that I was being illegally prevented from attending it and that I

was a whistleblower. I believe that I also asked some of them if they would be willing to try to

ask people who were running that event after they entered that school to attend that town hall

why I was being illegally barred from that public forum to try to have sufficient public pressure

exerted on those who were illegally preventing me from attending that town hall to relent and

allow me to attend that public forum.

42.     As I was being illegally prevented from attending from attending that town hall, some of

the members of the public that I apprised about that appeared to be stunned by that news

primarily because I was conducting myself in a lawful and calm manner that certainly didn't

justify such violations of my constitutional rights to have lawfully attended that town hall

meeting. Also, I talked with a couple of journalists as I was being illegally prevented from

attending that town hall meeting and shortly after it ended as I waited outside of the school that

hosted that town hall meeting largely to have such opportunities to meet journalists then and

apprise them of the fact that I was being illegally prevented from attending that town hall.

43.     The next screenshot is from the elapsed time of 1 second in a video recording that has the

filename of "IMG_2878.MOV" that I recorded on 10/26/17 at 6:55 pm as I stood in front of

Defendant Galante near the entrance to the school that hosted the Mayor's 10/26/17 town hall.

Defendant NYPD Officer John Doe2 10/26/17 then stood behind Mr. Galante, and Defendant

Ringel appears behind him on the right-side of that screenshot. That video recording is available

on the Internet at

https://drive.google.com/file/d/1ngHt2Bhbi_uSnBNuKrr_Z2lOcShBQxUs/view?usp=sharing.



44.    Mr. Galante told me around the time that I recorded that video that he received orders

that indicated that I was not to be allowed to attend the Mayor's 10/26/17 town hall. However, he

has a brain in his head as well as eyesight that he needed to properly use to realize that I was

conducting myself in an entirely lawful manner at the site of that town hall to disregard those orders because they were clearly unconstitutional on account of the clear fact that they violated my First Amendment and Fourteenth Amendment rights to attend that town hall meeting as well as NYPL §240.20 and his job as a member of the NYPD was to enforce applicable law instead of being an accomplice in violating it through his acts and omissions while illegally acting in concert with others for that purpose. For this reason, no qualified immunity exists in regards to the illegal acts and omissions by members of the NYPD that prevented me from attending the Mayor's 10/26/17 town hall. The left arm and back of Defendant NYPD Officer John Doe1 10/26/17 appear behind Mr. Galante's right shoulder in the preceding screenshot.

45.     The next screenshot is from the beginning of a video recording that has the filename of "IMG_2879.MOV" that I also recorded on 10/26/17 at 6:55 pm as I still stood in front of Defendant Galante. That video recording is available on the Internet at https://drive.google.com/file/d/1rsvni-sosTn3y75A-nTfT429CLWalU8U/view?usp=sharing. I'm clearly heard telling him then that I was asking him to get a NYPD Commanding Officer to come to where he and I then were. I was then referring to the fact that I sought to have such a senior ranking official to immediately come to where we were and enforce applicable law by overruling him and enabling me to attend the Mayor's 10/26/17 town hall. Mr. Galante refused to comply with my request. It clearly stands to reason that he could have arranged to have someone from the Legal Division of the NYPD to come to where we were then for that purpose. Two senior officials in the NYPD made deceitful remarks about this point in the last week in news reports. The following are remarks that are attributable to NYPD Commissioner Dermot Shea that appear in a news article that was written by Wes Parnell and is entitled "See it: NYPD Car Blasts Trump Endorsement From Loudspeaker" that the New York Daily News published

today on the Internet at https://www.nydailynews.com/news/crime/ny-nypd-car-blasts-trump-endorsement-brooklyn-20201025-2rh5tlm5tjcjbkjgzkdgpmg5ju-story.html

> "Law enforcement must remain apolitical, it is essential in our role to serve all New Yorkers regardless of any political beliefs," said Shea. "It is essential for New Yorkers to trust their police."

46.    The following are remarks that are attributable to NYPD Chief of Department Terence Monahan that appear in a news article that is entitled "NYPD Says Union's Trump Endorsement Won't Affect Enforcement" that a news organization named Hamodia published on 10/21/20 on the Internet at https://hamodia.com/2020/10/21/nypd-says-unions-trump-endorsement-wont-affect-enforcement/:

> ""When we put on this uniform, we are apolitical," Chief of Department Terence Monahan said. "We have no stance in one way or another.""

47.    Although the remarks attributable to NYPD Commissioner Shea are correct, I have personally and repeatedly fallen victim to the fact that Defendant Redmond and other members of the Mayor's NYPD security detail and other members of the NYPD act as dutiful and subservient cat's paws of the Mayor and the Mayor's staff much like a loyal dog. Such faithfulness to the Mayor by them instead of law-enforcement is the primary reason why I am asserting entirely valid legal claims in this action and others against the City of New York, members of the NYPD, and others that pertain to illegal acts and omissions that were committed against me at many public forums that the Mayor conducted with others. In short, the illegal acts and omissions that were committed against me that pertain to such public forums were politically-motivated to befit the Mayor's re-election aspirations in 2017 along with the job security interests of those who worked for him. That certainly wasn't being apolitical by the NYPD. That was instead flagrant violations of the Hatch Act through acts and omissions that constituted voter suppression, voter fraud, whistleblower retaliation, viewpoint discrimination,

and First Amendment retaliation.

48.     The next screenshot is from the elapsed time of 11 seconds in the video recording that has

the filename of "IMG_2880.MOV" that I recorded at 7:04 pm on 10/26/17 and is available on

the Internet at

https://drive.google.com/file/d/142zaaNwl855736kPHKDt_Q1aIfn9_k_P/view?usp=sharing. I

recorded that video as I stood next to Defendant Ringel near **a)** the entrance to the school that

hosted the Mayor's 10/26/17 town hall, **b)** Defendant NYPD Officer John Doe3 10/26/17, and **c)**

the line of people that I had been lawfully waiting in earlier to attend the Mayor's 10/26/17 town

hall. Defendant NYPD Officer John Doe3 10/26/17 is heard in that video as he gave direction s

to a member of the public to put his or her property in his or her bag prior to undergoing a

security check upon entering that school to attend that town hall. Also, a censor in journalism

who works as a camerawoman for Spectrum News seems to appear in the background in this

screenshot while a press credential appears to have then hung from her neck. I don't know her

name, but I know her hairstyle after having been in some of the same places with her a few

times. The back of Defendant Ringel's head is shown on the right in this screenshot. Defendant

NYPD John Doe3 10/26/17 appears on the left in this screenshot. Members of the public are seen

in this video as they walked toward the entrance of that school to attend that town hall in

violation of my Fourteenth Amendment due process and equal protection rights as well as my

First Amendment rights that include, but aren't limited to those that pertain to expressive

association, receiving information, assembly in a public forum, and expression.



49.     The video recording that has the filename of "IMG_2881.MOV" that I discussed earlier

in this complaint shows members of the public who were in line to attend the Mayor's 10/26/17

town hall and being assisted by the NYPD and others with being able to do so in violation of my

Fourteenth Amendment and First Amendment rights on account of the fact that I also registered

in advance to attend that town hall meeting and I arrived at that site before them to attend that

town hall and lined up to be granted access to it before they did. At the elapsed time of 5

seconds, I'm clearly heard stating the following pertinent remark as Defendant NYPD Officer

John Doe1 10/26/17 had the back of his head and his back shown in that video as I turned my camera to record both NYPD Officer John Doe3 and 10/26/17 and Defendant Ringel to indicate that all of them were involved then in violating my constitutional rights to attend that town hall through their acts and omissions:

"I'm taking video of people that are violating my civil rights right now."

50.     Right before the video recording that I just discussed ended, Defendant Atcheson is heard in it at the elapsed time of 17 seconds as she made the following remark to members of the public near me:

If you previously RS"

51.     I believe that she was then making a remark that was similar to the following:

If you previously RSVP-ed…"

52.     The next screenshot is from the elapsed time of 2 seconds in the video recording that has the filename of "IMG_2882.MOV" that I briefly discussed earlier in this complaint. I recorded that video as I stood near Defendants Redmond and NYPD Officer John Doe2 10/26/17 near the entrance to the school that hosted the Mayor's 10/26/17 town hall. Defendant Redmond appears on the left and Benjamin Kantor appears on the right. Mr. Kantor then worked for the Mayor's office as a photographer. I was standing on a public sidewalk that is a traditional public forum as I recorded these videos and the NYPD absolutely needed to have objectively justifiable grounds to have coerced me to move from the line that I was in on that sidewalk to attend the Mayor's town hall to somewhere else. The NYPD certainly didn't have any valid grounds for that. Defendant Redmond certainly was personally involved in preventing me from attending that town hall meeting just one day after he was among others who illegally prevented me from attending the Mayor's 10/25/17 resource fair meeting in Brooklyn. It is very probable that one of

the reasons why I was prevented from attending the Mayor's 10/26/17 town hall was to illegally prevent me from engaging in protected whistleblowing about the fact that I was illegally prevented from attending the Mayor's 10/25/17 resource fair. That is sufficient grounds to allow me to prevail with a viewpoint discrimination and First Amendment retaliation claim in this action I regards to the Mayor's 10/26/17 town hall.



53.     The next screenshot is from the elapsed time of 2 seconds in the video recording that has the filename of "IMG_2883.MOV". I recorded it on 10/26/17 at 7:37 pm and a copy of it is available on the Internet at

https://drive.google.com/file/d/1olnDPLhe15IU0CyfDUn1cQ4d6u7LSwIr/view?usp=sharing.

This screenshot shows Defendant NYPD Officer John Doe3 10/26/17 as he stood in front of

steps that led to the entrance to the school that hosted the Mayor's 10/26/17 town hall. That

video ends with Defendant Stribula partly shown as she walked toward him and that entrance.



54.     The next screenshot is from the elapsed time of 2 seconds in the video recording that has

the filename of "IMG_2884.MOV". I also recorded it on 10/26/17 at 7:37 pm and a copy of it is

available on the Internet at

https://drive.google.com/file/d/1OvRqHbRb3dkgoC7xRmvxpJV1z7BzJI7M/view?usp=sharing.

This screenshot shows Defendant NYPD Officer John Doe3 10/26/17 as he still stood in front of

steps that led to the entrance to the school that hosted the Mayor's 10/26/17 town hall. Defendant

Stribula and Defendant Mason also appear in it. Ms. Stribula appears on the left while looking to

her right and wearing eyeglasses. Defendant Mason appears at the top of the steps and on the

right shortly after he exited that school. He was then wearing a suit and tie. He was aware that I was illegally being prevented from attending that town hall meeting after he had most recently been among others on 10/12/17 as they illegally prevented me from attending a town hall meeting that the Mayor conducted in Manhattan.



55.    The next screenshot is from a screenshot that I took of date and time information that was shown on my cell phone at 8:33 pm on 10/26/17 to serve to remind me of the date and time when I had just talked with Defendant Letitia James face-to-face about the fact that I was being illegally prevented from attending that town hall meeting as she arrived to the site of that town hall and approached its entrance.  When I talked with her then, she told me that she would look

into that matter before she then entered that school. I have every reason to believe that she lied to my face about that. As New York City's Public Advocate, Ms. James had a clear, inherent, and ethical duty to have intervened on my behalf to try to enable me to attend that town hall.



56.     The next screenshot is of a draft version of an e-mail message that I saved at 8:35 pm on 10/26/17 that I used to remind myself of the time when **a)** I saw Defendant James arrive to the site of the Mayor's 10/26/17 town hall and **b)** Defendant Cruz left that area after he was among members of the NYPD who were illegally not intervening on my behalf to enable me to attend that town hall while he was aware that I was being prevented from attending it.

| Towaki Komatsu <Towaki_Komatsu@yahoo.com> | 🗋 Drafts - Yahoo! | October 26, 2017 at 8:35 PM |
| --- | --- | --- |
| (No Subject) | | |

8:30 pm

Public advocate arrives

Cruz leaves

57.     The next screenshot is from the elapsed time of 1 second in the video recording that has

the filename of "IMG_2888.MOV" that is available on the Internet at

https://drive.google.com/file/d/1Tpr7Rljg8zKxv8wgs7sVTILvKqO3Ykrx/view?usp=sharing. I

recorded that video at 9:45 pm on 10/26/17 as I stood next to Defendant Ioveno near the entrance

to the school that hosted the Mayor's 10/26/17 town hall. I recorded that video with his consent

shortly after he took a photograph with his cell phone of Defendant Redmond and I as we stood

in that immediate area in front of a truck and used my left middle finger in an unmistakable and

hilarious way to candidly express how I feel about the NYPD's criminal mob and how I felt

about the fact that Mr. Ioveno was illegally then not intervening on my behalf to enable me to

attend that town hall while he knew that I was conducting myself in an entirely lawful manner.

Mr. Redmond was then pretending that he and I were on amicable terms. We certainly weren't

because he was illegally preventing me from attending that town hall meeting after he similarly

and repeatedly violating my constitutional rights to attend public forums that the Mayor

conducted since 4/27/17. Part of one of Mr. Ioveno's hands is shown in that video at the very

beginning and someone is heard telling him goodbye as I recorded that video.



58.    The next screenshot is from the elapsed time of 1 second in the video recording that has

the filename of "IMG_2891.MOV" that is available on the Internet at

https://drive.google.com/file/d/1B08VLEcf8X4S_pchDYbrklfApiNmLgBk/view?usp=sharing. I

recorded that video at 10:47 pm on 10/26/17. Defendant de Blasio, members of his NYPD

security detail, and members of his staff are shown in it as they stood outside of an exit to the

school that hosted the Mayor's 10/26/17 town hall that was located in the rear of that school. I

walked to that area while thinking about calling out to the Mayor from a sufficient distance away as he left that school to apprise him of the fact that I had illegally been prevented from attending that town hall meeting, the public resource fair meeting that he conducted one day earlier, and additional public forums that he had been conducting. I thought about doing so then to record a video of him as I expected him to ignore me that I could use for a variety of purposes that include for use in litigation and to apprise voters and potential voters that he didn't represent their values to try to persuade a sufficient number of them directly and indirectly to belatedly fire him and his administration by the power of their votes in the 2017 New York City government elections. However, I decided not to call out to him then for that purpose mainly because I then stood in a residential area late at night and didn't want to bother those in homes nearby by loudly calling out to him.



59.     The next screenshot is from the elapsed time of 1 second in the video recording that has the filename of "IMG_2892.MOV" that is available on the Internet at

https://drive.google.com/file/d/1UNXY47vR4py-vI6UjAfoJC-_JytQPx7k/view?usp=sharing. I

recorded that video at 10:48 pm on 10/26/17. Eric Phillips is shown in that screenshot.



60.     On 10/26/17, Mr. Phillips was Bill de Blasio's mouthpiece as he worked for him as his

press secretary. Mr. Phillips walked past me on a sidewalk as I recorded that video as I asked

him facetiously if he had a good night before he disingenuously said to me, "How are you?" in

response while walking away. I'm heard in that video sarcastically answering his rhetorical

question by saying the following back to him:

        "Not good because you guys keep violating civil rights."

61.     I was referring to my civil rights by that remark and the fact that I was being illegally

prevented from attending public forums that the Mayor conducted. Although Mr. Phillips was

involved in that conspiracy, I don't currently have sufficient facts and evidence to assert entirely

valid claims against him for the illegal acts and omissions that were committed against me that

caused me to be prevented from attending the Mayor's 10/26/17 town hall.

62.     The next screenshot is of a draft e-mail message that I saved at 10:16 pm on 10/26/17 that

contains the e-mail address for a journalist named Marc Torrence who works for a news

organization named Patch. I saved that draft e-mail message shortly after I met him outside of

the school that hosted that town hall meeting and told him that I was illegally prevented from

attending that town hall.

| Towaki Komatsu <Towaki_Komatsu@yahoo.com> | 🗀 Drafts - Yahoo! | October 26, 2017 at 10:16 PM |
|---|---|---|
| (No Subject) | | |
| To: marc.torrence@patch.com | | |

63.     Mr. Torrence wrote a news article about what transpired during the Mayor's 10/26/17

town hall meeting as he didn't include any information about me in that news article. That news

article is entitled "10/24/2020 De Blasio Talks IDC, Schools, Housing At Park Slope Town Hall"

and is available on the Internet at https://patch.com/new-york/parkslope/bill-de-blasio-town-hall-

park-slope-live-updates. That article included a key photograph and was published on the

Internet after I talked with Mr. Torrence on 10/26/17. The next screenshot is from one of the

photographs that was included in that article. That photograph was taken on 10/26/17 of

members of the public as they were in line to be granted access to the school that hosted that

town hall.  As I was being illegally prevented from attending the Mayor's 10/26/17 town hall, I

mostly stood in an area that was closer to the entrance to the school that hosted that town hall

than what appears in the photograph from which this screenshot was created. Members of the

public who are shown in the photograph that this screenshot was created from likely witnessed

me being illegally barred from the Mayor's 10/26/17 town hall meeting. The entrance to the

school that hosted the Mayor's 10/26/17 town hall that was used to grant members of the public

access to that school to attend that town hall was located further to the right of what appears in

this screenshot.



64.     The preceding screenshot also confirms that the NYPD illegally had a metal barricade

setup on a public sidewalk at the same time that I was being illegally prevented from attending

the Mayor's 10/26/17 town hall meeting in flagrant violation of 18 U.S.C. §245(b)(5), 18 U.S.C.

§241, 18 U.S.C. §1513(e), 42 U.S.C. §1985, 42 U.S.C. §1986, 5 U.S.C. §1502(a), NYPL

§240.20, NYPL §240.26, NYPL §175.25, NYPL §240.65, NYPL §195.00, New York City

Charter §1116, and New York General Business Law §349. Having such barricades there

violated New York City Administrative Code §16-122(b) that states the following:

> "It shall be unlawful for any person, such person's agent or employee to leave, or to
> suffer or permit to be left, any box, barrel, bale of merchandise or other movable property

whether or not owned by such person, upon any marginal or public street or any public place, or to erect or cause to be erected thereon any shed, building or other obstruction."

65.     This discussion of Mr. Torrence and the fact that nothing was reported in the news about the fact that I was illegally barred from the Mayor's 10/26/17 town hall underscores the fact that journalism reporting in New York City is mostly a myth and the fact that those in journalism cannot be trusted to hold government officials and the NYPD properly accountable.

66.     While I was at the site of the Mayor's 10/26/17 town hall as it was being conducted and shortly before it began, I distributed literature that I prepared that contained protected whistleblowing information of public and private concern about different matters to members of the public as they waited in line to be granted access to the school that hosted that town hall. No one expressed any objection about my distribution of that material. Also, no member of the public at the site of that town hall expressed any objection to how I conducted myself while I was at the site of that town hall on 10/26/17.

67.     While I was at the site of that town hall meeting on 10/26/17, I recall that I had a conversation with a obnoxious member of the NYPD whose name and NYPD shield number I don't recall as he was dressed in a dark NYPD police uniform as he stood near other members of the NYPD in front of the entrance to the school that hosted that town hall near a curb. He was obnoxious during my conversation with him by making remarks to me in which he made it clear that in the event that a physical altercation occurred between us, he would certainly play to win that meant that he would try to dominate such a hypothetical confrontation. I believe that I told him then that I wouldn't hesitate to engage in legal self-defense if I was assaulted by anyone and that I would similarly try to dominate such a confrontation. What I meant to express to him and everyone else who was then within earshot of our conversation by those remarks of mine to him was that it would be advisable for him and everyone else to not provoke me in a way that would

authorize me to engage in legal self-defense against them because they would likely not enjoy the outcome of that, especially since there were many witnesses who were then present that were comprised of members of the public. I urge this Court to immediately order the City of New York to immediately provide me color photographs that show the faces of all members of the NYPD who were at the site of the Mayor's 10/26/17 town hall on 10/26/17 between 5:30 pm and 10:30 pm and stood in the immediate area of the entrance to the school that was used to host that town hall meeting that was used to grant members of the public access to it. I'm requesting this relief because I believe that I can identity additional defendants by photographs of how they appeared on 10/26/17 that I wish to use to add those people as additional defendants in this action for having illegally not attempted to intervene on my behalf to try to enable me to attend that town hall while they were then members of the NYPD who had a legal duty to have intervened on my behalf. I similarly urge this Court to immediately order the City of New York to immediately provide me all video recordings that were recorded between 5:30 pm and 10:30 pm at the site of that town hall meeting in that same area by video security cameras that were attached to the exterior of the school that hosted that town hall that most likely were controlled by the DOE and were required to have been preserved as evidence. . I similarly urge this Court to immediately order the City of New York to immediately provide me all video recordings that were recorded as well as photographs that were taken between 5:30 pm and 10:30 pm at the site of that town hall meeting in that same area by cell phones used by the members of the NYPD who were present in that area during that period.

68.     I recall that as Defendant Redmond and I stood near the entrance to the school that was used to grant members of the public access to it on 10/26/17 to attend the Mayor's 10/26/17 town hall, Mr. Redmond oddly mocked me somewhat as he suggested that I was way too uptight as he

made remarks to others nearby while he joked with them by making statements in which he

indicated that they needed to get me a girlfriend to alleviate stress I had. He made such remarks

about that between 5:30 pm and 10:30 pm. His remarks about that were totally unwarranted and

led me to instantly believe that he was likely someone who was cheating on his wife or his

girlfriend if he had one and that it was likely that many people in the NYPD that he worked with

similarly cheated on their wives and girlfriends because of inadequacies that Mr. Redmond and

his colleagues in the NYPD probably had. Mr. Redmond made such remarks about that in the

immediate area of where Mr. Ioveno took a photograph of us on 10/26/17 near that school.

69.     I also recall that it was a rather cold night as I waited outside of the school that hosted the

Mayor's 10/26/17 town hall on 10/26/17 as that town hall was being conducted. Due to how cold

it had become outside, I asked roughly two to three members of the NYPD who were wearing

dark police uniforms if they knew if there was a coffee shop nearby as I was thinking about

visiting one nearby temporarily to get a cup of coffee, get warm, and briefly wait while preparing

entirely valid complaints about the fact that I was being illegally barred from the Mayor's

10/26/17 town hall to submit to government agencies to try to arrange to have criminal

prosecutions immediately commenced against all who were responsible for that. Those who I

asked about that are certainly additional defendants that I wish to add in this action for having

illegally not tried to intervene on my behalf to enable me to attend the Mayor's 10/26/17 town

hall. I unfortunately don't know their names and NYPD shield numbers. I also don't have

photographs nor video recordings of them. They stood in the immediate area of where I

interacted with Defendant Galante on 10/26/17.

70.     As a result of having been illegally prevented from attending the Mayor's 10/26/17 town

hall, I became sick because of how cold it was outside as I waited outside of that school to try to

talk with journalists as they left that event after it ended. What follows shows an e-mail message that I sent on 10/31/17 at 9:37 am to someone named Silvana DeBellis and then worked for a law firm to apprise her that I needed to be granted an adjournment for a 50-h hearing that I was scheduled to participate in on that date with a member of that law firm for entirely valid claims that I asserted against Defendant City of New York and others that mainly concerned illegal acts and omissions that were committed against me that prevented me from attending the Mayor's 7/12/17 town hall meeting in the Bronx from within the room in which it was conducted as it was conducted. The reason why I needed that adjournment was because I fell sick with a flu that was caused by having waited outside in the cold on 10/26/17 as I was illegally prevented from attending the Mayor's 10/26/17 town hall. I recall that my nose was running as I was being illegally prevented from attending the Mayor's 10/26/17 town hall and waited next to the school that hosted that town hall.

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Rescheduling today's 10 am deposition due to illness
> **Date:** October 31, 2017 at 9:37:45 AM EDT
> **To:** sdebellis@adgrlaw.com
>
> Ms. DeBellis,
>
> This is Towaki Komatsu.
>
> I have a 10 am meeting with your office today for a deposition for claim number 2017PI021782.
>
> However, I am sick with the flu and am using medicine that makes me severely drowsy and causes it to be hard for me to concentrate adequately.
>
> As a result, I need to have this meeting postponed.
>
> Can you please reschedule this for tomorrow?
>
> Regards,

Towaki Komatsu

71.     Also, while I was being illegally prevented from attending the Mayor's 10/26/17 town

hall, I believe that I happened to meet Sal Albanese next to the school that was hosting that town

hall meeting. I believe that I told him then that I wasn't being allowed to attend that town hall

meeting and that he told me in response that he wasn't being allowed to attend that town hall

meeting either. Back then, he was competing against Defendant de Blasio to replace him as New

York City's Mayor. As I discuss in the "Legal Standards" section of this complaint, the Mayor's

10/26/17 town hall meeting could not legally have been conducted in the school in which it was

conducted if Mr. Albanese as well as all of the other political rivals of the Defendants de Blasio

and Lander in the 2017 New York City government elections hadn't been invited to participate

in that town hall meeting. I don't believe that all of those rivals received such invitations for that

town hall meeting.

72.     It's important to keep in mind that the 2017 New York City government elections were

conducted on 11/7/17 that as just 12 days after the Mayor's 10/26/17 town hall. The next

screenshot is from a Twitter posting that was posted on the Internet on 10/26/17 at 5:03 pm by a

Twitter account that has the username of "@GloriaPazmino" that is registered to a despicable

whistleblower news censor in journalism named Gloria Pazmino who works for a whistleblower

news censorship organization named Spectrum News. That Twitter posting is available on the

Internet at https://twitter.com/GloriaPazmino/status/923656479009370117 and the information it

contained served as a reminder that the Mayor was conducting a town hall meeting as a

campaign event on that date with Defendant Lander just 12 days before the 2017 New York City

government elections.



> **Gloria Pazmino**
> @GloriaPazmino
>
> We are 12 days from election day and @NYCMayor is having a town hall in his old Council district tonight alongside @bradlander.
>
> 5:03 PM · Oct 26, 2017 · TweetDeck

73.    The next screenshot is from a Twitter posting that was posted on the Internet on 10/26/17 at 6:47 pm by a Twitter account that has the username of "@SalAlbaneseNYC" and is registered to Mr. Albanese. That Twitter posting is available on the Internet at https://twitter.com/SalAlbaneseNYC/status/923682515537285125 and includes a photograph of Mr. Albanese as he stood next to the school that hosted the Mayor's 10/26/17 town hall presumably on 10/26/17 and prior to 6:47 pm as he met with members of the public and distributed flyers for his campaign to replace Defendant de Blasio as New York City's Mayor. The photograph in that Twitter posting confirms that he was then in an area that was located near where I was on 10/26/17 as I was being illegally prevented from attending the Mayor's 10/26/17 town hall partly by members of the NYPD's mob that Mr. Albanese oddly supports.



74.     On a related note, the United States Office of Special Counsel that deals with matters

pertaining to the federal Hatch Act issued an advisory notice dated 2/15/18 that is available on

the Internet at https://osc.gov/Documents/Hatch Act/Advisory Opinions/Federal/Candidate Visits

to Federal Agencies.pdf and provided guidance that addressed "activities relating to federal, state

and local political campaigns of candidates in partisan elections, including Presidential

candidates." That notice clearly identified town hall meetings, rallies, speeches, press

conferences, and "photo ops" or meet and greets as examples of campaign activities. That

advisory notice was issued by Ana Galindo-Marrone. She was then the Chief of the Hatch Act

Unit for the United States Office of Special Counsel. According to that standard, the Mayor's

10/26/17 town hall meeting was a campaign event just like all of the town hall meetings and

resource fair meeting that he had conducted since 4/27/17. Before that advisory notice was

issued, she and I were in direct contact via e-mail between July of 2019 and October of 2019 in

relation to entirely valid and sufficiently detailed complaints that I reported to her office about

flagrant violations of the Hatch Act (5 U.S.C. §1502(a)) by Defendant de Blasio, members of the

Mayor's office, and members of the Mayor's staff. However, I have no reason to believe that any

appropriate corrective action was taken in response to the information that I shared with her

office about that. The following is a relevant excerpt from an e-mail message that I received on

7/16/19 at 10:48 am from Ms. Galindo-Marrone that pertains to what I just discussed and was in

response to Hatch Act complaint that I submitted to her office against the Mayor, his NYPD

security detail, and members of the Mayor's CAU:

> **From:** "Marrone, Ana" <AMarrone@osc.gov>
> **Subject:** RE: Hatch Act complaint received
> **Date:** July 16, 2019 at 10:48:48 AM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> Dear Mr. Komatsu,
>
> You can send any additional evidence that supports your complaint to this email address.
>
> Kind regards,

Ana Galindo-Marrone
Chief, Hatch Act Unit
U.S. Office of Special Counsel
(202) 804-7084

75.     Also, less than 3 days after the Mayor's 10/26/17 town hall ended, I began preparing a

draft version of a complaint to commence a lawsuit against the City of New York, other

defendants in this action, and additional defendants that would partly be in response to the fact

that I was illegally prevented from attending the Mayor's 10/26/17 town hall. The following is a

relevant excerpt from that draft version of that complaint that corresponds to the illegal acts and

omissions that were committed against me on 10/26/17 in regards to my having been illegally

prevented from attending the Mayor's 10/26/17 town hall.

> "Plaintiff was illegally prevented from attending the public town hall meeting that the
> Mayor held on 10/26/17 in Brooklyn by Mr. Redmond, Ms. Stribula, and other members
> of the NYPD whose identities Plaintiff does not know. This occurred after Plaintiff
> arrived to the site of that meeting, waited in line to get inside, and presented a printed
> copy of his RSVP for that meeting. While trying to enter the building that hosted that
> meeting on that date, NYPD Detective Galante of the 78th Precinct told Plaintiff in front
> of that building that someone informed him that Plaintiff was not to be permitted to
> attend that meeting. Plaintiff was later told that Mr. Carrion had issued that order. Prior to
> leaving the site of that public town hall meeting, Plaintiff met New York City Public
> Advocate Leticia James there and informed her that he was illegally being prevented
> from attending that public meeting. Although she expressed to him that she would look
> into that matter, Plaintiff received no indication that she did. Plaintiff did not make any
> crude or offensive remarks or gestures in front of the building that hosted that public
> town hall meeting prior to a decision having been made to prevent Plaintiff from
> attending it."

76.     Also, I talked with Defendant Lander face-to-face as he arrived to the site of the Mayor's

10/26/17 town hall. I recall that I pointed out that I was being illegally prevented from attending

that public forum as I expected him to not accept such flagrant civil rights abuse while he would

be the moderator for that town hall meeting. He instead lied to me by telling me that there was

nothing that he could do about that. Contrary to his lie, he had the option of taking drastic

measures in response to what I just told him by boycotting that town hall meeting until those

who were preventing me from attending that public forum relented and allowed me to attend it.

He could have then used that town hall meeting partly to publicly and properly ostracize

everyone who was responsible for having illegally prevented me from attending that town hall

meeting and other public forums that the Mayor previously conducted. He could have told

everyone at that town hall meeting that he decided that he would take that town hall meeting to

me by asking everyone to leave the school that was hosting it to go outside to where I was to

resume having that town hall meeting then and there. Prior to 10/26/17, New York State

Assemblyman Andrew Hevesi similarly intervened on my behalf to enable me to enter the

building that hosted the Mayor's 6/8/17 town hall meeting in relation to observing how that town

hall meeting as Defendant Stribula and others illegally restricted my presence in that building to

an overflow room in which I observed how that town hall meeting was conducted in a different

area in that building on TV screens that were setup in that overflow room. As Mr. Hevesi left

that town hall meeting, I happened to meet him as he exited that building and apprised him of the

fact that I had illegally been prevented from attending that town hall meeting from within the

room in which it was conducted. He expressed surprise about that as he pointed out that he had

intervened on my behalf to enable me to enter that building to enable me to attend that town hall.

Before he entered that building to attend that town hall meeting, I happened to meet him as he

approached its entrance and apprised him of the fact that I was being illegally prevented from

entering that building to attend that town hall. A censor in journalism named Jon Cronin stood

net to Mr. Hevesi and I ask I talked with Mr. Hevesi as he exited that building about the fact that

I was illegally barred from attending that town hall from within the room in which he and the

Mayor conducted it. The sum and substance of the preceding discussion confirms that Defendant

Lander could have effectively and similarly intervened on my behalf to uphold my constitutional rights to have attended the Mayor's 10/26/17 town hall. Since Mr. Lander was then also a lawmaker, he had a clear, inherent, and ethical duty to have done so.  However, he opted to be a accomplice of those who illegally barred me from that public forum by unconscionably and willfully having chosen to not intervene on my behalf to enable me to attend that town hall meeting.

77.     Ms. Stribula acted as a criminal accomplice of those who were illegally preventing me from attending the Mayor's 10/26/17 town hall after she illegally prevented me from attending the Mayor's 10/12/17 town hall in Manhattan by having coerced me to leave the line in which I waited with other members of the public to be granted access to that town hall meeting.

78.     On 10/26/17, Defendant Ringel, Galante, and other members of the NYPD were personally involved in illegally coercing me to leave the line I lawfully waited in with other members of the public to be granted access to the Mayor's 10/26/17 town hall. I regrettably left that line in response to that threat. In hindsight, I should have stayed in that line and lawfully forced my way into that school to attend that town hall while lawfully engaging in self-defense against anyone and everyone who initiated physical contact with me to continue to violate my constitutional right to lawfully attend that town hall.

79.     All of the following defendants illegally refused to intervene on my behalf on 10/26/17 at the site of that town hall and otherwise simply didn't do so to enable me to attend that town hall as they acted in concert with Defendants Ringel, Carrion, Atcheson, Stribula, Redmond, and others to prevent me from attending that town hall as co-conspirators for that illegal scheme:

        Cruz, Ioveno, Mason, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD
        John Doe3 10/26/17, Letitia James, and Brad Lander

80.     All of the defendants that I just identified had a realistic opportunity to have intervened

on my behalf on 10/26/17 to enable me to attend that town hall. They also had a legal, ethical,

inherent, and affirmative duty to have then intervened on my behalf for that purpose that is

confirmed by what I discussed in the Legal Standards section about them and the jobs that they

then held. Through my remarks to them on 10/26/17 at the site of that town hall as well as

through their own ears and eyes with which they could and should have otherwise made

independent assessments about the illegal acts and omissions that were being perpetrated against

me in their immediate presence with respect to my efforts to lawfully attend that town hall,

sufficient information was available to all of those defendants to have spurred them to have

properly intervened on my behalf to attend that town hall. No one did so however as all of them

exhibited acceptance of that illegal practice against me. Instead, they allowed other members of

the public to attend that town hall who arrived to the site of that town hall after I did for that

purpose. That violated my Fourteenth Amendment due process and equal protection rights

largely because that was discriminatory against me.

81.     Through their illegal acts and omissions against me on 10/26/17, the defendants that my

10/26/17 claims concern illegally chilled my First Amendment right to expression as a speaker

during the Mayor's 10/26/17 town hall by preventing me from attending it as well as the public's

corresponding First Amendment right to receive information from speakers. That also illegally

chilled my First Amendment right to receive various information and resources that were made

available to those who attended that town hall by doing so. Those illegal acts and omissions

flagrantly violated my First Amendment right of assembly in a public forum as well as the

remainder of my constitutional rights that applied that that public forum and caused me

irreparable harm in that regard. That experience also caused me reputational harm,

embarrassment, humiliation, and enormous justifiable anger and stress largely as a result of

having been illegally prevented from attending that town hall. That experience also caused me reputational harm as well as enormous embarrassment, humiliation, and justifiable anger and stress largely as a result of having been illegally coerced to leave the line that I lawfully waited in with other members of the public to attend that town hall and thereafter prevented from attending that town hall. That subjected me to undue stigmatization.  A key but-for cause for that experience was egregiously negligent failure to train and supervise by Defendants Carrion, Redmond, O'Neill, de Blasio, Shorris. Byrne, Jr., Vance, Jr., and other defendants in this action who directly and indirectly supervised those who illegally prevented me from attending that town hall and coerced me to leave the line that I lawfully waited in.

82.      Also, no one ever made any remark to me on 10/26/17 at the site of the Mayor's 10/26/17 town hall meeting about the existence of buffer zones that were located near the buildings that hosted those public forums in which demonstrating and protest activities were not allowed. This is entirely true and accurate in spite of the fact that I don't regard how I conducted myself on those dates at those sites as having engaged in protesting and demonstrating. I was instead simply trying to lawfully exercise my constitutional rights in relation to attending that town hall meeting.

83.      To conclude this section, it's worthwhile to emphasize the material fact that the illegal acts and omissions that were committed against me by the defendants who were present at the site of the Mayor's 10/26/17 town hall meeting on 10/26/17 with respect to my efforts to lawfully attend that public forum weren't isolated illegal acts and omissions by them against me that occurred on just that date for that specific public forum. Instead, the table shown next identifies additional public forums since 4/27/17 that the Mayor and others conducted at which the defendants that my 10/26/17 claims concern committed very similar illegal acts and

omissions against me prior to 10/26/17 that among other things **a)** illegally prevented me from

attending those public forums altogether, **b)** caused me to be illegally segregated from the room

in which town hall meetings were conducted by being restricted to attending them from overflow

rooms, **c)** prevented me from attending press conferences that were open to the public to attend,

and **d)** caused me to be criminally assaulted, stalked, and harassed by them on a public sidewalk

that was adjacent to a building that hosted a public town hall meeting that the Mayor conducted

on the date it was conducted.

| # | Defendant | Summary of some of the illegal acts & omissions |
|---|---|---|
| 1 | Cruz | • Illegal exclusion from public town hall meetings, public resource fair meetings, and public hearings that the Mayor conducted:<br><br>7/12/17, 9/8/17, 9/14/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>4/27/17, 7/12/17, 8/30/17, 9/14/17 |
| 2 | Mason | • Illegal exclusion from public town hall meetings and resource fair meetings that the Mayor conducted:<br><br>9/14/17, 9/26/17, 9/28/17, 10/4/17, 10/12/17<br><br>• Illegal exclusion from a press conference that was open to the public:<br><br>10/3/17 at City Hall that involved a press conference that was conducted by people who pushed for reforming the NYPD.<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>9/14/17, 9/26/17, 9/28/17, 10/4/17, 10/12/17 |
| 3 | NYPD John Doe1 10/26/17 | • Illegal exclusion from public town hall meetings and resource fair meetings that the Mayor conducted:<br><br>9/28/17, 10/12/17, 10/18/17, 10/25/17 |

| | | |
|---|---|---|
| | | • Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as members of the Mayor's staff and other members of the NYPD violated them:<br><br>9/28/17, 10/12/17, 10/18/17, 10/25/17 |
| 4 | Redmond | • Illegal exclusion from public town hall meetings, resource fair meetings, and public press conferences that the Mayor conducted:<br><br>4/27/17, 7/25/17, 8/30/17, 10/25/17<br><br>• Illegal stalking, harassment, seizure, assault, detention, and restraint on and retaliation for First Amendment activities at a public press conference that the Mayor conducted:<br><br>7/25/17<br><br>• Illegal harassment, First Amendment retaliation, and ejection from a town hall that the Mayor conducted:<br><br>8/30/17<br><br>• Illegal failure to intervene to uphold my constitutional rights at public forums that the Mayor conducted as other members of the NYPD violated them:<br><br>5/23/17, 6/8/17, 7/12/17, 7/25/17, 9/14/17, 9/28/17, 10/25/17 |

## CAUSES OF ACTION

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.


**CLAIM #1:**   Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in _Dunn v. City of Fort Valley,_ No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3.      My right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was acknowledged the following remark that Judge Schofield expressed in the decision that she issued in _Gonzalez v. City of New York_, No. 14 Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016):

> "Two branches of First Amendment claims are relevant to the present case: (a) interference with the right to protest in a public forum and (b) retaliation for exercising First Amendment rights."

4.      More importantly, my right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was confirmed by the following excerpt from _Occupy Nashville v. Haslam_, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

> "a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. _See Dean,_ 354 F.3d at 551; _Galvin v. Hay,_ 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public forum.");** _**Childs v. Dekalb Cnty., Ga.,**_ **286 Fed.Appx. 687, 693-94 (11th Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public

property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech").”

(boldface formatting added for emphasis)

5.      Due to the facts and circumstances that I have discussed at length and with sufficient specificity in this pleading, I have decisively established that the Defendants identified above that this claim concerns were personally involved in having willfully, callously, and wantonly illegally violated my First Amendment rights in relation to my efforts to have attended the Mayor's 10/26/17 town hall.

6.      I have further established that the defendants that this claim concerns violated my First Amendment right of access to public records that were made available in the building that hosted the Mayor's 10/26/17 town hall that were made available strictly to the members of the public who were permitted to attend that town hall.

7.      Ms. Ramos is also liable for this cause of action due to her role as co-conspirator in that conspiracy as she illegally deceived Ms. Durkin on 6/28/17 and 6/29/17 in e-mail messages that she sent to Ms. Durkin about me and the illegal acts that continued to be illegally committed against me on 10/26/17 and prevented me from being able to lawfully attend the Mayor's 10/26/17 town hall. Ms. Ramos sent those e-mail messages to Ms. Durkin about me in furtherance of a fraudulent scheme to try to illegally cover-up such illegal acts and omissions that were committed against me. Relevant findings that support this assertion about Ms. Ramos' liability exist in the decisions that were issued in _US v. Blackmon_, 839 F.2d 900 (2d Cir. 1988), _Escalera v. Samaritan Village Men's Shelter_, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), _US v. Basey_, 816 F.2d 980 (5th Cir. 1987), _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995), _Pangburn v. Culbertson_, 200 F.3d 65 (2d Cir. 1999), and _Dunn v. City of Fort Valley,_ No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

**CLAIM #2:**   **First Amendment Retaliation, Viewpoint Discrimination,
and Standardless Discretion in Denying Access to a Public Forum**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #3:**                **Violations of the Fourth Amendment**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, Ramos,

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #4:**                **Violations of the Fifth Amendment**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Ramos)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #5:**              <u>**Violations of the Fourteenth Amendment**</u>
                          <u>**Substantive Due Process Rights**</u>

   (Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.        I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.        The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #6:**              <u>**Violations of Procedural Due Process**</u>

   (Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.        I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.        The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #7:**              <u>**Violations of the Fourteenth Amendment**</u>
                          <u>**Equal Protection Rights**</u>

   (Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.        I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.        The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #8:**               **Violations of the Fourteenth Amendment**
                    **Prohibitions Against Selective-Enforcement**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.       I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.       The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #9:**               **Failure to Intervene in Violation of the**
                    **Fourteenth Amendment**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.       I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.       The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #10:**               **Failure to Train and Supervise**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.       I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.       The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #11:**   **Violation of the New York State's Open Meetings Law**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #12:**                           **Abuse of Process**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #13:**                        **Deliberate Indifference**

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #14:**      <u>**Fraudulent Misrepresentation and Fraudulent Inducement**</u>

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #15:**      <u>**Violation of New York State General Business Law 349**</u>

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #16:**                         <u>**Negligence**</u>

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #17:**                    <u>**Municipal Liability**</u>

**(Against Defendant City of New York)**

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      Defendant City of New York is liable for this claim due to the information that I presented in this complaint.

**CLAIM #18:**      <u>**Intentional and Negligent Infliction of Emotional Distress**</u>

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #19:**           <u>**Conspiracy to Violate Civil Rights and**</u>
                              <u>**Cover-Up Such Abuse**</u>

(Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Ramos)

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.      The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #20:**                                    <u>**Unjust Enrichment**</u>

   (Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.       I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.       The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #21:**                                    <u>**Public and Private Nuisance**</u>

   (Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.       I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.       The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #22:**          <u>**Violations of the Hatch Act (see 5 U.S.C. §1502(a)(1))**</u>

   (Against Defendants City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

1.       I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.       The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

## DEMAND FOR A JURY TRIAL

1.      I demand a trial by jury in this action on each and every one of my damage claims.

## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me additional relief by:

1.      Causing this Court to exercise supplemental jurisdiction over K1, K3, K4, K5, K6, and K7 before then consolidating them with this action that will result in having this action to control how all of that litigation is conducted. This request stems from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2.      Empaneling a jury to hear and decide this case strictly on its merits.

3.      Granting me the following additional relief against the defendants individually and jointly:

   a.      Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

   b.      Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C. §1502(a)(1) that occurred partly by illegally:

    i.    Preventing whistleblowers from attending public forums that the Mayor conducted with them and were partly used as campaign events to attract various types of support from voters and prospective voters.

    ii.    Segregating and discriminating against whistleblowers at such public forums.

c.    Declaratory, injunctive, and equitable relief in accordance with findings expressed in _Capitol Records, Inc. v. Thomas-Rasset_, 692 F.3d 899 (8th Cir. 2012) through the issuance of an order that enjoins Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

d.    Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

    i.    Prohibits all members of the NYPD from deliberately making any physical contact with me while I am conducting myself in a lawful manner.

    ii.    Requires all members of the Mayor's NYPD security detail to not come within 10 feet from me while they are on-duty as members of the Mayor's NYPD security detail and I am conducting myself in a lawful manner, unless I explicitly grant consent for that to occur.

    iii.    Requires all members of the Mayor's CAU to not come within 10 feet from me while I am conducting myself in a lawful manner and they are on-duty as members of the Mayor's CAU, unless I explicitly grant consent for that to occur.

    iv.    Prohibits Defendant City's personnel from illegally interfering with my ability to attend public forums that the Mayor may conduct from within the room in which he does so as he does so.

    v.    Prohibits Defendant City's personnel from illegally interfering with the rights that

other people have to lawfully attend public forums that the Mayor conducts that

may allow others and I to exercise our First Amendment right to observe, hear,

and enjoy lawful speech and other expression that such people may engage in to

criticize the Mayor and others during them.

vi.   Prohibits Defendant City's personnel from illegally interfering with the First

Amendment and Fifth Amendment rights that people have to **a)** bring literature

and signs with them into rooms in which the Mayor conducts public forums, **b)**

lawfully distribute such literature during those meetings without disrupting those

meetings, **c)** distribute such literature and otherwise show it and signs in the

rooms in which the Mayor conducts such meetings before they begin and after

they end, and **d)** Keep such literature and signs with them as the Mayor conducts

such public forums.

vii.   Requires Defendant City to grant access to public forums that the Mayor conducts

inside of buildings based on the order in which members of the public line up

directly outside of those buildings shortly before those meetings begin to be

granted access to the room in which the Mayor conducts such public forums on

those dates.

viii.   Prohibits Defendant City from allowing its personnel to prevent members of the

public from attending public forums that the Mayor conducts inside of buildings

from within the rooms in which he does so while sufficient seating is available in

those rooms.

ix.   Orders Defendant City to immediately cause all members of the NYPD who are

present in areas where the Mayor conducts public town hall meetings, public

resource meetings, public hearings, and press conferences that the public may
observe to wear body-cameras that are always on and always recording both audio
and video recordings.

x.   Orders Defendant City of New York to provide all audio and video recordings
from such body-cameras in unedited and non-redacted form along with their audit
trail records to allow for an independent forensic analysis within 24 hours of any
adverse encounter that occurs between a) members of the public and b) the
members of the NYPD wearing those body-cameras.

xi.   Orders Defendant City to immediately a) cause clear audio recordings to be
recorded of all verbal communications that members of the NYPD have while
they are on-duty as members of the NYPD and present in areas where the Mayor
conducts public town hall meetings, public resource meetings, public hearings,
and press conferences that the public may observe.

xii.   Orders Defendant City of New York to provide all such audio recordings in
unedited and non-redacted form that includes information that identifies the date
and time when those recordings began to be recorded as well as the speakers
heard in those communications that are personnel of Defendant City within 24
hours of any adverse encounter that occurs between **a)** members of the public and
**b)** the members of the NYPD heard in those audio recordings while they are being
recorded.

xiii.   Orders Defendant City to immediately cause all other electronic communications
(such as e-mail messages, cell phone text messages, and encrypted
communications) that are engaged in by those who are part of the Mayor's NYPD

security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv.   Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv.   Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

1)   All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging accounts, and personal cell phone plans as well as by using computers and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are administered and/or controlled by Defendant City.

e.   Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

i.   Orders Defendant City to immediately cause the CCRB and DOI to be provided all video recordings within 24 hours after a complaint is reported to them about illegal acts and omissions that are committed by members of the NYPD and other

personnel of Defendant City that are recorded by video security cameras that Defendant City controls. This includes, but is not limited to illegal acts that are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

ii.   Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

iii.   Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the Mayor's 10/26/17 town hall and that they are prohibited from being employed by Defendant City again:

Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, Vance, Jr.

iv.   Orders the following defendants to immediately and fully reimburse the City of New York with pre-judgment and post-judgment interest for the total value of pay and benefits that they received that directly correspond to the length of time during which they were involved in the illegal acts and omissions that were committed against me in relation to my efforts to have lawfully attended the Mayor' 10/26/17 town hall:

Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason,

        Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17,
        NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill,
        Ramos, Shorris, Vance, Jr.

v.     Restrains Defendant City's personnel and agencies from continuing to commit
illegal acts and omissions against me that violate my rights, especially in all areas
that are public forums.

vi.    Restrains the City of New York from allowing the NYPD to provide more
security and law-enforcement that would benefit members of the press in public
forums and other public areas than what members of the NYPD extended to me
on 10/26/17 in relation to my efforts to attend the Mayor's 10/26/17 town hall
meeting on the grounds that such greater security and law-enforcement would
violate my Fourteenth Amendment rights that pertain to selective-enforcement,
equal protection, due process, and discrimination.

vii.   Declares that the ban that the Mayor announced that prohibits large gatherings of
people in New York City and protests from being conducted is overly broad,
pretextual, void, and unenforceable largely because it impermissibly violates core
First Amendment rights as well as Fifth Amendment and Fourteenth Amendment
rights that pertain to due process, selective-enforcement, equal protection, and
liberty.

viii.   Further declares that though it may possibly be advisable to wear a face mask in
New York City, no one is required to do so partly because **a)** members of the
NYPD are not themselves wearing face masks outside and **b)** doing so impedes
the flow of oxygen to healthy people and impermissibly infringes upon the First
Amendment rights that people have to engage in freedom of expression, such as

by having people see them smiling, expressing affection by kissing, being able to yawn without having to wear a face mask, and having other facial expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

     ix.    Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

f.    Declaratory relief by declaring that the Mayor's 10/26/17 town hall was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken in relation to that meeting are void pursuant to Section 107 of New York State's Public Officer Law because that town hall meeting was conducted in violation of New York State's Open Meetings Law.

g.    Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

     i.    Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that hosted the Mayor's 10/26/17 town hall meeting between the time when **a)** the first member of the public entered that building on 10/26/17 in relation to attending that town hall meeting and **b)** everyone who attended that town hall meeting exited that

building after it concluded on 10/26/17.

ii.   Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel in the areas where I interacted with the defendants on 10/26/17 at the site of the Mayor's 10/26/17 town hall meeting while they and/or others illegally prevented me from attending that town hall meeting through their illegal acts and omissions.

iii.   Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally:

1)   Prevented from attending the Mayor's 10/26/17 town hall meeting.

iv.   Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued to the members of the Mayor's staff, the Mayor's CAU, the members of the Mayor's NYPD security detail, and the other members of the NYPD who were assigned work to do in relation to the Mayor's 10/26/17 town hall meeting.

v.   Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 10/26/17 town hall meeting as well as the names and contact information for the journalists who attended that town hall meeting.

h.   Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/19/20 by all video security cameras that were installed in the school

and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on

that date between the times when the first member of the public was allowed into that school

for the purpose of attending that town hall until everyone who attended that town hall exited

that school.

i.      Compensation for all costs and attorney fees that are related to my pursuit of this civil

action.

j.      Equitable and injunctive relief that authorizes me and others that I may ask to help me

to paint, write, or draw any message or image of any size indefinitely throughout New York

City without needing pre-approval from anyone on any public street, sidewalk, public

passageway, concourse, and park indefinitely by using resources that will be provided to me

by the City of New York for that purpose.

k.      Equitable and injunctive relief that orders the City of New York to cause its NYPD to

accord whatever messages and images that I may paint, write, or draw in public areas

throughout New York City to receive equal law-enforcement protection that is accorded to

Black Lives Matter signs on streets in New York City, especially the one located in front of

Trump Tower in Manhattan.

l.      An award of damages against the following defendants pursuant to 18 U.S.C. §1986

for having not intervened on my behalf in relation to my effort to have attended the Mayor's

he Mayor's 10/26/17 town hall meeting:

> The City of New York, Atcheson, Carrion, Ringel, Stribula, Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, de Blasio, Byrne, Jr., James, Lander, O'Neill, Ramos, Shorris, Vance, Jr.)

m.      An award of damages against the following defendants pursuant to New York State

General Business Law §349 for deception in relation to my efforts to have attended the

Mayor's 10/26/17 town hall meeting with respect to how those defendants conducted themselves as criminal accomplices instead of the law-enforcement personnel that they technically were on 10/26/17:

> Cruz, Galante, Ioveno, Mason, Redmond, NYPD John Doe1 10/26/17, NYPD John Doe2 10/26/17, NYPD John Doe3 10/26/17, Byrne, Jr., O'Neill, Vance, Jr.

n.    An award of punitive damages for all of my claims set forth in this pleading.

o.    An award of pre-judgment and post-judgment interest.

p.    Declares that the Mayor's 10/26/17 town hall was illegally conducted inside of a public school.

q.    Equitable and injunctive relief that orders the City of New York to remove all obstructions from public sidewalks, public streets, public parks, and public concourses that include traditional public forums within 24 hours that the NYPD and Mayor's office has set up and otherwise allowed to exist on them and to not setup such obstructions again in such public areas nor otherwise allow them to exist on and in them without prior approval by this Court. The existence of such obstructions on sidewalks violates New York City Administrative Code §16-122(b). Also, such obstructions impermissibly infringe upon and otherwise burden the First Amendment rights that people have to lawfully walk, bicycle, and otherwise freely move about and congregate in such areas – especially on sidewalks and in parks that are traditional public forums – while some who seek to do so may have various disabilities that include blindness and physical ailments. Allowing such obstructions to exist on public sidewalks, in public streets, in public parks, and on public concourses in New York City is clearly inequitable and quite literally an insult to injury with respect to my claims in this action that largely concern illegal acts and omissions that were committed against me

while no pandemic existed in New York City that prevented me from lawfully attending public forums. It is patently inequitable to my countervailing interest and ability to lawfully exercise my constitutional rights on public sidewalks and in parks to be curtailed by the NYPD and Mayor's administration during the ongoing Coronavirus pandemic to accommodate such things as outdoor dining after the NYPD and Mayor's administration flagrantly, willfully, criminally, and repeatedly violated my constitutional rights to lawfully attend public forums inside of buildings that the Mayor and other government officials conducted. In the same way that I took a risk that I would be illegally prevented from lawfully attending such public forums that the Mayor conducted while no pandemic existed in New York City as I visited the sites where those public forums were conducted on the dates when they were conducted, the owners of restaurants and other businesses that would benefit by being able to expand their operations on public sidewalks and in public parks in New York City at the expense of my First Amendment, Fifth Amendment, and Fourteenth Amendment rights to freely make use of all areas on such public sidewalks and public parks that are traditional public forums took a risk that circumstances beyond their control would possibly arise that would materially and repeatedly disrupt their ability to operate their businesses. A reasonable, equitable, and creative accommodation may be made for owners of businesses that wish to conduct their operations outside by having this Court order the immediate bulldozing of City Hall; the NYPD headquarters, precincts, and training facilities, and Gracie Mansion to allow such businesses to promptly expand their operations on account of the fact that those locations have been the primary sanctuaries of mobsters dressed as government officials and members of the NYPD that committed illegal acts and omissions that rigged and stole the 2017 New York City government elections through voter

suppression, voter fraud, whistleblower retaliation, and terrorism that persists against New Yorkers.

r.       Equitable relief that will have this Court adopt the practice in _USA v. Donziger_, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this action concerns in response to criminal acts and omissions that they committed and/or condoned against me that are addressed in this complaint to remedy the fact that prosecutors have negligently refused to do so.

s.       Orders the City of New York to immediately implement a procedure by which all members of the public can obtain free, unedited, and non-redacted copies of all video recordings within 48 hours after they are recorded by video security cameras that are controlled by the NYPD that will begin in the next 7 calendar days for which the following relevant facts apply to befit the public's interest in government transparency, accountability, being accorded proper due process while testifying in public hearings and otherwise talking with government officials, and having a means with which to measure the extent to which **a)** due process is and isn't accorded to members of the public during such interactions members of the news media inappropriately and consistently censor those who testify in public hearings that aids and abets greater societal ills that include terrorism by the NYPD, voter suppression, whistleblower retaliation, viewpoint discrimination, and voter fraud:

  i.     Such video recordings to be made available to the public within 48 hours include those that are recorded inside of City Hall's building in all areas in which public hearings are conducted as well as all other public areas inside of City Hall's building.

  ii.    Such video recordings to be made available to the public within 48 hours

include those that are recorded by all video security cameras of those areas by video security cameras that are controlled by the NYPD.

iii.    Such video recordings to be made available to the public within 48 hours also include those that are recorded outside of and in the immediate vicinity of City Hall's building of the property of City Hall for all areas of that property.

iv.    Such video recordings to be made available to the public within 48 hours include those that are recorded by all video security cameras of the areas just discussed by video security cameras that are controlled by the NYPD.

v.    Such video recordings to be made available to the public within 48 hours also include those that are recorded of all areas of the sidewalks and other passageways and walkways that immediately surround City Hall's property.

vi.    Such video recordings to be made available to the public within 48 hours include those that are recorded by all video security cameras of the areas just discussed by video security cameras that are controlled by the NYPD.

vii.    Such video recordings to be made available to the public within 48 hours must be made available as types of video recordings that that have the file extension of ".mp4", ".avi", and ".mov" that can readily be played back on computers that run the operating systems for Windows and Macintosh computers without the need for special software to do so.

viii.    Such video recordings to be made available to the public within 48 hours must include information in them that show the date and time when they were recorded.

t.    Restrains the City of New York from transferring the NYPD's authority to issue and

revoke press credentials to another entity within Defendant City's government.

u.      Immediately revokes the NYPD's authority to issue and revoke press credentials and empowers me and a group of other whistleblowers who are independent of the influence of both **a)** Defendant City and **b)** alleged news organizations to act in the NYPD's place to determine who will and will not have press credentials issued to them as well as those who will have their existing press credentials revoked to befit the public's interest in transparency, government accountability, and inappropriate and complicit censorship by the press that aids and abets societal ills within an illegitimate, corrupt, and dysfunctional government.

v.      Declares that New York City has proven to be and remains an anarchist jurisdiction largely because of illegal acts and omissions that the defendants in this action criminally perpetrated in New York City in relation to the constitutional rights that people have to lawfully attend and participate in public forums in New York City.

w.      Declares that all restrictions that have been established in New York City by New York State Governor Andrew Cuomo. Defendant de Blasio, and the NYPD that restrict peaceful **a)** protesting and demonstrating activities outdoors and indoors and **b)** gatherings of people indoors and outdoors for other purposes that may possibly include obtaining information from witnesses and formulating plans to establish a class-action lawsuit against the City of New York in relation to this case and related litigation that I commenced impermissibly violate the First Amendment, are overly broad, is clear standardless discretion, are an unlawful prior restraint on First Amendment rights, are being selective-enforced in violation of the Fourteenth Amendment, and are void.

x.      Injunctive and equitable relief by ordering Defendant City to immediately provide me within 24 hours all "Unusual Occurrence Reports" and related reports that members of the

NYPD were required to complete in relation to their acts and omissions against me that caused and otherwise enabled me to have been prevented from attending the Mayor's 10/26/17 town hall meeting.

y.      Orders the City of New York to immediately close the buildings in which New York City's Housing Courts operate that the City of New York maintains until 60 days after the following occurs:

      i.      All New York City public libraries have fully re-opened to allow all members of the public to use the Internet access and other resources that such libraries make available that would be of benefit to pro se litigants who need Internet access and may not otherwise have that with which to:

          1)   Engage in legal research and prepare legal papers to properly prepare for legal proceedings assigned to New York City's housing courts.

          2)   Search for and apply for employment opportunities.

          3)   Stay abreast of news pertaining to the coronavirus and how best to take care of themselves, their families, and friends to stay healthy during the ongoing coronavirus pandemic.

          4)   Engage in research to make contingency plans about housing and other matters.

          5)   Stay abreast of news pertaining to upcoming government elections that directly impact their life.

z.      Such other, further, and different relief as the interests of justice and equity may require.

Dated:        New York, New York
              October 25, 2020


                                        From,


                                        s_/Towaki Komatsu


                                        *Plaintiff, Pro Se*
                                        802 Fairmount Pl., Apt. 4B
                                        Bronx, NY 10460
                                        (347) 872-1205
                                        Towaki_Komatsu@yahoo.com

# Exhibit A



## Council Member Brad Lander

with Borough President Eric L. Adams
U.S. Representative Nydia Velázquez
State Senator Jesse Hamilton
Assembly Member Jo Anne Simon
present

# WORKING FOR **COUNCIL DISTRICT 39**



# TOWN HALL

- with -

# Mayor Bill de Blasio

**THURSDAY,** October 26TH at 7:30pm

DOORS OPEN AT 6:30PM AND CLOSE AT 8:00PM

**FIRST COME, FIRST SERVED**

MS 51 - William Alexander Middle School
350 5th Avenue, Brooklyn, NY 11215
(Between 4th & 5th Streets)



TOWN HALL CO-SPONSORS
**BROOKLYN** Community Board **6 & 12**
**PARK SLOPE** Civic Council
**PARK SLOPE** Neighbors
**FIFTH AVENUE** Committee
**COBBLE HILL** Association

**Mayor's Community Affairs Unit**

## TO RSVP

**Visit:** www.nyc.gov/cd39townhall
**Email:** communityaffairs@cityhall.nyc.gov
**or Call:** (212) 788-7929

ACCESS PROVIDED:

Please contact us if you have any additional accessibility needs.



OverviewNewsMayor's BioOfficials

**Mayor's Community Affairs Unit**

**Bill de Blasio Mayor**

Thank you for your interest in our upcoming town hall with Mayor Bill de Blasio.

Please submit your registration information here, and you will receive a confirmation message when successfully registered.

Email*

Towaki  Komatsu@yahoo.com

Title

First Name*

Towaki

Last Name*

Komatsu

Address

Zip Code*

10460

Phone Number

Organization

Top Community Concern

Discrimination

Office of the Mayor | Overview | City of New York |                                           10/21/17, 3:09 PM



OverviewNewsMayor's BioOfficials

Thank you for your RSVPing for our upcoming mayoral town hall.  This
message will serve as confirmation of your registration.

Doors will open at 6pm and all seats are first come, first serve. Please arrive
early to ensure seat availability.

# <u>Exhibit B</u>

| | |
|---|---|
| **From:** | Stribula, Shauna |
| **Sent:** | Thursday, April 27, 2017 2:46 PM |
| **To:** | @CAU3; Gold, Jennifer; McCrayer, Jenika |
| **Subject:** | Updated Staff Plan |

**Staff Plan**
**CM Van Bramer 4/26 Town Hall**

**Load in:**

*Captains* are listed first and underlined.

*Outside*



- Amoy/Eden/Sadaf: Check In RSVP line
- Harold: Manage non-rsvp line

*Inside*

**During event:**

- Mic Runners Shift Teams:

# **Exhibit C**

# SUMMARY STATEMENT ON APPLICATION FOR
# EXPEDITED SERVICE AND/OR INTERIM RELIEF
### (SUBMITTED BY MOVING PARTY)

Date ___10/18/17___

Title of Matter: Towaki Komatsu v.    Index/Indict # __100054/2017__

New York City Human Resources  Administration

Appeal by __Petitioner__ from  order / judgment / decree  of  Supreme / Surrogate's / Family    County __New York__

Court entered on _August 21_ , 20 _17_

Name of Judge __Nancy Bannon__    Notice of Appeal filed on _____ _September 29_ , 20 _17_

If from  administrative determination, state agency  _New York City Human Resources Administration_

Nature of action or proceeding  __Hybrid article 78__

Provisions of  order / judgment / decree  appealed from  _____

This application by  appellant / respondent   is for _Due to the space constraints here, please refer to the attached sheet_

that is entitled "Interim Relief Sought."

If applying for a stay, state reason why requested  _____

Has any undertaking been posted __No__    If "yes", state amount and type_____

Has application been made to court below for this relief __Yes__    If yes, state Disposition __Denied__

Has there been any prior application herein in this court ____No____    If "yes", state dates and nature _____

Has adversary been advised of this application ____Yes____    Does he/she consent __I do not know__

| Attorney for Movant | Attorney for Opposition |
|---|---|
| Name Towaki Komatsu, Pro Se | Jeffrey Mosczyc |
| Address 802 Fairmount Place | 150 Greenwich St. |
| Apt. 4B | 38th Fl. |
| Bronx, NY 10460 | New York, NY 10007 |
| Tel. No. 718 - 450 - 6951 | 929 - 221 - 6558 |
| Appearing by | |

(Do not write below this line)

**DISPOSITION**

Interim stay denied, however, the Court takes no position as to any purported exclusion orders issued by any public or private entity. No such order or orders are before the Court.

Justice Richard T. Andrias   Date 10/18/17

Motion Date 11/24/17   Opposition 11/10/17   Reply 11/24/17

EXPEDITE _____ PHONE ATTORNEYS _____   DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.   _____ Court Attorney

serve motion papers + copy of this order

"Revised 02/01"